UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

THE HON. ANN L. AIKEN, JUDGE PRESIDING

UNITED STATES OF AMERICA,                )
                                         )
                        Government,      )
                                         )
            v.                           ) No. 06-60070-AA
                                         )
KEVIN TUBBS,                             )
                                         )
                        Defendant.       )
_____  )

REPORTER'S EXCERPT OF PROCEEDINGS

SENTENCING

EUGENE, OREGON

THURSDAY, MAY 24, 2007

PAGES 1 - 27

Kristi L. Anderson
Official Federal Reporter
United States Courthouse
405 East Eighth Avenue
Eugene, Oregon 97401
(541) 431-4112
Kristi_Anderson@ord.uscourts.gov

38

APPEARANCES OF COUNSEL:


FOR THE GOVERNMENT:    UNITED STATES ATTORNEY
                       BY:   KIRK ENGDALL, ESQ.
                       kirk.engdall@usdoj.gov
                       and   JOHN RAY, ESQ.
                       john.ray@usdoj.gov
                       405 East Eighth Avenue
                       Eugene, Oregon 97401
                       (541)465-6771


FOR THE GOVERNMENT:    UNITED STATES ATTORNEY
                       BY:   STEPHEN PEIFER, ESQ.
                       1000 SW Third Avenue, Suite 600
                       Portland, Oregon 97204-2902
                       (503)727-1044
                       steve.peifer@usdoj.gov

FOR THE DEFENDANT:     MARC P. FRIEDMAN
                       BY:   MARC P. FRIEDMAN, ESQ.
                       245 West 13th Avenue
                       P.O. Box 11167
                       Eugene, Oregon 97440
                       (541)686-4890
                       mpfriedma@yahoo.com


Also present:  Daniel Feiner

EXCERPT OF PROCEEDINGS

THURSDAY, MAY 24, 2007

THE COURT: What you may or may not be aware of is that in Portland, small SUVs are being burned while we are in this process. Whether they are related or not, it really just doesn't matter. What you started is a chain of events that gives people the understanding that there is this widespread issue, there is a concern, and the only way to get people's attention is to take radical action. So throughout the State of Oregon, back east, the calls that come in are identifying Oregon with a place where, when you don't like how things get done, you start fires.

And what about the air? If you cared about the environment, why burn all that was going up in the air and polluting the environment? Incredible thoughtlessness.

None of you were martyrs. None of you should be celebrated for what you did. All of you should be given the consequences of action and told there are other ways. You cannot take action on your own and damage people's property and the governmental process, period.

Your mother raised you to be better than that. And until you were arrested, I suspect she knew none of this. I'm not going to ask you whether you talked to her about it or not. But I strongly suspect that if you had stopped for five minutes and said, gosh, my mother, who took

in animals and strays and taught me to be caring, what would she think about what I'm doing, I suspect if you even asked yourself that question, you wouldn't be here today. And you are older than most of the people who will come before me. You knew better.

So after hearing everything today, I am simply struck by the differences in this sentencing from that of Mr. Meyerhoff. Mr. Meyerhoff, although denying the leadership role, fully and wholeheartedly accepted responsibility for his criminal behavior and condemned his prior action and those of his conspirators and expressed true remorse.

And I think you have attempted to do that today and I think you have made your best efforts. And I heard what you had to say. And I hope you are sincere. And like Mr. Meyerhoff, you too should be thankful that the government has been willing to offer and extend a negotiated resolution that does allow you to reenter the community and make amends.

They made a decision, they evaluated this case very carefully, and they concluded that there were consequences to extract, and, at the same time, when you came -- when you would have the opportunity to come back in the community, they saw something in you, or you convinced them that you will be a law abiding and contributing member

of this society.

That is the best message you can provide to future generations: It simply wasn't worth it. There are other ways to help people see a different path.

But I do have to note that given the considerable length and depth of your involvement in these crimes and the uncharged relevant conduct, that, contrary to the repeated attempts to minimize your participation, the facts just simply speak otherwise.

I just have to call to your attention, I sat here throughout the hearing thinking, hmm, Mr. Tubbs, you have pled guilty to these offenses. It was almost as though you were denying much involvement. And that struck me this morning as I listened to your lawyer talk on and on.

I would have been more impressed had you simply said, this is how it is. I will take responsibility. And this -- one way or the other, I understand what I did, you need to understand why I did it. It was foolish. I will take my punishment like an adult and move on. I was struck by there's still an attempt to minimize or to sort of hang on the fringe.

Regardless, I don't believe for one minute that you were an unwilling and passive participant in most of these crimes. It just, frankly, seems like you didn't want to get your hands dirty. Yes, you were often, if not

always, the lookout man. But you also had the van that was fraudulently registered in another's name during the conspiracy that facilitated the crimes, rendering it most convenient for you to be the driver and the lookout.

And I find your actions in obtaining the fraudulent documents to be clear evidence of more than just tagging along. In fact, I find that you were a facilitator and an organizer. You clearly identified the Childers Meat Company and Cavel West. You recruited others, Rebecca Rubin, and possibly funded Mr. Meyerhoff so that he could train others, and provided fraudulent identification to others. And you agreed to become involved on your own accord, knowing your actions were wrong, knowing they were illegal, and knowing there would be a price to pay if you were caught.

As with your conspirators, you planned and committed acts of arson to intimidate and frighten people into changing their conduct. You succeeded in one respect. You frightened people and made them feel less secure in their workplace and perhaps even their homes.

And, as you heard today, you even made lifelong forest service employees, people who are dedicated to public service, afraid to walk in the public forests. You destroyed their work, their possessions, and their sense of trust. And I find their appearance and words spoken today

to be particularly courageous. And to further highlight the cowardice of your actions, it makes me wonder whether others who were victimized have not spoken out for fear they might be targeted again.

As I said yesterday, fear and intimidation can play no part in changing the hearts and minds of people in a democracy. Let me say it again. Fear and intimidation can play no part in changing the hearts and minds of people in a democracy.

I reject the notion that many of your actions were motivated by a desire to improve the plight of animals and the environment. Evidence of the arson of the Oakridge Ranger Station committed after the efforts of legitimate environmental activists and attorneys who secured a legal halt to the logging at Warner Creek says that. You saw firsthand that lawful and positive action in support of environmental protection could make a difference, and yet you chose the act of arson and intimidation to further your own interests, whatever those were.

In fact, your actions and those of your conspirators branded proponents of environmental protection as dangerous and irrational, thus making it more difficult for those who attempt to achieve their goals through legitimate means.

As with your conspirators, your actions were

systematic, and you used fear and intimidation in an attempt to coerce others, including governmental employees trying to do their jobs and serve the public, into changing their behavior to achieve your goal.

Whether under the terrorism enhancement or an upward departure within my discretion, you must be held accountable for attempting to intimidate and retaliate against government agencies and private individuals and corporations.

Regardless of whether the target is private or a public entity, intimidation of one is equally reprehensible as the other. Everyone has a right to feel safe in their workplace, in their homes, and certainly within our public forests.

And contrary to your attorney's arguments, I do not need and need not rely on the government's characterizations of your actions to support my findings. Your actions speak for themselves. Any claim that your action at the Oakridge Ranger Station and the wild horse corrals were not in retaliation against government conduct simply belies credibility, as evidenced by the location and timing of your actions and the words of the communiques, not by any, quote, slant, unquote, that the government proposes.

How can you possibly claim that you were not attempting to influence or retaliate against the conduct of

government or others? The communiques express pride in destroying the, quote, horse murdering plant, unquote, and describe your efforts to halt the BLM's illegal and immoral business of rounding up wild horses from public lands and funneling them to slaughter. These actions are not attempts to raise public awareness.

Notably, I heard no mention that you began an awareness campaign to call attention to the inhumane treatment and slaughter of horses at Cavel West. You just thought torching the place would be more effective.

Concern for treatment of animals is commendable, and many people take many positive actions to protect animals. They volunteer at shelters. They rescue abused horses. They foster animals. They work for changes in the legislature. They try to raise awareness. They donate their money and their time. They do not commit arson.

Your attempt to shift the blame to Joseph Dibee for the Cavel West is as misguided as your attempt to shift the blame for the Oakridge Ranger Station to Jacob Ferguson. This court is -- this court is to believe that your involvement in significant arson activities that caused millions of dollars of damage, cost people their jobs and livelihood was just a coincidence? I don't think so. That you found yourself driving to these scenes without the knowledge of what was to occur? I don't think so. Even

though you obtained a fraudulent registration for your van, presumably to avoid detection? That you were unaware of the motivation of others in the arson of Superior Lumber, Rock Springs, U.S. Forest Industries, after you, yourself, were involved in numerous arson activities? You portray yourself almost as a victim of your friends that you couldn't say no to. Yet you were involved in more arsons than almost any other conspirator. To coin a phrase, give me a break.

As Ms. Page concisely stated, your actions were dangerous, reckless, and stupid. You will need to earn and deserve Ms. Page's love and respect, because I can only imagine how stunned she was to learn of your past actions. And it is laudable that she is standing by you. But you still have to earn that trust and respect back.

I understand you felt and hoped that these criminal events were behind you and that you could move on. Unfortunately, the victims of your illegal actions were not so lucky. They still feel the effects of your selfishness, misguided and criminal acts.

It is troubling that even now at your sentencing, you choose, really, again, not to truly step up and just simply own up to your responsibility. I see you still as minimizing. And you blame it on the entreaties of others and your loneliness. However, over one year before the arson of other targets, you and you alone targeted a dairy,

constructed the incendiary device similar to those used in later arsons, and on Christmas Day, no less. Who can you blame for that action? The evidence shows that you were willing and able to take action on your own. The fact that Jacob Ferguson, or anyone else, encouraged you to do so does not lessen your responsibility or your culpability, and it is disheartening that you still fail to realize that.

So I'm going to walk through the guideline calculations.

I find the following guideline calculations apply to the offenses as grouped pursuant to 3D1.1.

Case No. 60-60070 [sic], Count 1, conspiracy.

Pursuant to guideline 3D1.2, conspiracy is grouped with the underlying substantive offense. Accordingly, the conspiracy count is grouped with the substantive offenses below.

Count 2, arson of the Oakridge fire station.

The base offense level for this offense is 6 with an upward adjustment of 15 levels for the amount of loss, and two levels for more than minimal planning.

Further, 844(f)(2) is enumerated as a federal crime of violence, regardless of the 2001 amendments to 2332b(g)(5)(B), and I find that the evidence clearly establishes that this offense created a substantial risk of harm, based on the size and location of the fire and the

individual who occasionally slept there. I further find that the offense was calculated to retaliate against government conduct, specifically, actions of the forest service in their management of forest lands. The temporal proximity to defendant's participation in the Warner Creek protest is significant. Therefore, a 12-level enhancement will apply, making the offense level of 35.

Count 3, arson of Cavel West.

The base offense level for this offense is 6, with an upward adjustment of 13 levels for amount of loss under 2B1.3(b)(1), and two levels for more than minimal planning under 2B1.3(b)(3).

I further find that the defendant played the role of organizer in identifying Cavel West as a target of arson, warranting a two-level upward departure -- upward adjustment.

The government contends that this offense qualifies for the terrorism enhancement because it was motivated to retaliate against the BLM's sale of wild horses to slaughterhouses. If arson of the BLM horse corrals had occurred first, I would have no problem finding that clear and convincing evidence supported such a motivation. However, those arsons occurred after Cavel West, and the communique issued after this offense referred to the arson itself and putting the, quote, horse murdering plant out of

business. Therefore, I find the government has not established that the offense was calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct, resulting in an offense level of 23.

Count 4, BLM Burns Wild Horse Facility.

The base offense level for this offense is 20.

Further, I find that the offense was calculated to influence, affect, or retaliate against government conduct, as evidenced by the communique issued afterwards describing the arson and horse release as efforts to stop the BLM's illegal and immoral practice of rounding up wild horses that eventually end up in the slaughterhouse.

The communique also states that the practice of grazing cattle on public lands must stop and encourages others to take action.

The only question is whether this court can consider this offense in violation of § 844(f)(1), a federal crime of terrorism, in light of the Patriot Act's 2001 amendment requiring that arson of government property must include a substantial risk of harm or death before it may be considered as a federal crime of terrorism.

It is difficult to find that there was a substantial risk of harm because of the remoteness of the corral and the fact that the fire was smoldering when

discovered. Thus, the sole issue is whether the 2001 amendments apply to this offense, even though the offense conduct was completed prior to the amendments.

In my opinion, I rejected defense counsel's argument that the amendments rendered the guidelines a, quote, revised edition.

I continue to reserve ruling on this issue, as defendant Thurston intends to submit further argument. Ultimately, whether this offense qualifies for the enhancement does not affect my sentencing determination in this case. Therefore, the offense level is 20.

Count 5, attempted arson of the U.S. Forest Industries.

The base offense level is 20.

The government maintains that this offense qualifies for the terrorism enhancement because the U.S. Forest Industries harvested timber from federal lands. However, the communique issued after this offense referenced the arson as, quote, retribution for all the wild forest animals -- wild forests and animals, unquote, and that it was, quote, payback and a warning, unquote, to greedy companies.

I find that clear and convincing evidence does not establish that the offense was calculated to influence or affect the conduct of government by intimidation or

coercion, or to retaliate against government conduct, resulting in an offense level, then, of 20.

Count 6, arson of Childers Meat Company.

The government agrees that this offense cannot be considered as a federal crime of terrorism. Therefore, I find that the base offense level is 6, with an upward adjustment of 13 levels for the amount of loss, and two levels for more than minimal planning, resulting in an offense level of 21.

Count 7, arson of the Eugene Police Department Public Safety Station.

Pursuant to 2K1.4(a)(2), the base offense level is 20.

Further, 18 U.S.C. § 844(i) is enumerated under 2332b(g)(5)(B), and based on the totality of the evidence, the only possible conclusion I can reach is that the defendant intended to retaliate against the conduct of government. Regardless of defendant's role, he is responsible for the conduct of others committed during the commission of this offense. Even if this offense does not qualify as a terrorism enhancement because of the location and nature of the intended target, a police substation, I would exercise my discretion to depart upward under 5K2.0. Therefore, the offense level is 32.

Count 8, arson of Superior Lumber.

The base offense level for this offense is 6, with an upward adjustment of 13 levels for amount of loss under 2B1.3(b)(1), and two levels for more than minimal planning under 2B1.3(b)(3).

The government contends that this offense qualifies for the terrorism enhancement because Superior Lumber harvested timber from federal lands.

However, the communique issued after this offense referenced Superior Lumber as, quote, a typical earth raper contributing to the ecological destruction of the northwest, unquote, and that the defendants hoped to, quote, see an escalation in tactics against capitalism and industry, unquote. It did not, however, mention any conduct of the government. Therefore, I find that the government has not established that the offense was calculated to influence or affect the conduct of government by intimidation, coercion, or to retaliate against government conduct, resulting in a base level offense of 21.

Counts 9 through 43, arson of Romania Chevrolet.

The base offense level for this offense is 6, with a 13-level upward adjustment for amount of loss, and a two-level upward departure for more than minimal planning. Further, 844(i) is enumerated as a federal crime of violence, and I find that the evidence clearly establishes that this offense was calculated to retaliate against

government conduct, specifically, the arrest and prosecution of Jeffrey Luers for arson at the very same location. Even though defendant served as a driver, he is responsible for the conduct of his coconspirators during the commission of this offense. Therefore, a 12-level enhancement will apply, and the total offense level is 33.

Counts 44 through 56, arson of Jefferson Poplar Farm.

The base level for this offense is 6, with a 13-level upward adjustment for an amount of loss, and two levels as an upward adjustment for more than minimal planning.

As I found with Mr. Meyerhoff, the statement in the communique reveals that the offense was intended to send a message to the government that legislation is ineffectual. As with the Romania Chevrolet offense, even though defendant did not participate in the actual offense, his relevant conduct includes the reasonably foreseeable actions of others taken during the commission of this offense. Thus, I find that the purpose of the offense was to influence or affect the conduct of government.

Because 18 U.S.C. § 844(i) is identified as a federal crime of terrorism, a 12-level upward departure applies. Regardless, even if this offense did not qualify for the enhancement, I would exercise my discretion under

United States Sentencing Guidelines 5K2.0 to depart upward. Therefore, the base level offense is 33.

Finally, I decline to impose the terrorism enhancement under the conspiracy count, given that I have imposed the enhancement or imposed upward departures based on group offenses.

Multiple count adjustment.

Pursuant to 3D1.4, the combined offense level for multiple counts is determined by taking the offense level applicable to the group with the highest offense level and increasing that offense level by a specific amount.  In this case, the group with the highest offense level is 35.  The offense levels of the remaining groups total four units, and the court must increase the offense level by four, resulting in a combined offense level of 39.

Upward departures.

Under the sentencing guidelines section 5K2.0, I have the discretion to depart where the guidelines do not adequately take into account aggravating circumstances of the offense conduct.  Here 3A1.4 does not adequately take into account the defendant's intent to frighten, intimidate, and coerce government and private individuals through his actions.

After the Childers Meat arson, the communique warned that the conspirators will continue to target these

operations and their insurance companies until they are out of business. These are powerful statements intended to coerce, frighten, and intimidate the owners of such businesses and the people who work there.

Likewise, the communiques after the Cavel West, Superior Lumber, U.S. Forest Industries, the Burns Wild Horse Corral arsons all described enjoyment or satisfaction in destroying property and encouraging or hoping that others would take similar actions.

Therefore, I exercise my discretion under 5K2.0 to depart upward by one level, resulting in a base offense level of 40. By upwardly departing only one level, I do not intend to minimize the nature of defendant's conduct. Rather, based on the grouping calculations, a one-level increase results in the same offense level had the terrorism enhancement applied.

Based on the agreements of the parties, the defendant will receive a three-level downward adjustment for acceptance of responsibility, resulting in an adjusted offense level of 37.

Criminal history category.

The defendant has 0 criminal history points, resulting in a criminal history category of I. However, under 3A1.4, the defendant's criminal history category is established at a VI.

Therefore, based on an offense level of 37 and a criminal history category of VI, the guidelines range is 360 months to life.

Do you have a motion, Mr. Engdall?

MR. ENGDALL: Yes, Your Honor.

The government would move for substantial assistance, a downward departure of 7 levels. I believe that gets us to a level 30, with a range of 168 to 210 months, and we would recommend he be sentenced at the low end of that range, 168 months.

THE COURT: In addition, I have the discretion to depart downward pursuant to 5K2.0 for mitigating circumstances not taken into account under the guidelines. Therefore, I find that defendant's cooperation warrants a one-level downward departure for -- taking the 8 to a 9 for a total and final offense level of 29, with an applicable guidelines range of 151 to 188 months.

In addition to all the material that I read, everything that has been said today, I have not only gone through and carefully, in an attempt to adequately address guidelines calculations that the court must make, I have also looked very carefully at all the consideration the court is to give 18 U.S.C. § 3553 regarding the nature and circumstances of these offenses; your own criminal history and your characteristics; the goals of sentencing, be it

punishment, deterrence, rehabilitation, or public safety; and other factors that I believe are important in fashioning a sentence that is reasonable but not greater than necessary for these offenses.

And I have to tell you, it is profoundly, palpably sad to know that this is yet about the second of eight -- or a total of ten, eight more days to sit in this courtroom and watch wasted minds, people damaged, the community debate skewered sideways, the costs of putting you in a facility, whether it's minimum, maximum, or something in between. It is incredibly depressing, when you could be out there practicing random acts of kindness that would have had a tremendous impact in the debate.

Can you imagine if you had started a fund and purchased those horses and used them in a therapeutic way with kids with handicapped disabilities? Could you imagine if you had gone out to Greenhill, they are in desperate need of help, and offered to participate with your band of merry friends to provide shelter for all the animals that are not cared for? Can you only imagine if you had gone out and educated people and purchased property and given it as a trust for generations to come? But instead, all these acts are destructive. It makes no sense.

And what strikes me is so many of you are smart people, and you had kind people in your life. Why couldn't

kindness be your guide? Why couldn't education be your tool? It's a question I will think about the rest of my time on this bench. Random acts of kindness. I only wish the communiques that were coming out now talked about, that's the way we go. Stop destroying the earth to get a message across. Care for the earth. Care for one another.

So, taking all that into account, with regard to Count 1, you are committed to the Bureau of Prisons for confinement for a period of 60 months.

With regard to Count 2 through 56, you are committed to the Bureau of Prisons for confinement for a period of 151 months to be served concurrent with the sentence imposed in Count 1 and with each other.

Now, Mr. Engdall, would you -- I looked, and I probably should have been able to quickly reference the restitution amount in your -- the slides, but I wasn't able to do that. The figure that I have is $10,652,533.

MR. ENGDALL: That is correct, Your Honor.

THE COURT: Is that the number?

MR. ENGDALL: We had an opportunity to visit with the parole and probation department, and that is an accurate figure. We'll accept that. Thank you.

THE COURT: All right.

You shall pay full restitution to the victims identified in the presentence report in the amount of

$10,652 -- $652,533, jointly and severally with the codefendant, Stanley Meyerhoff, Chelsea Gerlach, Joseph Dibee, Daniel Gerard McGowan, Josephine Overaker, Suzanne Savoie, Nathan Block, Joyanna Zacher, and I will waive interest.

I know that over time, this is -- this figure probably will never be paid. But for the rest of your life, if you truly want to rehabilitate yourself, you will pay every month, and you will pay whether you are obligated to or not to pay back the damage that you caused.

In addition, you will be required to serve a three-year term of supervised release subject to the standard conditions and supervision requirements adopted by this court and upon the following special conditions:

You shall cooperate in the collection of DNA as directed by the probation officer if required by law.

I will recite, again, the restitution. You are to pay full restitution to the victims identified in the presentence report in the amount of $10,652,533, jointly and severally with Stanislas Meyerhoff, Case No. 60-60078 [sic]; Chelsea Gerlach, 60-60079 [sic] and 60-60122 [sic]; Joseph Dibee, 60-60011 [sic]; Daniel Gerard McGowan, 60-60124 [sic]; Josephine Overaker, 60-60011 [sic]; Suzanne Savoie, 60-60080 [sic]; Nathan Block, 60-60123 [sic]; and Joyanna Zacher, 60-60126.

If there's an unpaid balance at the time that you are released from custody, it shall be paid at the maximum installment possible, but not less than $200 per month or 10% of gross income per month, whichever is greater.

You are prohibited from incurring new credit card charges or opening additional lines of credit without the approval of your probation officer.

You shall authorize release to the U.S. probation office any and all financial information by means of a release of financial information form or by any other appropriate means as directed by your probation officer.

Your employment shall be subject to approval by the probation officer.

You shall disclose all assets, liabilities to your probation officer, and you shall not transfer, sell, give away, or otherwise convey any asset with a fair market value in excess of $500 without approval of the probation officer.

You shall have no contact with individuals known to be or have been involved in the environmental or animal rights activism movement without approval of the court.

MR. FRIEDMAN: The only problem with that --

THE COURT: And I have read, because I hadn't just yet read Ms. Gerlach's statement and the arguments made by Mr. Weinerman on her behalf, that I don't have any problem if there's a submission of a list and they are well known

organizations that the court can have ready access to information and can -- I will not infringe on their First Amendment rights to participate to the extent they can be involved in the -- say, for example, the Sierra Club or generalized Audubon Society or those sorts of organizations. I will have some discretion.

And believe it or not, I intend to be here when all of you come out so that I can ensure that when you start over out in the community, we are paying attention and that you are contributing, not taking from this community.

Is that clear enough?

MR. FRIEDMAN: Definitely. That addresses it, Your Honor.

THE COURT: I'm not imposing a fine. I'm making the finding you don't have the financial resources, nor an appreciable earning ability to pay the fine.

You are required by statute to pay the fee assessment in the amount of $5,600.

You entered into a plea agreement which waives all or part of your appeal rights. If you wish to file a notice of appeal, you may do so. If you cannot afford to do so, contact the clerk's office. It will be done for you and done for free, but it must be done within ten days and will be governed by your plea agreement.

I don't recall seeing a recommendation for

placement. I will, on behalf of any defendant requesting the -- a letter, I will do letters regarding placement. And very frankly, I'm going to write strong language that each and every one of them should be put to work in programs providing education to those who are less fortunate.

MR. FRIEDMAN: With regard to placement, Your Honor, we would like to do a little bit of research and be able to advise the court within a week.

THE COURT: I don't have a problem with that. And I'm sorry. Mr. Purdue and Mr. Blasher would make themselves available if the probation office can be of any help, and I'm not certain any of us can, but you are more than welcome to call them.

Anything else? Did I miss anything, Mr. Engdall?

MR. ENGDALL: No, Your Honor. Thank you.

MR. FRIEDMAN: No, thank you.

THE COURT: Mr. Tubbs, good luck.

THE DEFENDANT: Thank you.

THE CLERK: Court is in recess.

*(The proceedings were concluded this 24th day of May, 2007.)*

I hereby certify that the foregoing is a true and correct transcript of the oral proceedings had in the above-entitled matter, to the best of my skill and ability, dated this 7th day of June, 2007.

_____
Kristi L. Anderson, Certified Realtime Reporter

