```
 1               UNITED STATES DISTRICT COURT

 2                    DISTRICT OF OREGON

 3

 4          THE HON. ANN L. AIKEN, JUDGE PRESIDING

 5

 6

 7  UNITED STATES OF AMERICA,          )
                                       )
 8                       Government,   )
                                       )
 9          v.                         )  No. 06-60070
                                       )
10  KEVIN TUBBS,                       )
                                       )
11                       Defendant.    )
    _____)
12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    EUGENE, OREGON

16

17              THURSDAY, MAY 24, 2007

18                   PAGES 1 - 160

19

20

21                       Kristi L. Anderson
                         Official Federal Reporter
22                       United States Courthouse
                         405 East Eighth Avenue
23                       Eugene, Oregon 97401
                         (541) 431-4112
24                       Kristi_Anderson@ord.uscourts.gov

25
```

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE GOVERNMENT:    UNITED STATES ATTORNEY
                             BY:  KIRK ENGDALL, ESQ.
 4                           kirk.engdall@usdoj.gov
                             and  JOHN RAY, ESQ.
 5                           john.ray@usdoj.gov
                             405 East Eighth Avenue
 6                           Eugene, Oregon 97401
                             (541)465-6771
 7
      FOR THE GOVERNMENT:    UNITED STATES ATTORNEY
 8                           BY:  STEPHEN PEIFER, ESQ.
                             1000 SW Third Avenue, Suite 600
 9                           Portland, Oregon 97204-2902
                             (503)727-1044
10                           steve.peifer@usdoj.gov

11    FOR THE DEFENDANT:     MARC P. FRIEDMAN
                             BY:  MARC P. FRIEDMAN, ESQ.
12                           245 West 13th Avenue
                             P.O. Box 11167
13                           Eugene, Oregon 97440
                             (541)686-4890
14
      Also present:  Daniel Feiner
15

16

17

18

19

20

21

22

23

24

25
```

1          PROCEEDINGS

2        THURSDAY, MAY 24, 2007

3          THE CLERK:  This is the time set for Criminal

4    06-60070, United States of America versus Kevin Tubbs,

5    imposition of sentence.

6          THE COURT:  Counsel, before we begin, I want to

7    tell you that I need to leave at about 10 minutes to 11:00.

8    I have a speaking engagement that's been long-standing,

9    probably close to nine months or a year, and that's just how

10   today needs to go.  So we'll just take a break from 11:00

11   to, I would say, 12:30, and then come back and I will take

12   an earlier -- a break earlier in the afternoon.  But that's

13   the schedule we need to have for today, so both sides should

14   planning accordingly.  All right?

15          Mr. Engdall.

16          MR. ENGDALL:  Good morning, Your Honor.  With the

17   court's permission, I would ask to be allowed to remain

18   seated during my presentation so I can run the PowerPoint

19   and also be heard.

20          THE COURT:  For all counsel, because of the

21   microphones, I have no difficulty with sitting.  You don't

22   have to ask permission.  That's fine.

23          MR. ENGDALL:  Thank you, Your Honor.

24          May it please the court, the government's

25   presentation this morning will include some brief opening

1   remarks by myself, obviously, and then we'll have a short
2   PowerPoint presentation which will highlight a little bit of
3   the defendant's background, some of his protest activities
4   at the 1995 Warner Creek protest where he met several of his
5   coconspirators.  There will be a brief overview of the
6   arsons in which he was a participant and a special emphasis
7   on the Cavel West arson.

8        Then at the conclusion of that PowerPoint
9   presentation, I will provide the court with the government's
10   rationale for its sentencing recommendation and make that
11   recommendation, also with argument for our sentencing
12   guidelines adjustments.

13        And at the conclusion of that, Your Honor, there
14   are two individuals, there are two forest service employees
15   who were working at the Oakridge Ranger Station at the time
16   of the arson.  They have requested to simply address the
17   court as victims in that particular arson.  So with the
18   court's permission, we would be asking to allow that to
19   occur.

20        That being said, my comments about the defendant
21   are that --
22             THE COURT:  Let me interrupt for just a minute.
23             MR. ENGDALL:  Oh.  Yes, Your Honor.
24             THE COURT:  I would just like to know what your
25   expectations are.  I'd like to make sure we are going to be

1    able to get this done today.  If we aren't, I'm going to
2    need to make some accommodations with other schedules.
3              MR. FRIEDMAN:  I'm confident, Your Honor, that we
4    will be able to finish today.  I may have one witness.  I
5    may decide not to call him.  And I have got a couple short
6    videos to show you, and I think there will be one
7    individual, one family member that will be speaking.  I
8    think our presentation probably will take about two hours,
9    two and a half hours at most.
10             So depending upon the amount of time that
11   Mr. Engdall takes, it may be appropriate to start
12   immediately or to start right after your break.
13             THE COURT:  Okay.  Go ahead.
14             MR. ENGDALL:  Thank you, Your Honor.
15             THE COURT:  Um-hmm.
16
17             MR. ENGDALL:  Kevin Tubbs was an active
18   participant in at least 14 arsons, and prior to becoming a
19   serial arsonist, he followed the path of civil disobedience
20   and simple assault as a PETA agent, PETA meaning People for
21   the Ethical Treatment of Animals.  He spent many days
22   dressed in animal costumes and provoked business executives
23   by throwing cat excrement and blocking their passage.
24                   (Reporter interrupted.)
25             MR. ENGDALL:  He spent many days dressed in animal

1     costumes and provoked business executives by throwing cat
2     excrement and blocking their passage.

3           His role throughout the conspiracy was not that of
4     a leader as defined in the sentencing guidelines section
5     3B1.1(a), but more of an organizer pursuant to section
6     3B1.1(c).

7           He could also be described as catalyst in the
8     conspiracy in that he very often participated -- excuse
9     me -- precipitated arsons by enlisting others to do the
10     heavy lifting.  He was also a facilitator.  According to
11     Stan Meyerhoff, while at the 2000 or 2001 E-LAW conference
12     in Eugene, Mr. Meyerhoff couldn't remember exactly which
13     one, Mr. Tubbs arranged for a meeting with Captain Paul
14     Watson of the Sea Shepard vessel, which at the time, Watson
15     provided Mr. Meyerhoff with a $1,000 in cash for supplies
16     that Meyerhoff understood would be used for his work -- to
17     continue his work as an arsonist.

18           Again in September of 2001, Mr. Tubbs and William
19     Rodgers provided Meyerhoff with another $1,000 and a police
20     scanner to travel to Minneapolis, Minnesota and instruct Ian
21     Wallace on how to build incendiary devices and how to plan
22     direct actions.

23           Throughout the conspiracy, Mr. Tubbs provided
24     equipment used in several of the arsons.  His van, two-way
25     radios, and police scanners were utilized in more than one.

1     He also researched targets by himself, completed

2     reconnaissance of the targets, and then would contact other

3     coconspirators and encourage them to join him in the action.

4     The Cavel West arson was such an action.

5         He also made himself available to assist others in

6     arsons.  He made certain that his role, however, was one in

7     which the least amount of risk would be required.  He was

8     generally the driver or the lookout for the coconspirators

9     who actually carried the fuel and the timers to the target.

10        While he was arguably the least courageous of the

11    arsonists, he offered the group other talents and other

12    services.  Kevin Tubbs made false and stolen identification

13    documents available to Family members during the life of the

14    conspiracy and kept stolen identification documents up until

15    the time of his arrest.

16        He told investigators that he found two pieces of

17    identification for a Mr. Kevin Golitz, G-O-L-I-T-Z, that he

18    kept from May 7th, 1998, when it was obtained by using a

19    death certificate and request from the State of California.

20    He kept that until the day of his arrest some seven years

21    later.

22        He would also steal driver's licenses that were

23    accidentally left at his place of employment, which was an

24    adult bookstore in Springfield, Oregon.  He provided

25    coconspirator Darren Thurston with two of those driver's

1   licenses.

2        When he was arrested, he was found in possession

3   with two other stolen Oregon driver's licenses.  When Darren

4   Thurston and Chelsea Gerlach were arrested, they too were in

5   possession of stolen documents, identification documents,

6   which they had received from Kevin Tubbs.  He not only

7   provided these identification documents to his

8   coconspirators, but used false identification to register

9   his own vehicle when it was used for arsons.  The van that

10   was used in the Cavel West arson was just such a vehicle.

11   It was registered by Mr. Tubbs under the name of

12   Ronald Calloway.

13        Kevin Tubbs claims that he completely withdrew

14   from all actions in late 2001.  While that may be factually

15   accurate, it's not the complete story.  Kevin Tubbs

16   initially told investigators the fraudulent and stolen

17   identification documents seized from him at the time of his

18   arrest were only artifacts in his past life.  Six months

19   later, he admitted that he had been keeping the documents in

20   case someone needed them for a direct action.  He may have

21   gone into retirement, but he remained ready to assist anyone

22   who wished to continue with, as he put it, direct actions.

23        On December 10th, 2004, Kevin Tubbs reminisced

24   with Jacob Ferguson during a consensual recording and stated

25   he was closer to some of his coconspirators than he was with

1  his own family. Tubbs remained in contact with his
2  coconspirators up until the time of his arrest, and that, in
3  fact, enabled the government informant to locate Stan
4  Meyerhoff, Chelsea Gerlach, Darren Thurston, and William
5  Rodgers. He maintained contact with Stan Meyerhoff and
6  visited with Meyerhoff in June and August 2005, only three
7  months before their arrests.

8        He kept in touch with the comings and goings of
9  Rebecca Rubin and was aware that she was routinely entering
10 illegally, illegally reentering the United States from
11 Canada. He had also been provided maps by Rebecca Rubin
12 which showed the pathway to enter the United States and
13 Canada by avoiding immigration inspection.

14       He maintained contact with Chelsea Gerlach and
15 Darren Thurston and visited with them in December of 2004,
16 he visited with Joseph Dibee in 2002, and he visited with
17 William Rodgers in 2005, a short time before his arrest.

18       Also, within weeks of the arrest of Mr. Tubbs and
19 William Rodgers, he told Jacob Ferguson where William
20 Rodgers was actually residing in Arizona. In August of
21 2004, Tubbs told Jacob Ferguson that he knew people in
22 Canada who would be willing to help coconspirators -- the
23 coconspirator and fugitive Josephine Overaker and help her
24 with money and safe haven.

25       Mr. Tubbs continued to be a true believer in the

1    methods of violence against the government. On March 22nd,
2    2005, only nine months before his arrest, he told
3    Jacob Ferguson that he believed the protestors who simply
4    locked themselves to the bridge at the Biscuit timber sale
5    protest in Southern Oregon weren't doing it properly. He
6    went on to say that a person such as himself should simply
7    lock himself to the bridge, and when law enforcement
8    arrives, he would blow himself up. He went on to say that
9    it would certainly garner more publicity, and that if you
10   loved your cause, you should be willing to die for it.

11          When discussing his life as an arsonist to
12   Jacob Ferguson, he expressed that some things in his life
13   were regrettable, but his participations in the arsons made
14   it all worth it. Up until his arrest, then, this defendant
15   remained a true believer in the ELF cause and ready to
16   continue with violent acts.

17          He did this knowing full well the personal anguish
18   uncontrolled fires can cause. In his sentencing memo, he
19   relates the story of his home catching on fire and the pain
20   and suffering he experienced when his own pets were injured
21   and killed. He, unlike Mr. Meyerhoff, understood the
22   inherent dangers of fire and the suffering that can result
23   from uncontrolled conflagrations.

24          With that in mind, I'd like to begin our
25   PowerPoint, Your Honor. This first slide just shows,

1    obviously, some photos of Mr. Tubbs throughout his life,

2    references the aliases that he used during the conspiracy,

3    Bob, Dog, and Ronald Calloway.

4              Thank you.  Next.

5              Here's his family and educational background.  He

6    is a -- his father is deceased in 1990.  He went to Humbolt

7    State University as an exchange student.  He got a

8    baccalaureate in fine arts in 1991.

9              His employment history.  When he was arrested, he

10   was still working at the Castle Megastore in Springfield,

11   Oregon.

12             Here's an arrest history that we have on him, and

13   I would like the court to note the shoplifting arrest that

14   occurred here in Springfield, Oregon, in December 2004.  It

15   indicates that he had police contact within a year of his

16   arrest.

17             This is where Kevin Tubbs really got to meet and

18   know some of the coconspirators of The Family, as we have

19   come to know the name.  He met Jacob Ferguson there,

20   Mr. Dibee, William Rodgers, Josephine Overaker, and Lacey

21   Phillabaum.

22             Next slide.

23             This slide, Your Honor, is a video clip that

24   was -- it's a snippet from an activist film entitled

25   *Pickaxe*.  And in this video clip, you will hear Kevin Tubbs

1   speaking and actually being a spokesperson on the film.   And
2   near the end of the snippet, you will hear him give
3   directions to others, which indicates that he had some sort
4   of, not supervisory role, but certainly some minor
5   leadership role.

6           (The videotape was played; not reported.)

7           MR. ENGDALL:   This obviously was a film made about
8   the Warner Creek protest and the individuals involved with
9   that.

10          The next slide shows us his first arson.  This was
11  a solo arson at the Dutch Girl Dairy here in Eugene, Oregon,
12  on Christmas Day, 1995.  Mr. Tubbs decided that he was going
13  to destroy some of the vehicles at that location.   He
14  spray-painted graffiti on the side of the vehicle. You can
15  see it says, "Dairy equals death, ALF."  He used three
16  devices.  He made those devices himself.  They were
17  two-liter bottles filled with accelerant, wrapped in duct
18  tape.  There were some matchsticks attached to the duct tape
19  adjacent to one of the bottles and an incense stick that he
20  lighted for the timer.  Three devices were used.  One failed
21  to function.  They were found by the -- I believe the
22  employees the next morning, by the employees the next
23  morning.  The arson loss as a result to the fire of the
24  trucks was slightly over $15,000.

25          The next slide is the Oakridge Ranger Station,

1   which, as we know, occurred October 30th, 1996, where the
2   forest service ranger station building was destroyed.  Two
3   devices were used.  The devices that were used in this
4   particular arson were one-gallon jugs filled with fuel with
5   a soaked sponge.  That sponge was soaked in -- in gasoline
6   and diesel mix.  You had matches attached to the sponge and
7   then a punk going down the matches which lit the sponge
8   which then caused the fuel in the one-gallon container to
9   burn.  This was his second arson.  It was also unpopular
10  with the local activists, so no claim was made.

11          Mr. Tubbs explained his role to the investigators
12  and said that more -- that prior to this arson that he was
13  approached by Mr. Ferguson and Ms. Overaker, and they simply
14  wanted a ride to the Oakridge Ranger Station.  He gave them
15  a ride, assuming that they were just going to go and
16  spray-paint graffiti on the building and leave.  He had been
17  to that building before.  He and Mr. Ferguson had been
18  involved in protests there and had glued locks.  He was
19  familiar with the building and with the area.

20          When the investigator spoke with Mr. Ferguson,
21  Mr. Ferguson had a different take on the facts of that
22  particular day.  Mr. Ferguson and Ms. Overaker had just
23  committed the Detroit Ranger Station attempted arson on the
24  building and completed arson on the vehicle.  They went over
25  to see Mr. Tubbs.  Mr. Ferguson and Mr. Tubbs were

1   acquainted.  And Mr. Ferguson explained to Mr. Tubbs what he
2   had done at the Oakridge Ranger Station, and Mr. Tubbs,
3   according to Mr. Ferguson, wanted to get in on the action,
4   was interested in it.  They talked about where they could
5   go.  They both knew the Detroit Ranger Station, and so they
6   decided that would be the target.  According to
7   Mr. Ferguson, Mr. Tubbs wanted to make the devices because
8   it was important to Mr. Tubbs that those devices would work
9   properly.

10         They gathered the materials.  Mr. Tubbs did, in
11  fact, construct the devices.  And then they, on the night of
12  October 30th, they drove to the Oakridge Ranger Station in
13  West Fir, Oregon, just west of Oakridge.

14         On their way there, they stopped at the side of
15  the road.  They put the fuel in the containers.  They put
16  the containers in backpacks, backpacks of Mr. Ferguson and
17  Ms. Overaker.  And then they drove to the Oakridge Ranger
18  Station.  Mr. Tubbs parked the vehicle north of the station
19  on a -- in a little side road or a spur and waited for
20  Mr. Ferguson and Ms. Overaker to complete the task.

21         They -- the two of them, Ferguson and Overaker,
22  went to the ranger station.  They went around to the back of
23  the ranger station, placed one of the devices in a Dumpster
24  there for recycling paper, and came around to the east side
25  of the building and placed one device there.  They ran back

1   across the road, got into the vehicle wherein which

2   Mr. Tubbs was waiting, and then they drove back to Eugene.

3           They stayed at Mr. Tubbs' house that night and

4   discovered that -- the next morning that the arson had been

5   successful.  They waited for a short period of time, and

6   then realized that the Eugene activist community was not at

7   all pleased with the burning of the ranger station.  This,

8   of course, was around the time of the Warner Creek timber

9   sale protest, and the activist community and the

10  environmentalists had been successful in their legal

11  argument to prevent the logging of that timber sale, and so

12  they believed that this -- this arson was unnecessary and a

13  clear provocation and detrimental to their efforts to work

14  in a lawful manner to gain the results of their cause.

15          I think the next slide actually is a -- yes.  This

16  is a statement by Tim Ream who was a member of the activist

17  community.  This is a clip from *Cascadia Live*, which was a

18  local television show.  Weekly television show.  This was a

19  TV broadcast that was made shortly after the Oakridge arson,

20  and it indicates how upset the legitimate activist community

21  was about the arson at Oakridge.

22          (The videotape played; not reported.)

23          MR. ENGDALL:  Next slide.

24          The next slide, Your Honor, shows two photographs.

25  The one on the left is the device that was similar to the

1  one that was used at the Oakridge Ranger Station. This
2  constructed device was never again used by this arsonist
3  cell, The Family. It's the one-gallon jug with the sponge
4  and the matches with the punk. The one on the right is, of
5  course, the one we just saw moments ago. It was the device
6  that Mr. Tubbs manufactured and created for that arson.

7        The reason why these slides are on here is because
8  the investigators asked Mr. Tubbs about the Oakridge Ranger
9  Station arson, and as I told you before, his story was that
10  he simply was a driver. And Mr. Ferguson advised the
11  investigators that Mr. Tubbs was actually the creator of the
12  devices.

13       Curiously enough, when he was asked to describe
14  the incendiary device that he made for the Echo Dairy arson,
15  Mr. Tubbs described specifically the device on the left-hand
16  side. He gave an exact description of the device that
17  Jacob Ferguson said that he -- that Mr. Tubbs had assembled
18  for the Oakridge Ranger Station.

19       We questioned the veracity of Mr. Tubbs'
20  statement, and based upon what Mr. Ferguson told us the
21  regarding the Oakridge Ranger Station and all the other
22  arsons that Mr. Ferguson was able to advise us about, it's
23  our belief that Mr. Tubbs, in fact, did create the devices
24  that were used at the Oakridge Ranger Station.

25       This is the Cavel West arson. This is

1    Mr. Tubbs -- I would say Mr. Tubbs' arson in that Mr. Tubbs
2    chose this target for the action.  He had seen an article in
3    a local newspaper, *The Register-Guard*, and learned that wild
4    horses were being rounded up from public lands and were
5    being slaughtered at the Cavel West horse meatpacking plant
6    in Redmond, Oregon.

7          A couple of months prior to the arson, he drove to
8    Redmond, Oregon, he tells us, with his dog.  He decided at
9    that time that this would be a good target.  He returned to
10   Eugene, Oregon.  He met with Jacob Ferguson and Joseph
11   Dibee, told them also about the target.  He invited them to
12   come see what he had seen, and all three went back to
13   Redmond and walked around the plant, trying to decide what
14   action could be done.  Mr. Dibee believed that it could be
15   burned by drilling large holes in the walls and pouring fuel
16   into the walls.

17         Once they returned to Eugene, they discussed what
18   type of manpower would be necessary and decided that more
19   people would be needed other than just those three.  It was
20   at that time that Joseph Dibee suggested that he would
21   recruit Jonathan Paul, and, in fact, that is what occurred.
22   Paul agreed to participate in the arson.  Jonathan Paul
23   contacted Jennifer Kolar to help Jonathan Paul, and Paul and
24   Kolar then went in to prepare the accelerant that was going
25   to be used.  This particular arson, they thought they would

1    use some homemade Napalm, and so Jonathan Paul and Jennifer
2    Kolar went around and got as many glycerine-based bars of
3    soap that they could.  They cut the soap into little pieces,
4    and they mixed it with the fuel mixture.  They call this
5    vegan Jello, which obviously was a blend of gasoline and
6    diesel.

7            It was Mr. Dibee's job to prepare the timing
8    device.  On the night of the arson, they drove -- they all
9    drove to Redmond, Oregon.  They had a predesignated staging
10   area where they parked, put on their dark clothing, their
11   masks, their gloves.  They did their radio checks.  They
12   also dug a hole at that location, so upon their return from
13   the arson, they would take off their clothing, put the
14   clothing into the hole, pour acid on the clothing, and cover
15   the clothing with dirt.  This was obviously to prevent
16   detection by law enforcement officers.

17           They did travel, then -- after they were prepared,
18   they traveled to Redmond, Oregon.  They parked at the
19   McDonald's restaurant parking lot where Mr. Tubbs had a
20   radio and a scanner.  He, as was typical for him, stayed
21   back away from the risky business, and the other individuals
22   approached the Cavel West meatpacking plant.

23           Mr. Dibee began to drill a hole in the wall of the
24   Cavel West meatpacking plant.  This was a concrete wall.  As
25   he drilled a hole, he would wait until the refrigeration

| | |
|---|---|
| 1 | units would go on so as to muffle the sound of his drill. |
| 2 | Once the hole was completed, he stuffed rags into the hole |
| 3 | and put a bucket of fuel under the rags and prepared the |
| 4 | timing device. |
| 5 | In the meantime, two other devices were placed in |
| 6 | and around the area, and as they were being placed, the |
| 7 | other devices were being placed, Mr. Dibee prepared the |
| 8 | timing device.  Well, the timing device preignited, and the |
| 9 | flames began.  He was almost burned.  He and Jennifer Kolar |
| 10 | called the signal to abort the arson.  It was heeded by the |
| 11 | other individuals, by Mr. Ferguson and Mr. Paul.  They ran |
| 12 | back to the van, got in the van, drove directly back to |
| 13 | their staging area.  They did, in fact, take off their dark |
| 14 | clothing and their masks and gloves and caps, put them in |
| 15 | the shallow hole that they dug.  They did, in fact, pour |
| 16 | acid on them, cover them with dirt, and returned to Eugene. |
| 17 | The loss as a result of this arson was over a |
| 18 | million dollars. |
| 19 | Next slide, please. |
| 20 | This slide just shows Mr. Tubbs' involvement.  He |
| 21 | selected the target, he invited the team members, he |
| 22 | assisted in planning in the attack and participated in the |
| 23 | arson. |
| 24 | Next slide. |
| 25 | Sign at Cavel West.  This is the -- an aerial |

1    photograph, Your Honor, of the plant prior to the arson,
2    itself. A series of buildings east of a railroad track. Up
3    to the top of the page is a railroad track. McDonald's
4    restaurant would be off the picture but over on the
5    left-hand side on the highway that runs directly through
6    Redmond, Oregon, Highway 97.

7    This is a photo, a video taken by a Redmond police
8    officer, another first responder photo similar to the one at
9    the Joe -- the Romania Chevrolet Truck Center. So this was
10   taken as the Redmond police officer was dispatched to a fire
11   alarm occurring at the Cavel West meatpacking plant.

12   There is no sound on this video.

13   That is the wall where the -- the device that
14   Mr. Dibee was working on that prematurely activated.

15   The next clip, Your Honor, shows the suppression
16   effort of the Redmond Fire Department.

17   Go ahead.

18   There also is no sound on this one, but I should
19   advise the court that this becomes significant because the
20   suppression effort required a vast amount of water, and as a
21   result of that, the Redmond water supply was jeopardized.
22   It used a considerable amount of the reservoir for the
23   city's water supply to finally suppress this arson.

24   Next slide.

25   This is the aftermath photo. This is an aerial

1  photo of the meatpacking plant. The fire that we saw from
2  the police officer's patrol vehicle occurred at the -- well,
3  on the right-hand side, there are two main burned-out hulks
4  of buildings. It's the one on the right-hand side. And if
5  you will look at the bottom portion of that, there's a white
6  wall with, it looks like, three windows, and to the left of
7  the three windows, the burn and char marks. That is the
8  location of the police officer's video.

9        Another shot of that. Again, the photograph on
10  the lower right-hand corner is the location of the
11  incendiary device placed by Mr. Dibee that preignited.

12        Next slide, please.

13        Close-up of that again. You will see the hole in
14  the wall on the right-hand photograph. Just below the hole
15  in the wall was found a pair of pliers, tools utilized by
16  the arsonists, by Mr. Dibee and Mr. Tubbs and the rest of
17  the conspirators of that particular arson.

18        Later, as -- as the fire was -- or the remainder
19  of the fire was being dug out, they found, actually, a drill
20  bit that was associated with the drill that Mr. Dibee had
21  used to drill that hole.

22        Next slide, please.

23        In the back side of the meatpacking plant there
24  was a shed. That is where one of the failed devices was
25  found. During the -- during the -- at the time of the

1   arson, there was actually an employee that lived in a nearby
2   building.  He was present at the time of the arson, or he
3   was in residence at that building the night of the arson.

4          I show -- the next slide, please -- the types of
5   devices that were located there.  There is a jug.  This has
6   the mechanical timer device, common mechanical kitchen clock
7   that was attached to a battery and to a lightbulb.  The
8   lightbulb had the glass taken off so that the bare filament
9   was exposed.  When the timer pushed two wires together when
10  it got to zero, the two wires reclosed the circuit, caused
11  electricity to flow from the nine-volt battery.  It would
12  turn on the lightbulb.  The lightbulb filament, being
13  exposed, would heat up.  The light bulb filament would touch
14  matches.  The matches were adjacent to a sponge soaked in
15  accelerant.  That sponge would burn and then cause the
16  melting and the burning of the accelerant in the one-gallon
17  jug.

18         Next slide.

19         This is a black bucket that was utilized by the
20  defendants at the time -- during the course of this
21  particular arson.  This is a bucket that contained vegan
22  Jello, and you can look at the bottom of that, black -- the
23  paint was scraped as if to stir that vegan Jello.  The
24  buckets were spray-painted black so that it would be more
25  difficult to detect.  Sometimes there was -- during the

1    course of this conspiracy, sometimes they were painted
2    black.  Sometimes they were just covered with black plastic
3    bags.  This -- the vegan Jello here was dumped out and
4    spread all around the area so that it would serve as an
5    additional fuel source for the device that we just observed,
6    and in the picture on the left-hand side, you can still see
7    the device under that piece of plywood.  So when that device
8    under the piece of plywood, had it activated, ignition would
9    have caused the vegan Jello to burn and caused the entire
10   shed to become engulfed in flames.

11          This is a photograph of the aftermath of the fire.
12   They had fuel storage tanks there.  They were not
13   jeopardized by the fire directly because of the successful
14   fire suppression effort of the Redmond Fire Department.  The
15   arrow in the lower right-hand corner indicates the fire
16   damage and how close it came to those fuel storage
17   facilities.

18          This is the communique that was issued as a result
19   of -- after the Cavel West arson, after it was determined
20   that there were no complaints by the activist community, and
21   presumably no one had been injured at that time.  And in
22   pertinent part, that communique reads, "The Animal
23   Liberation Front paid a visit to Cavel West horse murdering
24   plant."  They describe what they did there.  "Three
25   electrical timing incendiary devices that would bring a

1   screeching halt to what countless protests and
2   letter-writing campaigns could never stop."

3           So this was clearly an exasperated, desperate
4   attempt by these conspirators to do something because
5   legitimate means were not accomplishing their goals, so they
6   decided to burn down the Cavel West meatpacking plant.  It
7   also talks about the premature ignition, where it states,
8   "Unfortunately, as the battery was being connected to the
9   device at the refrigeration unit, a spark started and
10  started the entire area on fire."  This is significant, Your
11  Honor, I think, because not only were these arsons dangerous
12  to the businesses, dangerous to the people that lived at or
13  near those businesses, dangerous to the people that were
14  called upon to suppress those fires, they were dangerous to
15  these arsonists as well.  The arsonists were amateurs.  They
16  didn't know what dangers they were being -- they were
17  causing as a result of these devices, and the devices are
18  uncontrollable.  While they thought themselves to be
19  somewhat of an expert, they could go off at any time.  Even
20  the ones that we saw in shed that failed to ignite, with the
21  workers and the fire suppression effort going on, those
22  could have activated at any time.  They certainly put
23  everyone in the area in danger.

24          The last quote in the -- that we have highlighted
25  in this communique identifies the amount of damage that's

| | |
|---|---|
| 1 | been done and correctly states that the entire plant is |
| 2 | currently closed and out of operation.  In fact, that plant |
| 3 | was never opened again.  It was -- the business was closed. |
| 4 | The employees of that business lost their jobs and had to |
| 5 | find other work.  So it was devastating personally to the |
| 6 | employees, it was devastating to the business of the Cavel |
| 7 | West meatpacking plant, and devastating to the community for |
| 8 | the loss of jobs. |
| 9 | Next slide. |
| 10 | This is the BLM wild horse corral.  Mr. Tubbs was |
| 11 | there.  He, again, was the driver and lookout.  He had |
| 12 | radios, scanners.  This was a direct attack on the Bureau of |
| 13 | Land Management for their rounding up of wild horses off of |
| 14 | public lands.  This occurred November 30th, 1997, in Burns, |
| 15 | Oregon.  Five devices were used during the course of this |
| 16 | arson.  Two failed to function.  One of the devices that |
| 17 | failed to function was in a tractor, and that's in the upper |
| 18 | right-hand corner of our slide. |
| 19 | The people involved in this were obviously |
| 20 | Mr. Tubbs, Josephine Overaker, Rebecca Rubin, the deceased |
| 21 | William Rodgers, and Mr. Jacob Ferguson.  The lower |
| 22 | photograph clearly shows the aftermath and the devastation |
| 23 | of the fire.  The loss to this fire was $120,000. |
| 24 | The communique, in pertinent part, reads, "Efforts |
| 25 | to halt the BLM's illegal and immoral business of rounding |

1    up wild horses from public lands and funneling them to
2    slaughter."

3             This was a direct attack on the government, a
4    direct attack on the Bureau of Land Management and the
5    facility there in Burns, Oregon.

6             The second highlighted portion of this communique
7    reads, "The practice of rounding up and auctioning wild
8    horses must be stopped.  The practice of grazing cattle on
9    public lands must be stopped.  The time to take action
10   now" -- "is now."

11            This is clearly retaliation for what the
12   government was in the business of doing at the time.  They
13   had to manage the wild horse population on public lands, and
14   they also, of course, coordinated cattle grazing on public
15   lands.  This, again, is a direct attack on the policies and
16   business of the government, and clearly meant to intimidate,
17   coerce the government and its -- its operation.

18            Next slide, please.

19            This is the animal plant and health inspection
20   service building.  This is in Olympia, Washington.  This was
21   part of a double whammy.  Not quite as large as the
22   Jefferson Poplar Farm/University of Washington double
23   whammy, but certainly as devastating to these particular
24   locations.  This was a research plant operated by the
25   government.

1       Mr. Tubbs, Mr. Ferguson, and Mr. Rodgers had

2  discussed attacking this particular plant -- this particular

3  location, excuse me.  They believed that APHIS was involved

4  with destruction of animals.  They had heard that a cougar

5  had been killed by this particular operation.  In fact, the

6  Animal and Plant Health Inspection Service was -- its

7  purpose was to preserve life, and not to destroy it, so the

8  conspirators missed their mark on this one.

9       On the day of the arson, Mr. Ferguson, Mr. Tubbs,

10  and Ms. Overaker traveled to Olympia, and in preparation for

11  the arson, they went to Home Depot to steal the five-gallon

12  buckets that they needed and the sponges.  Ms. Overaker went

13  in.  She was arrested for shoplifting for those items.

14  Mr. Ferguson and Mr. Tubbs waited in the van.  As they saw

15  her being taken away from -- it was a big box store.  I'm

16  not sure it was a Home Depot.  I think it may have been a

17  Lowe's.  The police arrested Ms. Overaker, took her to the

18  police station.  Mr. Ferguson and Mr. Tubbs waited there.

19  They obviously couldn't get their supplies.  They went off

20  to meet with Mr. Rodgers.  They -- their van broke down.

21  They were unable to get Mr. Rodgers and find Mr. Rodgers.

22       They also were supposed to meet up with Joseph

23  Dibee who was to provide the timing devices for this

24  particular arson.  As Mr. Tubbs and Mr. Ferguson were

25  waiting in the parking lot with their broken down van trying

1   to repair that, Mr. Rodgers walked up and contacted them,
2   and by that time, Ms. Overaker had been released from the
3   police department, and she was also there.  They were
4   shocked to see Ms. Overaker, told her that she must leave,
5   again, the alibi that she had been identified by police
6   stealing components that clearly would have been used in
7   this arson.  So she was told to leave there immediate
8   presence.  She did that, in fact.

9           That left Tubbs, Ferguson, and Rodgers without
10  timing devices.  Mr. Dibee never did show up.  They went to
11  a local market.  They purchased sort of a wax encased --
12  what do you call it? -- a barbecue lighter.  They went to
13  the location of APHIS.  They placed the devices around
14  APHIS, the three devices, which are basically containers of
15  accelerant.  They hand lit those devices and left the area.

16          In the meantime, the other target, referred to as
17  ADC, another government agency, was burned by the second --
18  the second cell, the second group of arsonists.  And both --
19  both -- both locations were burned to the ground that
20  particular night.  The arson loss at the Animal and Plant
21  Health Inspection Service was more than a million dollars.
22  Mr. Tubbs and Mr. Rodgers remained in Olympia.  Mr. Ferguson
23  returned to Eugene that night.

24          Next slide, please.

25          This is the Bureau of Land Management wild horse

1  corral in Rock Springs.  Again, it occurred October 11th,
2  1998.  This was, of course, as we recall, the secondary
3  target.  The primary target was going to be the Vail arson.
4  It's simple.  Mr. Tubbs was part of this arson attempt.  He
5  was the driver and a lookout.  The other individuals,
6  Ms. Rubin, Mr. Meyerhoff, Mr. Ferguson, Ms. Overaker,
7  Mr. Rodgers, and Ms. Gerlach approached this facility.  They
8  set the containers of fuel on -- near the buildings and on
9  the vehicles.  But they -- as they released the horses,
10  there was a stampede that ran to the neighbors.  The police
11  were called.  They had to abort the arson.  They took the
12  timing devices, hid them in the rocks, which the photograph
13  of the rooky area is just -- is in the lower right-hand
14  corner, hid the timers, went and got into the van, and left
15  the area.

16         Next slide, please.

17         Here's the communique on that one, and in
18  pertinent part, "The fact that BLM hasn't informed the
19  public about this event only shows that BLM wants to
20  continue their business of slaughtering horses for foreign
21  dinner plates without public scrutiny.  Until the BLM ceases
22  this campaign of equine cleansing, our campaign against the
23  BLM will only intensify."  And, in fact, their campaign
24  against the BLM did intensify.  This is a direct threat, an
25  attempt to coerce or retaliate against a government entity.

1            Next slide, please.

2            Vail ski resort.  Now, Mr. Tubbs was not charged

3    with this particular crime.  He initially had traveled to

4    Colorado to engage in -- as a participant in this particular

5    crime, but as we are aware, he was detoured to go to the

6    Rock Springs wild horse corral.  The attempt was made there.

7    Upon all the participants' return to Colorado, it was

8    decided that this particular arson would be postponed.

9    Everyone but Chelsea Gerlach and Mr. Rodgers left the area,

10   and Mr. Rodgers and Ms. Gerlach completed the arson at the

11   Vail, Colorado ski resort.  The loss was about $24 million.

12           This is the communique:  "This action is just a

13   warning.  We will be back if this greedy corporation

14   continues to trespass into wild and unroaded areas."

15           This arson, of course, happened shortly after the

16   lawsuit was resolved and it was determined that the

17   expansion onto United States Forest Service lands of this

18   ski resort operation could continue.  Mr. Rodgers and

19   Ms. Gerlach were determined to make a statement, and they

20   did.  This was a statement of retaliation, coercion, and

21   intimidation, and an attempt to try to influence both the

22   ski resort and the government from continuing with the

23   expansion of that facility.

24           Next slide, please.

25           United States Forest Industries.  This is an arson

1  that occurred on December 27th, 1998.  Two devices were

2  used.  Initially, Mr. Tubbs -- Ms. Rebecca Rubin,

3  Jacob Ferguson, and Sarah Kendall Harvey at the time,

4  Kendall Tankersley now, planned and executed this arson.  A

5  week prior to the actual burning of the building, they

6  traveled down to Medford, Oregon.  Mr. Tubbs was, of course,

7  a driver, lookout at that particular point in time.

8          Ms. Rubin and Mr. Ferguson carried the fuel to the

9  building.  Mr. Ferguson placed the devices, set the timers.

10  Ms. Tankersley was a lookout at that particular location.

11          They left the area.  The devices failed to

12  function.  It was incredibly foggy at that particular time

13  of the year, and the devices simply failed to function.

14          A short time later, three or four days later,

15  Mr. Ferguson was aware that the arson had not taken place;

16  that is to say, the building had not burned down.  He was

17  concerned about that, so he called Kendall Tankersley to

18  drive down to Medford to check to see if the devices were

19  still there.

20          She did, in fact, go there.  She saw the buckets

21  hidden in the bushes, and she called Mr. Ferguson and

22  advised him of that.  He arranged with Ms. Tankersley to

23  meet in Ashland, Oregon.  Mr. Ferguson came back from where

24  he was, which was in Sacramento visiting with his mother.

25  He came back to Ashland, Oregon, where he purchased -- sort

1    of did a makeshift timing device with a cigarette and
2    matches.  He -- they both returned back to United States
3    Forest Industries building, their office building there.
4    Mr. Ferguson went back up to the five-gallon buckets.  He
5    noticed that some of the -- some of the accelerant had
6    actually vaporized.  But he reestablished the timing device.

7            He and Chelsea Gerlach -- excuse me.  I beg your
8    pardon.  He and Kendall Tankersley then left the area and
9    found a motel room in a city a short distance away.  The
10   device, in fact, did function at that particular time, and
11   the loss as a result of this arson was nearly a million
12   dollars.

13           Childers Meat Company.  We have heard about this
14   before.  Two devices used.  Kevin Tubbs was involved with
15   this.  This was his arson, really.  He was an ALF-type guy.
16   He and Mr. Ferguson, Mr. Meyerhoff, Ms. Overaker,
17   Ms. Gerlach, and another person were involved in this arson.
18   Mr. Tubbs was the driver and lookout.  The night of the
19   arson, he drove his coconspirators to that location.
20   Mr. Ferguson -- Mr. Ferguson's job was to place the devices,
21   which he did.  Ms. Overaker was -- assisted with that, as
22   did the other person.  They cut the wire fence which was
23   behind the building next to a dairy.  They entered the back
24   side of that property.  As I said, they placed the device
25   under the eaves of the office door and placed the second

1   device back by the gas main. Both devices functioned.

2           The interesting part of this, as the court

3   recalls, is that the fire -- the device in the front

4   functioned first, caused the fire. The fire department

5   arrived. Firefighters were in the building suppressing the

6   fire, in and around the building suppressing the fire. Only

7   then did the second device activate. That second device is

8   the one that was placed next to the gas main.

9           The fire obviously was suppressed, but the damage

10  and loss to that business was greater than a million

11  dollars.

12          Next slide please.

13          Here's the communique: In pertinent -- the

14  language of the communique that we believe is the pertinent

15  part is that, "The Animal Liberation Front will continue to

16  target these operations and their insurance companies until

17  they are out of business." So now we are expanding not --

18  these individuals are expanding their targets not only to

19  these businesses, not only to government, but also to

20  insurance companies, more ancillary businesses that are

21  associated with these -- the businesses that they have a

22  philosophy -- that their philosophy allows them to attack.

23          Next slide, please.

24          West University Public Safety Station,

25  September 6th, 2000. Kevin Tubbs was recruited by

1   Mr. Meyerhoff and Ms. Gerlach to be the lookout.  He was
2   positioned across the street from this public safety
3   station.  As we know, this target was chosen for two
4   reasons.  Number one, to allow Mr. Meyerhoff to test his
5   newly designed device; and secondly, because the activist
6   community and Mr. Tubbs and -- excuse me -- Mr. Meyerhoff
7   and Ms. Gerlach were upset with the Eugene Police Department
8   because of their arrest and prosecution of Robert Thaxton,
9   who had been recently given a seven-year jail sentence for
10  assaulting a public safety officer and also for the Eugene
11  Police Department's use of pepper spray on activists,
12  radical activists during the seven-week revolt in Eugene
13  some three months prior to this arson.

14          As we recall the facts, the devices were placed.
15  Mr. Meyerhoff placed his device on the bicycle, leaned it up
16  against the wall of the building.  Ms. Gerlach placed her
17  device, which was in a backpack, on a side wall.
18  Mr. Meyerhoff's device functioned.  A guard came over to try
19  to pull the bicycle away from the building to try to
20  minimize fire damage.  The fuel in the device splashed out
21  of the device and onto the ground around the security
22  guard's legs.  Another alert security guard came over and
23  extinguished that fire with a hand-held fire extinguisher.
24  As the investigators were looking and investigating the
25  bicycle fire scene and investigating that particular device,

1    they also, then, were alerted to the fact that there was the

2    backpack device.  They called the bomb squad to render that

3    device safe.  What they found when they opened the backpack

4    was that that device actually functioned as well.  The only

5    reason why it didn't burst into flames was because it was so

6    closely, compactly wrapped in the backpack that there wasn't

7    enough oxygen for it to burn completely.

8            Also, it's important to note and recall that this

9    West University Public Safety Station is in an area of -- a

10   highly populated area 24 hours a day.  It's a public safety

11   station that's utilized by police officers, certainly, to

12   write reports and take breaks.  It's also in a location that

13   is close to the Sacred Heart Medical Center, which is a

14   24-hour, seven-day-a-week operation with all kinds of

15   individuals coming and going.  And it's also down near the

16   University of Oregon -- University District where students

17   come and go at all times.  These devices, of course, were

18   placed next to the building but also in close proximity to

19   the sidewalks where civilians and other innocents came and

20   went.

21           Superior Lumber Company in Glendale, Oregon.  At

22   Superior Lumber Company, this involved Mr. Tubbs,

23   Mr. Meyerhoff, Mr. McGowan, Mr. Ferguson, and Suzanne

24   Savoie.  This was planned because Superior Lumber Company

25   was known to have harvested old growth timber and timber off

1    of public and private lands.  It occurred January 2nd, 2001,

2    the New Year's Day weekend.  Two devices were used.

3    Mr. Tubbs was the driver of the team that went down there.

4    He was also a lookout; was equipped with a radio, as always.

5            These individuals stationed -- or did their prep

6    work at a staging area which was just north on I-5, north of

7    the Glendale exit.  They arrived at the staging area, put on

8    their dark clothing, checked their radios, checked the

9    devices to make sure they were functioning properly, and

10   then proceeded from there to Glendale to the office complex

11   of Superior Lumber Company.  Mr. Meyerhoff, again, had his

12   new device.  He wanted to make sure that it would work

13   properly.  Mr. Meyerhoff and Mr. Ferguson, in fact, placed

14   the devices at that location.  Mr. Tubbs was a lookout.

15   Ms. Savoie provided services as a lookout, as well, and

16   Mr. McGowan.

17           The devices -- once the devices were placed,

18   timers set, everyone was picked up, went back to the staging

19   area.  They took off their work clothes, so to speak, the

20   dark clothing, their hats, their gloves, and placed them in

21   sacks, bags.  They kept their radios with them, but they

22   returned, then, to the Eugene area, and on their way back,

23   they deposited their clothing in various trash receptacles

24   in rest stops along the way back to Eugene.

25           The loss of this arson was more than $1 million.

1    This particular business was a small business in that
2    community.  Many of the people were put out of work during
3    the holiday time.  This business, however, because of its
4    commitment to that community and notwithstanding the fact
5    that it could do no business because of the devastating
6    loss, the management and owners of Superior Lumber Company
7    maintained their payroll for their employees because that's
8    just the kind of people they are.

9              Next slide, please.

10             This is the communique, and in pertinent part, it
11   states, "This year we hope to see an escalation in tactics
12   against capitalism and industry."

13             They continued their onslaught.  They continued to
14   attack anything and anyone they believed was doing something
15   that was against their personal philosophy.  They meant to
16   intimidate, they meant to retaliate, and they meant to
17   strike fear into the hearts of the people that were in the
18   community and the people that were involved with the
19   business, and they were successful.

20             Next slide, please.

21             Joe Romania Chevrolet Truck Center, Eugene,
22   Oregon.  The court is very aware of the facts of this
23   particular case.  As you know, there was one actual timing
24   device but multiple trailers.  This occurred March 30th,
25   2001, at Joe Romania Chevrolet Truck Center.  35 vehicles

1    were involved.   It involved the -- the participants
2    involved -- that were involved -- excuse me -- were William
3    Rodgers, Nathan Block, Joyanna Zacher, Stanislas Meyerhoff,
4    and, of course, Kevin Tubbs.

5         Kevin Tubbs was a lookout in this particular fire
6    at the north end of the truck center parking lot.   It was
7    his job to alert the other coconspirators should -- should
8    anything -- a police officer arrive, should there be any
9    reason at all to abort the arson, that was his function.

10        The loss at that this particular location was
11   approximately $1 million.

12        Now, here's the claim for the arson.   The court
13   has seen this before, but, again, for the record, in
14   pertinent part, the communique reads as follows.   Of course
15   we know that this communique was written after the fire.   It
16   was completed after there was no loss of life or injury.   In
17   pertinent part, it says:

18        "The time is right to fight back.   Free and
19        critter are being persecuted.   The state thinks it
20        can stop the growing resistance by jailing some of
21        us.   SUVs destroy the earth, while the prison
22        system tries to destroy those who see beyond this
23        empty life.   We must strike out against what
24        destroys us before we are all either choking on
25        smog or held captive by the state."

1          This is a direct attack on the government process.

2    In this particular instance, it was a direct attack on the

3    Lane County Circuit Court and the prosecution of Jeffrey

4    "Free" Luers and Craig Marshall, his codefendant.  It was an

5    attempt to influence the operation of the government.

6          Next slide, please.

7          Jefferson Poplar Farm.  Again, the court is very

8    well aware of the facts of this particular case.  Six

9    devices were used.  Three failed to function near the office

10   complex or the office building of that -- of that business.

11         Mr. Tubbs was a participant in the reconnaissance

12   of this particular target, as was Ms. Gerlach.

13   Mr. Meyerhoff, Block, Zacher, and McGowan were the ones on

14   the ground.  Ms. Savoie also participated in the

15   reconnaissance of this particular target.

16         The graffiti left at the scene, again, this is

17   part of the double whammy, the big double whammy between the

18   University of -- or that involved the University of

19   Washington Horticultural Research Center was also destroyed

20   that night.  The loss at this location was nearly a million

21   dollars and ultimately caused the demise of the business.

22         Next slide, please.

23         Finally, the BLM wild horse corral, Litchfield,

24   Oregon.  Mr. Tubbs participated in this.  There were four

25   devices used.  Three failed to function.  Again, a danger to

1    those responding to extinguish the fire and suppress the
2    fire of the hay barn that burned.  The loss was over
3    $200,000.
4              Next slide, please.
5              This communique clearly indicates that the
6    arsonists in this particular fire were attempting to
7    influence the Bureau of Land Management and the government.
8              "For years, the BLM has rounded up thousands
9         of wild horses and burros to clear public land for
10        grazing cattle.  Many of these wild animals are
11        sent to slaughter."
12             This is also, of course, associated with their
13   attempts -- their efforts at the Cavel West horse
14   meatpacking plant.
15             The last portion of the communique that we have
16   highlighted states as follows:
17             "In the name of all that is wild, we will
18        continue to target industries and organizations
19        that seek to profit by destroying the earth."
20             They clearly are referencing this location, this
21   Bureau of Land Management operation.  They are clearly
22   retaliating against the government in this situation and
23   trying to intimidate and influence the operation of the
24   Bureau of Land Management in its wild horse and burro
25   program.

1          Next slide, please.

2          This slide shows some other uncharged conduct

3    against -- that was against Mr. Tubbs.  He was not charged

4    with this conduct.  He avoided prosecution of this conduct

5    for reasons of statute of limitations and also with regard

6    to an agreement that he had with the government.

7          Wildlife Pharmaceutical was an arson in Fort

8    Collins, Colorado.  He was a participant in that.  There's a

9    Palmer Mink Farm with an animal release in Preston, Idaho in

10   October of 1997.  There was another animal release at the

11   Glen Hollow Fur Farm in Hebo, Oregon.  That occurred in --

12   excuse me -- October 29th, 1997, about two and a half weeks

13   later after the Palmer Mink Farm arson.  And then, of

14   course, the burglary and release of the dogs at the medical

15   research laboratory, the BioDevices labs in Orange City,

16   California, in August of 1999.

17         Next slide, please.

18         This is an accurate figure, Your Honor.  We took

19   it to heart yesterday, and this figure is -- shows the loss

20   that was due to the arsons which involved Mr. Tubbs, and in

21   fact, as you can see, it exceeds $11 million.

22         Next slide, please.

23         This, Your Honor, is sort of a summary of the

24   ability and Mr. Tubbs' function as a facilitator and his

25   organizing roles throughout the conspiracy.  At the Cavel

1    West arson, he was -- he researched that arson -- or that

2    location, excuse me.  This was a passion of his.  He had, as

3    I said before, read in the newspaper about the slaughter of

4    wild horses there, and he was concerned about that.  He did

5    reconnaissance of the target by himself.  He went back to

6    Eugene and met with Jacob Ferguson and with Joseph Dibee and

7    discussed the -- the target, and they had a discussion about

8    what they could do at that location.  He recruited or

9    invited those individuals to go with him.  They went to

10   Redmond and, of course, did their own reconnaissance of the

11   target.

12          At that meeting also, they -- once they did their

13   recon of Cavel West, they had a consultation regarding what

14   kind of arson techniques could be used.  There was a

15   concrete building, at least a portion of it was concrete.

16   Mr. Tubbs had some concerns that it wouldn't be feasible to

17   burn concrete.  That's when Mr. Dibee came up with the idea

18   of drilling hole -- excuse me -- drilling the hole in the

19   wall.

20          Obviously, Mr. Tubbs was a team member of that

21   arson at the time of the arson and was on the ground and

22   assisting.

23          He also has the ability and did facilitate

24   individuals to harbor Josephine Sunshine Overaker.  He had a

25   network of individuals.  We believe that the person that he

1   had -- he talked about the person being up north.  We
2   believe that it was a contact in Canada.

3           He, throughout the conspiracy, as I mentioned
4   before, provided the coconspirators with fraudulent and
5   stolen identification documents and, in fact, had documents
6   at the time of his arrest that he ultimately admitted were
7   there to be used for any future actions.  So up until the
8   time of his arrest, he was still prepared to assist,
9   facilitate, and introduce others to the use of false
10  documents should they need to have those for their actions.

11          And he maintained -- maintained contact with The
12  Family members up until the moment of his arrest and, in
13  fact, was -- as a result of our consensual recordings with
14  Mr. Tubbs, we were able to locate several of our defendants.

15          This is a slide that just basically depicts what I
16  have just stated.  Kevin Tubbs was in contact with Joseph
17  Dibee.  He was in contact with William Rodgers, and the fact
18  is three weeks before William Rodgers' arrest, we gleaned
19  the information from Mr. Tubbs and found the location of
20  Mr. Rodgers.  We had not been able to find Mr. Rodgers for
21  many, many months throughout the investigation and, at the
22  last hour, were able to locate Mr. William Rodgers by
23  consensual recordings of Mr. Tubbs.

24          We were able to locate Stanislas Meyerhoff; also
25  Chelsea Gerlach through Mr. Tubbs as well.  Mr. Tubbs had

1   had contact with Jonathan Paul and, of course, had had
2   meetings with and met with Darren Thurston and Chelsea
3   Gerlach.  Darren Thurston and Chelsea Gerlach were a couple
4   at that particular point in time.  And so Mr. Tubbs was able
5   to visit with those individuals.
6           Next slide.
7           This is a photograph of one of the documents that
8   we recovered as a result of the search warrant at his house
9   at the time of his arrest.  This is a drivers' license for a
10  person by the name of Ronald Calloway.  Ronald Calloway is
11  actually an African-American.  He's a real person.
12  Mr. Tubbs adopted Ronald Calloway's identity and used this
13  identity in registering his vehicle, his van.  The van was
14  used in more than one arson throughout the course of the
15  conspiracy.
16          Next slide.
17          These are documents also found at the home of
18  Mr. Tubbs at the time of his arrest.  The items -- the two
19  photographs on the right-hand side is the front and back of
20  a Canadian birth certificate in the name of Kevin Paul
21  Lilley, and the document on the left-hand side, it's very,
22  very hard to read, but it is a -- a Santa Clara County,
23  California birth certificate for Kevin Michael Golitz that
24  Mr. Tubbs kept and maintained.  Now, the birth certificate
25  of Mr. Golitz is the one that was derived from a research of

1   death records, and then once they determined that there was
2   an individual that was deceased, they ordered up the birth
3   certificate. They use utilized that birth certificate,
4   then, to get fraudulent identification. Normally it would
5   be legitimate because [sic] the certificate was falsely
6   obtained, it was fraudulent identification, and they used
7   that --

8                     (Reporter interrupted.)

9           MR. ENGDALL: But it was falsely obtained. The
10  certificate was legitimate but falsely obtained, and so they
11  used that to get and to order and apply for additional
12  fraudulent identification documents.

13          Next slide, please.

14          These two drivers' licenses were found at the
15  residence of Mr. Tubbs. We have obliterated the
16  identification markings on the drivers' licenses. These
17  were found at his home at the time of his arrest. I want to
18  call the court's attention though, to the issue date of
19  these particular drivers' licenses. These are ones that he
20  kept that were left at his business, his place of
21  employment, I should say, and he never returned them. He
22  just saved them for possible use of direct actions in the
23  future. The issue date of the one on the left was
24  March 1st, 2004. The one on the right is November 27th,
25  2001. These dates become significant because he has

1  professed that he left the ideologies of the ELF and ALF
2  behind him.  He was a legitimate citizen not involved with
3  any kind of criminal conduct, and yet within -- certainly
4  the issuance date was close to a year prior to his arrest.
5  We don't know exactly when he obtained that particular
6  document, but certainly it must have been sometime after
7  March of 2004.

8          Thank you.

9          One factor, Your Honor, if we can go back to the
10  Ronald Calloway license picture.  I should advise the court,
11  I misspoke myself.  This was not found as a result of the
12  search warrant at his residence.  He had destroyed this
13  identification, and the reason why he destroyed the
14  identification, according to his statement on the consensual
15  recordings when he was talking to Jacob Ferguson, was
16  because he had this identification document, and he had
17  received a jury summons.  He was to be -- serve as a juror
18  in Lane County and he did not appear at Lane County, and he
19  was fearful that he would be arrested for not appearing and
20  performing his jury service.  So he told Mr. Ferguson that
21  that was the reason why he destroyed that particular
22  document.

23          That concludes the slide show, Your Honor, that we
24  have, our PowerPoint presentation.

25          I'd like to, with the -- if the court would

1  entertain, provide to the court the government's arguments
2  for its request for a two-level enhancement for an
3  aggravating role pursuant to United States Code § 3B1.1(c),
4  and then discuss the terrorism enhancement justification.

5        With regard to the aggravating role, it's the
6  government's contention that Mr. Tubbs was not necessarily a
7  leader, but, as I have characterized it, he was a
8  facilitator and an organizer, which I think would qualify as
9  a manager in activity that would not be otherwise described
10 in the sections of 3B1.1(a) and (b).

11        And the basis of this is that, one, he identified
12 targets and invited others to engage in criminal acts.  He
13 recruited Ms. Rebecca Rubin.  He invited Mr. Ferguson and
14 invited Mr. Dibee to participate with arsons.  He funded
15 Stan Meyerhoff so that Mr. Meyerhoff could train Ian Wallace
16 on how to construct incendiary devices in Minneapolis,
17 Minnesota.  He arranged for Mr. Meyerhoff to meet with
18 Captain Paul Watson, who provided cash to Mr. Meyerhoff to
19 continue his commission of arsons.  He provided fraudulent
20 identification to his coconspirators, and he arranged for
21 the harboring of his fugitive coconspirator Josephine
22 Overaker should she ever need additional assistance in
23 avoiding law enforcement detection.  And as I mentioned
24 before, he recruited Rebecca Rubin for the arson at United
25 States Forest Industries.

1          With regard to the terrorism enhancement, I simply
2    reference, without much discussion, the Eugene Police Public
3    Safety Station.  That arson was selected because it was,
4    among other things, a retaliation against the Eugene Police
5    Department for its involvement with the arrest and
6    prosecution of Robert Thaxton for the assault on police
7    officers, and for the retribution against the police for the
8    use of pepper spray on the Eugene activists during the
9    seven-week revolt.

10         Regarding the Romania Truck Center arson, again,
11   this was a retaliation and a threat against the state
12   government for its prosecution and trial of Jeffrey Luers.
13   The communique gives the most compelling evidence of their
14   intent and of the intent of the defendant and his
15   coconspirators.

16         And lastly, the Jefferson Poplar Farm, this was
17   the double whammy.  It was intended to retaliate and
18   intimidate and influence state universities in both --
19   excuse me -- in Washington and intended to influence
20   legislative bodies in both states, the State of Oregon and
21   the State of Washington.  Again, the communique is the most
22   compelling evidence of the defendant's attempt to affect,
23   coerce, and retaliate against the government.

24         With regard to the government's sentencing
25   considerations, again, the process by which the government

1   arrived at the recommendation for Mr. Tubbs is identical to
2   the process that we used to arrive at the sentencing
3   recommendation for Mr. Meyerhoff and all the defendants.  We
4   considered the crime, the nature and dangerousness of the
5   crimes, the complexity of the arsons, specific threats to
6   humans.  We considered the statutes that were involved, the
7   guidelines.  We looked at the individual's background.  We
8   invited comment from the relatives.  Actually, Mr. Tubbs'
9   mother spoke to the prosecution team.  We looked at the
10  cooperation and the policy considerations.  We consulted
11  with other departments, agencies, with other districts, and
12  certainly with the -- the staff in our office.

13          In conclusion, the government's recommendations of
14  168 months for Mr. Tubbs is predicated on the following
15  factors:  The main mitigating factor, Your Honor, was that
16  he, in fact, cooperated with the government three weeks
17  after his arrest, and that was substantial assistance to the
18  government and assisted the government in its continuing
19  investigation and prosecution of other codefendants.

20          Factors in aggravation were that his cooperation
21  began only after he was arrested and after he had received
22  court-appointed counsel, after three other coconspirators
23  had already cooperated with the government and agreed to
24  testify against Mr. Tubbs, himself.  That would be
25  Mr. Ferguson, Mr. Meyerhoff, and Ms. Kolar.

1    After -- this was -- he also agreed to cooperate
2    with the government only after the death of Mr. Rodgers and
3    only after he was allowed to hear himself on the consensual
4    recordings. Throughout his debriefings with the government,
5    he tended to minimize his role and was somewhat
6    self-serving, and unlike Mr. Meyerhoff, he was a true
7    believer in the cause of the Earth Liberation Front as well
8    as the Animal Liberation Front. He participated in 14
9    arsons but was allowed to plead guilty to only nine. He
10   abused illegal drugs continually until the date of his
11   arrest and continued to be involved in minor criminal
12   conduct until the time of his arrest.

13       He was never able to fully realize the enormity of
14   his criminal conduct. He was less than remorseful of his
15   actions prior to his arrest, and after his arrest, he
16   continued to maintain what was a -- maintain that he was a
17   person of peace and a nonviolent man, despite his violent
18   acts. He continued to maintain contact with his
19   coconspirators until the day of his arrest. His career as a
20   serial arsonist placed others in harm's way and in serious
21   risk of physical injury and death.

22       He was involved in at least nine separate arsons
23   in which incendiary devices were used, as well as one crime
24   of destruction -- strike that. He was not involved on that.
25   As well as one crime of destruction -- at least one crime of

1  destruction and animal releases.  He avoided prosecution for

2  several reasons.  One was due to the statute of -- some of

3  which were due to the statute of limitations reasons.

4          The total damage caused by the actions of this

5  defendant were, as I mentioned before, more than $1 million

6  and the loss of untold scientific research, business

7  records, and other personal property.

8                    (Counsel conferred.)

9          MR. ENGDALL:  What did I say?  1 million?  I meant

10  $11 million.  I beg your pardon.

11          We believe that the recommendation of 160 months

12  is a sentence that provides the following:

13          It's a sentence that has meaning to the defendant

14  and to the public.  It ensures accountability for the

15  defendant and justice for the victims.  It reflects the

16  seriousness of the criminal conduct, and it will serve to

17  deter others.  It accounts for the defendant's acceptance of

18  responsibility and must consider the defendant's rejection

19  of his violent lifestyle in his efforts to become a

20  productive citizen, however that's in play in this

21  particular situation.  And it considers his substantial

22  assistance to the government.

23          That is our recommendation, Your Honor.

24          At this time, I would ask to allow Ms. Marsha

25  Ledbetter and Dennis Sullivan to speak to the court.

1            THE COURT: That's fine.

2            Please come forward.

3            THE CLERK: Ma'am, can I just have you step -- oh,

4    they are just going to speak? Are they to be sworn?

5            THE COURT: Mr. Engdall, do you want them sworn?

6            MR. ENGDALL: No, Your Honor. I'm sorry. These

7    are just statements as victims. Thank you.

8            MS. LEDBETTER: My name is Marsha Ledbetter, and I

9    worked at the Oakridge Ranger District.

10           The Oakridge Ranger District was more than a

11   government building. It was a place of work for planners,

12   foresters, archeologists, biologists and engineers. These

13   workers used documents left by professionals that came

14   before them. They recorded the current forest conditions

15   and compared that to the history left to them to determine

16   the best placement of roads, timber sales, and campgrounds.

17   They planned for public safety, improved fish and wildlife

18   habitat, and projected where fires might happen that could

19   be devastating to the community.

20           They documented their findings and assessments for

21   the next generation of forest workers to use as their

22   roadmap to determine where we had been and where we were

23   going in our mission to care for the land.

24           The information from past generations of forest

25   service employees was handwritten. Not all had been

1 | transformed into computer data bases like we have today.
2 | The district fire destroyed much of this historical
3 | information.  It was as if we took all the history books
4 | explaining what happened on the district in the past and
5 | threw them away.

6 | Employees found the loss of the professional
7 | history devastating, but the personal impacts were just as
8 | hard to deal with.  There were many questions.  Who did
9 | this.  Why did they do this.  What happens now.  And will
10 | they strike again.

11 | The event was intimidating.  I looked over my
12 | shoulder more, didn't share where I worked when talking with
13 | people.  Where I once trusted and felt secure, I no longer
14 | did.

15 | The days after the fire are imprinted in my mind.
16 | Days like the day we opened the safe, only to have the
17 | paperwork burst into flames when oxygen mixed with heat,
18 | causing ignition three weeks after the fire.

19 | The day we visited the site to salvage anything we
20 | could find to take with us of our work history.  Some people
21 | found nothing, as it was all burned beyond recognition.
22 | Finding a trinket given by a friend for a birthday, locating
23 | a family photo, or finding boots used to do your job became
24 | like finding a hidden treasure.  Every time I drove past the
25 | site, I burst into tears, as I remembered standing and

1   watching as the years of work that took place at this site
2   went up in smoke.

3          In the quiet of night, when sleep was far away,
4   I'd get up and write about my feelings as a way to organize
5   my thoughts and gain control of the emotion.  One night I
6   wrote, Out of the ash, the smoke and the flame, our lives
7   changed forever.  We'll never be the same.  Out of the ash,
8   the pain cuts so deep, that knot in my stomach, can anyone
9   sleep.  Out of the ash, the questions still grow.  What will
10  we do, and where will we go.  Out of the ash, acts of
11  violence appear.  Who did we talk to and who did not hear.
12  Out of the ash, the loss seems so great.  No office, no
13  culture, just feelings of hate.  Out of the ash, we save a
14  reminder of a time that was happy, gentle, and kinder.  As
15  with all history, this too will pass.  We will be stronger
16  out of the ash.

17          I thought the memories of the fire would pass, but
18  they are just hiding.  Even after a decade, I can smell the
19  smoke, feel the heat, and see the fear and anguish on the
20  faces of my coworkers and friends.  The memories are hiding
21  in those dark places of my mind, right next to security and
22  trust.

23          MR. ENGDALL:  Thank you.
24          Mr. Sullivan.
25          MR. SULLIVAN:  My name is Dennis Sullivan.  I'm

1   the assistant fire management officer at the current Middle
2   Fork Ranger Station, but I was the -- also the assistant
3   fire management officer at the night of the fire at the
4   Oakridge Ranger Station.

5          In 1956, at the young age of six, my family's home
6   burned to the ground one week after Christmas.  I still
7   remember how devastating that experience was.  Not only did
8   we lose all of the neat toys and new clothes, but everything
9   that meant anything to our family was gone.

10         I lived with relatives and friends in cramped
11  quarters, and most of our clothing were hand-me-down from
12  people who wanted to help.  Not a lot of fun period in my
13  life.  Little did I know that 40 years later, a similar
14  tragedy would occur in my life.  I got a phone call from my
15  boss, Dale Gardner, who at that time was the fire management
16  officer.  Dale is also a volunteer firefighter for the City
17  of Oakridge.  He told me that the building at the Oakridge
18  Station was on fire and I needed to respond.  When I left
19  the Oakridge city limits and saw a huge orange glow in the
20  sky, my heart sank.  Deep down in my heart, I knew that very
21  little could be done to save anything.  When I arrived at
22  the station, the majority of the building was on fire from
23  the front to the back, and remember thinking that it was
24  impossible for a fire to spread that fast from one end of
25  the building to the other.

1             Only the fire --

2                     (Reporter interrupted.)

3             THE COURT:  Can you just take a deep breath, and

4    if you'd just slow down a little bit and start maybe about a

5    paragraph before.

6             THE WITNESS:  Okay.  I got a phone call from Dale

7    Gardner?

8             THE COURT:  That's fine.

9             THE WITNESS:  Okay.  I got a phone call from Dale

10   Gardner, my boss, who was the fire management officer.  Dale

11   was also a volunteer for the firefighting -- structural

12   firefighting office -- group at the station.  He told me

13   that there was a fire at the Oakridge Ranger Station and I

14   needed to respond.  When I left the Oakridge city limits and

15   saw a huge orange glow in the sky, my heart sank.  Deep down

16   in my heart, I knew that very little could be done to save

17   anything.

18            When I arrived at the station, the majority of the

19   building was on fire from the front to the back, and

20   remember thinking that it was impossible for a fire to

21   spread that fast from one end of the building to the other.

22   Only the fire management wing of the office was not burning.

23            My office was near the end of the wing.  My boss

24   asked me to become the incident commander for the incident

25   because he was needed by the structure firefighters.  I

1 remember first walking around the facility to assess the
2 situation. I felt that if anything was savable, it would be
3 the fire management wing. However, the fire was spreading
4 rapidly down the hall toward my work area.

5 Efforts by the structure fire department to stop
6 that fire became impossible. At that time there was no --
7 not sufficient water supply to accomplish much, and my task
8 was to get our wildland firefighter engines to supply the
9 structure engines with water. This meant hauling water from
10 the city limits to the station.

11 Orders needed to be placed for engine operators.
12 This took time. Once drivers arrived, a turnaround time for
13 each engine was 15 to 20 minutes. Needless to say, the
14 firefighting effort was highly affected.

15 It was around this period of time that I was
16 informed that there could be a district employee in the
17 building. This employee occasionally slept in the office.
18 I remember standing there looking at this building, which
19 was totally in flames, with a feeling of total helplessness.
20 I was numb. The thought that somebody was in there sickened
21 me. There was absolutely nothing anyone could do. I
22 remember giving some instructions to try and find out if
23 this person was -- was at home. It wasn't until sometime
24 later that I was informed that that person of concern was
25 indeed at home. It wasn't until -- okay. I remember tears

1  came to my eyes when I heard the good news.

2         The structure fire department primarily

3  concentrated on cooling off the building, which was now

4  totally engulfed.  I grabbed a waterline and began spraying

5  water onto my burning work area.  At that time, I had an

6  antique oak desk that was on fire, but my primary concern

7  was preventing the right bottom drawer of that desk from

8  burning.  All of my important documents concerning my

9  25-year career with the forest service were in that drawer.

10  I was able to put some of the fire on the desk out and the

11  surrounding area, and I remember looking around behind me to

12  see if anyone was looking.  I didn't see anyone, so I jumped

13  in through the window, grabbed the drawer, placed it outside

14  the window, and climbed out.  Later, when I reflect back on

15  the event, the only thing that comes to mind was dumb.

16         I felt fortunate that I was one of the few people

17  that had anything that survived that fire.  I dried out

18  those water-logged papers and I still have them.  They are

19  burned around the edges, and most of the stuff was

20  salvageable.  I remember feeling -- I remember feelings of

21  loss.  Years of hard work, history, and antiques gone.  I

22  remember a feeling of helplessness.  Mentally I was

23  convinced that this event was arson, and I became very

24  angry.  I told myself that I was not going to let anyone --

25  let whoever did this ruin my life.

1    In the days that followed, I witnessed fear in
2    fellow employees.  People who were afraid to go into the
3    woods and do their jobs.  Many would only do so if
4    accompanied by someone else.  My fiancee flat told me that I
5    wasn't going to go into the woods by myself, and we had
6    arguments over this issue.  Fortunately, I was able to
7    convince her that, for my own health, I needed to get back
8    to some type of normalcy in my life, and that meant not
9    surrounding myself with fear.

10    When the Oakridge district employees moved into
11    the Rigdon Ranger Station, the 40-year-old childhood
12    memories came back to me.  Everyone wandered around in a
13    daze trying to grasp at something that they could identify
14    with.  Lots and lots of tears by everyone.  People were kind
15    to us, but you never really feel at home when you are
16    sharing limited space with others in their home.

17    I moved to this community in 1972 and have worked
18    at the ranger station since that time, and I considered both
19    the community and the place I worked as my home.  I felt
20    that my home had been destroyed again.  I had to use other
21    people's used office furniture that someone else didn't
22    want, and borrow just about everything needed to do my job.

23    Yes, a new building has been constructed.  I am,
24    once again, working at the similar location, but it has
25    never been the same.

1            Thank you.

2            MR. ENGDALL:   Thank you, Mr. Sullivan.

3            Your Honor, that concludes the government's

4    presentation to the court.

5            THE COURT:   Why don't we begin at 12:30.

6            MR. FRIEDMAN:   Thank you, Your Honor.

7            THE CLERK:   Court is in recess until 12:30.

8                         *(Recess.)*

9            THE COURT:   Thank you.   Please be seated.

10           Counsel.

11           MR. FRIEDMAN:   Thank you, Your Honor.   Good

12   afternoon.

13           From the opinion issued on Monday afternoon and

14   your ruling yesterday in Mr. Meyerhoff's case, the court's

15   provided some guidance on its view of these cases.   We don't

16   want to belabor the evidence which was received yesterday

17   other than to ask this court to adopt, for the purposes of

18   Mr. Tubbs' sentencing, the information regarding the Bureau

19   of Prisons and classification systems and the impact upon a

20   cooperating witness, a snitch, when a person is

21   incarcerated.   And we will delve into that in a little bit,

22   Your Honor, but that is certainly the situation that faces

23   Mr. Tubbs.   And as you will see, Mr. Tubbs' cooperation has

24   branded him as a snitch.

25           Kevin Tubbs is an earnest and honorable man whose

1   past decisions were skewered, mired by the sincerity and
2   depth of his beliefs and personal passions and the perceived
3   righteousness of his cause.  And this blinded him to the
4   criminality of his actions.  His actions grew out of
5   frustration and a zealous desire to save this planet, yet,
6   in his desire to do right, the preeminent necessity was to
7   do no harm to any living thing, human, animal, or plant.
8   Today he understands that the justness of a cause does not
9   permit the violation of law or excuse the damage to the
10  property of others or the hardship and misfortune he has
11  caused others.

12          Your Honor, there is much which needs to be said,
13  perhaps too many issues to address today to settle without
14  seem to nitpick.  But Your Honor, some of the errors, the
15  misinformation in the government's presentation and the
16  government's memo cannot be ignored.  Further, this
17  misrepresentation and misinformation is representative of
18  the government's misunderstanding and/or unwillingness to
19  see Kevin Tubbs clearly, and that's what we are asking this
20  court to do, is see Mr. Tubbs clearly.

21          Until December 5th, 2005, the day Kevin Tubbs was
22  arrested, the government, the FBI, ATF, Eugene Police, and
23  justice department had expended considerable time, energy,
24  and resources to solve this case.  And in that time, Your
25  Honor, an image, an understanding, a suspicion, a theme was

1  formed in the minds of the investigators in the justice
2  department.  We know now -- what we know now is this was not
3  because of sophistication or brilliance or vast resources of
4  these perpetrators.  These actions, these arsons, were not
5  carried out by well-financed, well-trained operatives.  This
6  was not a cadre of people who had taken blood oaths or sworn
7  allegiance to one another or to another group or power.
8  This was neither a tight-knit cell or, as the government has
9  chosen to call them, The Family.

10      These are simply idealistic individuals who, on
11  occasion, came together to -- who conducted themselves by
12  consensus, who, without real leadership and with limited
13  planning and skills, caused considerable damage.  Not
14  designed to topple our government, not intended to
15  intimidate or coerce anyone or anything, not the government
16  or any party, but simply to make a statement which they
17  hoped would focus people's attention on the issues they
18  believed relevant, the cause of animal rights, animal abuse,
19  the horrific slaughter of horses and cattle for human
20  consumption, and the cause of environmental protection, the
21  prevention of environmental degradation, and the
22  preservation of the life-giving earth.

23      But after almost ten years of pursuing dead ends,
24  being frustrated and baffled, when the government cracked
25  its case and seized upon Jacob Ferguson and secured his

1   cooperation, the government was committed to a theory, an
2   idea of who these people were.
3           Even if these were not the dangerous and
4   diabolical criminals the government wanted to believe they
5   had been pursuing all these years, the government had its
6   story, and they were committed to it.  When Attorney General
7   Gonzales proclaimed the government had succeeded in
8   capturing the largest eco-terrorist cell in the Northwest,
9   the dye was cast, in whatever form the word came from
10  Washington, and we believe that local counsel is truthful
11  when they say none of them had direct contact with the
12  justice department in D.C.
13          I recall in my first meeting with the
14  investigators and the AUSA, they told me that Mr. Tubbs was
15  a true believer and that Kevin Tubbs would not cooperate
16  with the government.  I have no doubt they were sincere when
17  they said this, because what did they have to go on?  Only
18  the word of Jacob Ferguson.  Yes, there were tapes which
19  Ferguson had made at the direction of the government, many
20  tapes, in fact, where Mr. Ferguson wore a body wire when he
21  was sent to meet with his old friend, Kevin Tubbs.
22          There are, however, a combination of factors which
23  have shaped the government's perception of this case and
24  upon which the government's case now rests.
25          First, its original ideas about the acts and the

1   actors.  Long before they had any clear idea of who these
2   people were or even what they were about, the notion that
3   this was a sophisticated, well organized, and well led group
4   was set.

5       Two, the information gleaned from Jacob Ferguson
6   and the manner in which it was shaped and reshaped in the
7   one half or two years he worked with them.  Mr. Ferguson's
8   story did not come out at one time as a clear, concise,
9   forever unaltered story.  Mr. Ferguson's version of these
10  events developed over time; was enhanced or modified as he
11  continued to work for the government's investigators.  And
12  for Mr. Ferguson, who is the primary fire starter,
13  recruiter, the core of so much for which Mr. Kevin Tubbs now
14  stands charged, Ferguson's statements, his motivation was to
15  minimize his own role, to deflect responsibility, and cast
16  others as the leaders and planners to reduce his own
17  culpability.  And whether the government bought this or not,
18  we dot not know.

19      What we do know is that Ferguson is an unreliable
20  source.  And we can and will see, when compared -- when we
21  compare what he has said to what other defendants have said,
22  that what he's said has not been reliable, has not been
23  completely truthful -- has not been truthful.

24      And where we don't have information from other
25  defendants to flesh out this truth, and that's one of the

1  things that I have provided for the court in my memorandum,
2  and I will go over briefly here today, just a comparison
3  between the information that was developed between -- from
4  Mr. Tubbs, from Mr. Ferguson, and the 302s that were
5  developed from the other defendants in this case.

6         And, again, where we don't have information from
7  other defendants to flesh out the truth, as in Oakridge, we
8  can and will look to the source and ask this court to
9  consider this when determining if Kevin Tubbs is being
10 truthful with the court.

11        Finally, Your Honor, the government's perception
12 of this case relies upon an effort to make the information
13 it has match its goal of casting Mr. Tubbs and his
14 codefendants as terrorists.  Each fact, each bit of
15 information is being stretched, twisted, and forced to
16 comport with their framework, which just doesn't fit.  In
17 the government's effort to rationalize the terrorism
18 enhancement, motives, beliefs, intentions are being ascribed
19 to Mr. Tubbs.  These no more represent his actual motives,
20 beliefs, or intentions than does perhaps the current
21 administration's foreign policies reflect the American
22 public's will.  It's a view which the government has been
23 committed to and does not permit the truth or the facts to
24 shake them.  And I will discuss this in greater detail in a
25 moment.

1          Further, Your Honor, and we submit that this will
2    be shown as -- through the course of this afternoon, the
3    government does not offer sufficient proof, proof which the
4    court has already established as the proper criteria, clear
5    and convincing, to establish these motives.  But a clear
6    example of this is in the notion of "The Family."  This is a
7    term which was only used by Mr. Ferguson with Mr. Tubbs in a
8    passing reference to avoid naming the friends and associates
9    with whom they once both had connections.  To Mr. Tubbs,
10   this was not a denominator or identifier which was ever used
11   by the various people in association with each other.  But
12   for the government, this reference has taken on great
13   meaning, because this reference comports with their view of
14   the people as a cohesive group or a cell, a family.  Perhaps
15   this term was used by those people who participated in the
16   Book Club meetings.  But Kevin Tubbs did not.  And as we
17   will say again, Kevin Tubbs was never part of the Book Club.

18         However, for the court to truly understand these
19   events and the roles which various individuals played, it's
20   critical to understand how individuals related to each
21   other, how this loose-knit group of occasional associates
22   functioned to conduct the actions they did.

23         Contrary to the government's expectation and
24   belief that there was a top-down hierarchy in which there
25   was clear leadership and responsibility for the planning and

1   supervision, that simply did not exist here. People came
2   together and engaged in actions by consensus. Each person
3   brought various skills and differing desires. Each person
4   did what they wished to do, to the extent they were capable.
5   There was never a true leader or leaders. There were
6   individuals like Mr. Ferguson or Mr. Rodgers or Mr. Dibee or
7   Mr. Meyerhoff who identified targets, conceived plans, built
8   devices, coordinated people to help carry it out. But each
9   of these operations came together with little discipline and
10  limited discussion. People took on role -- duties and roles
11  as they saw fit, stepping forward where they chose. It was
12  more along the lines of a game of telephone than a chain of
13  command. Often a plan evolved as people came forward to
14  participate.

15        Leadership was lacking, and particularly in the
16  beginning, where Ferguson was concerned, information was not
17  shared. This is a critical factor where the government
18  attempts to ascribe or infer aims and goals or intentions
19  upon the group. Even if one person had a specific purpose
20  in carrying out a particular action, that purpose does not,
21  cannot automatically ascribe to the others, particularly in
22  this case where Kevin Tubbs may have driven or acted as a
23  lookout out of a duty or loyalty only to a friend, rather
24  than for any political or social goal.

25        Further, for the most imbecilic reason of all,

1  Kevin's involvement often hinged on nothing more than the
2  fact that he lived in Eugene and was available, loyal, and
3  lonely.

4          I have a few more comments by way of introduction,
5  Your Honor.  Kevin Tubbs was never a participant in the
6  so-called Book Club and never even heard of it referred to
7  as such until seeing the discovery provided by the
8  government.

9          The government's sentencing memo contains numerous
10  errors.  Some may be simply oversights, some basic
11  misstatements of fact.  For instance, the government
12  repeatedly states that Kevin Tubbs pled guilty to or was
13  involved or responsible for the BPA tower attack.  This is
14  patently false.  This is an error which I'm confident they
15  will acknowledge but is representative of the erroneous
16  information presented to this court.

17          Another example, one that's referred to both in
18  the memorandums discussed this afternoon -- this morning, is
19  a statement that Kevin Tubbs gave Stan Meyerhoff a thousand
20  dollars to travel across the country and start other cells.
21  This is false.

22          Is this up?

23          I apologize, Your Honor.  I'm looking at the
24  bottom of a 302 from Mr. Meyerhoff in which it clearly
25  states that Meyerhoff said that during the 2000 or 2001

1  E-LAW environmental law conference in Eugene, Tubbs, or
2  possibly Rodgers, arranged a meeting between Meyerhoff and
3  Captain Paul Watson.  Meyerhoff at first identified Watson
4  as part of Greenpeace, but after the interview, it goes on
5  to say, "Watson gave Meyerhoff a thousand dollars or
6  slightly more during the 20 or 30-minute meeting.  Watson
7  did not speak of specifics but talked of supplies Meyerhoff
8  needed to continue his work.  It was clear to Meyerhoff that
9  the funds were intended to support the arsons he was
10 committing in the area.  Meyerhoff went to the meeting
11 already knowing that he was there to receive payment and,
12 upon further reflection, believes Tubbs set up the meeting."

13         Again, what we have here, Your Honor, while the
14 government is trying to indicate that Mr. Tubbs was
15 responsible, what we have, at best, is an unclear
16 recollection from Mr. Meyerhoff that Tubbs may have some
17 role in precipitating this meeting, and, again, it's quite
18 clear that he's not certain of that.  What I'd submit, Your
19 Honor, is the truth is being stretched to fit the facts as
20 the government wants to see it.

21         Finally, Your Honor, the burden is on the
22 government to present evidence, clear and convincing
23 evidence that offenses to which Mr. Tubbs has pled are
24 subject to the terrorism enhancement, and specifically, that
25 the motive is calculated to affect the conduct of government

1    by intimidation or coercion, or retaliation against
2    government conduct, what we can term this terrorist
3    motivation.

4         This court has determined that the conspiracy
5    under § 371 can be subject to the enhancement if the
6    government proves by clear and convincing evidence that the
7    specific acts in this case, we are only addressing acts
8    against private property under 844(i), were motivated by
9    this terrorist motivation. We submit that the government
10   has not done so, cannot do so.

11        Additionally, the court has found that 844(f)(1)
12   actions, in this case for Mr. Tubbs we are referring to
13   Oakridge and BLM Burns, cannot be considered as predicate
14   acts for the purposes of the conspiracy. Whether these acts
15   are subject to the terrorism enhancement as substantive acts
16   the court has left open, and I will address this towards the
17   end of my presentation this afternoon.

18        But overall, it's the element, the inquiry into
19   motivation, which is the key to the issues that are before
20   this court today.

21        And even if you were to find that the enhancement
22   applies to some defendants, it does not necessarily apply to
23   Kevin Tubbs. We submit, and I believe the government has
24   conceded that this court has -- has held -- and has held
25   that information elicited from Mr. Tubbs' proffer cannot be

```
 1   used against him.  While it is proper for all such
 2   information to be presented to the court, it is wholly
 3   improper under sentencing guidelines 1B1.4 for this
 4   information to be used against him.  And we'll talk
 5   specifically about which counts that may refer to.
 6             We have provided the court a full and, we submit,
 7   an accurate description of Mr. Tubbs' roles and
 8   responsibilities in each and every action in which he was
 9   involved.  Mr. Tubbs has not shied from addressing both the
10   charged and uncharged events.  We know the government
11   disputes Mr. Tubbs' role in the Oakridge fire and his role
12   at Cavel West and has inflated his role in other incidents.
13             What I would like to do, Your Honor, so you can
14   understand the man that is before you today for sentencing,
15   is delve into his background a little bit before I talk
16   about his particular part -- what happened in the various
17   incidents in which he is charged and to which he has pled,
18   because you can't understand who he is and how he ended up
19   here without understanding this background, because that's
20   the key to understanding the motivation.  What has taken
21   Kevin Tubbs from what I submit is a very naive, a very
22   ineffectual individual to the man who sits here today.
23             And there's a few things, because I know the court
24   has had a chance to read our memorandum in this case, but a
25   few highlights that are really important, Your Honor.  His
```

father served in the military, served honorably in the military, was in the Marines, and then went into the Air Force. Served both in Korea and Vietnam. Met his wife while he was stationed in Germany. They got married. Kevin has an older sister who is sitting here today. Right there. And his niece is also here.

What Kevin's mother instilled in him was a fundamental respect for life and a very fundamental love of animals. And this part of him, this passion is something that has carried him, unfortunately, to this day. As a youth, his mother brought in strays, and animals were always there, always there in his life. And he was fortunate. He was brought up in a good and loving and caring home.

One of the things that his mother also showed him was not only this love of animals, but a caring for other people, a loyalty, a devotion to other people. And, again, that is something that's carried him forward to this day.

Even as a teenager, he began his first involvement in animal rights, animal-related activities. At 15 years old, he joined the National Wildlife Federation and the Audubon Society. He was involved in school.

And yet at the same time, Your Honor, that he was doing these things, he's described as being too introverted and too gentle and that other children were consistently taking advantage of him. His sister remembered that he was

1    a person who could never say no. The fact is that perhaps

2    one of his greatest strengths, one of the things that made

3    people like him the most is, in this case, his greatest

4    weakness, that he had this unconditional loyalty to others.

5            When Kevin graduated high school, money -- there

6    wasn't a whole lot of money in the family, and he enrolled

7    at the University of Nebraska, Kearney State College.  And

8    he discovered there that he had a passion for theater arts

9    and for philosophy.  And he pursued those two passions,

10   those two interests.  In fact, his -- his theatrical skills

11   were awarded when he was a freshman for the Alpha Phi Beta

12   Society -- National Honors Society.

13           But it was more than what he was doing

14   academically.  One thing I should point out, Your Honor, is

15   that from the time Kevin was a teenager, he worked.  There

16   is, in fact, only two gaps in his work history.  One, as we

17   will talk about in a moment, is when he was staying out at

18   Warner Creek, and the current one is now, since he's been

19   incars -- since his arrest.  He worked in high school.  In

20   college, he worked.  In his second year as a junior, he was

21   hired as a TA and -- or not -- I'm sorry.  Not TA.  An RA.

22   And was responsible for the dorm.

23           But something major happened in Kevin's life in

24   his junior year.  In his junior year, he decided to accept a

25   transfer to Humbolt State University.  And again, I just

1    point, for the record, in the government's memorandum, they
2    indicated that he graduated from Humbolt State.  That is not
3    true.  He was there for one year.  In fact, he originally
4    went out to Humbolt State with the intention of only staying
5    for one term, and did extend that for a full year.

6         Kevin relates to me -- I asked him how he ended up
7    going to Humboldt -- picking Humboldt as a school, because,
8    again, you know, being from Oregon, we have a sense of what
9    that university -- that school is like and what it's known
10   for.

11        Kevin saw a map, saw a school, saw a dot for
12   Northern California, thought that he was going to be near
13   San Francisco, and just chose that.  So when he got to
14   Humbolt State, Your Honor, he literally had no idea of the
15   sort of culture, environment that he was coming into.  And,
16   again, as an intelligent, alert young man, he fell in.  He
17   continued to work, but he fell in.  He was amazed by all the
18   people that were doing tabling, tabling for every group
19   there was and, particularly, tabling for animal rights
20   organizations.  And because he had -- already had this
21   passion, this love of animals, when he first discovered
22   PETA, when he first discovered EarthFirst!, these were
23   things that interested him.

24        He made another discovery, Your Honor, one of many
25   there.  He discovered marijuana.  Had never had it -- used

1  marijuana before. Unfortunately for him, he discovered that
2  he liked it, and it became an habitual problem up until the
3  time of his arrest. And it's certainly a piece of his life
4  that he regrets, but also, not as any excuse, explains a lot
5  of the things that happened to him later on.

6        But Your Honor, there was another discovery that
7  he made, this book, and a professor. This book literally
8  changed his life, Your Honor. This is a book that, when he
9  read it for the first time, discovered -- and for him it
10 truly was a discovery, that not only were animals loving and
11 gentle creatures, but they were sentient beings. That they
12 were no different, no less than you or I. And this -- not
13 only was this a realization for him, but it changed his
14 life. He became a vegan. From an individual who had grown
15 up in Nebraska eating beef, he swore off.

16       And after his year at Humboldt, he returned to
17 Nebraska, and his family noticed that there was a change in
18 him. But he was still the gentle Kevin that they had always
19 known. But, you know, they weren't upset. They weren't
20 disturbed, but they noticed that there was a change.

21       His senior year in college, back in Kearney --
22 Kearney was significant. Shortly after school started, he
23 became involved in another theatrical production, *The*
24 *Crucible*, and a few days before the premiere, his father
25 died. It was very sudden, very unexpected, and it had a

1    major impact on him.

2            One thing I forgot to mention, Your Honor, is I

3    think I read somewhere, perhaps in the government's memo,

4    they were trying -- they were suggesting that there was a

5    distance between Kevin and his father.  There wasn't a

6    distance, Your Honor.

7            THE COURT:  I didn't read that, so --

8            MR. FRIEDMAN:  Okay.

9            THE COURT:  -- if it was there, it didn't have an

10   impact on me.

11           MR. FRIEDMAN:  Okay.  What I'd simply want to

12   point out is Kevin, in fact, had considered going into the

13   military as -- like his father had; in fact, had been active

14   in ROTC when he was in high school and sort of been

15   considered a geek as a result -- because of it and

16   considered enlisting in the Marines but essentially was

17   talked out of it by his mother, who did not want him to do

18   that, and he ended up in college instead.

19           But my point is that his father was a very

20   significant figure for him.  And when his father died, he

21   lost that central role.  He lost a very significant, central

22   role.  And yet there's a story that we have to relate that,

23   even though his father had passed away, he drove down to

24   Omaha to attend the funeral.  He then turned around and

25   drove right back up so that he could be there for the

1 premiere of this play that he was in, out of his duty, out
2 of his loyalty to the people that he was with in the play.
3 It was also in his senior year at Kearney that
4 Kevin became involved in his first animal action. And what
5 that was, there was a shoot-on-sight rule for crows.
6 (Reporter interrupted.)
7 MR. FRIEDMAN: Shoot-on-sight.
8 THE COURT: Shoot-on-sight.
9 I really -- honest to gosh, I read everything
10 everybody gives me. I could recite back that he went back
11 to go to *The Crucible* to be in that play. I can recite this
12 back to you, just as I can recite Ms. Gerlach's for
13 tomorrow. The only thing I haven't seen in Ms. Gerlach's is
14 the video, which I will watch tonight. I read every word
15 that's filed, so you don't have to read it out loud to me.
16 MR. FRIEDMAN: And I'm not trying -- what I'm
17 trying to do is --
18 THE COURT: I'm going to tell you, if you are
19 going to do what you are highlighting, we are going to be
20 here until way into tomorrow, because you wrote a long memo.
21 MR. FRIEDMAN: I apologize.
22 THE COURT: No. No. I'm fine with it, but you
23 are hitting highlights in a condensed part of a very large
24 memo, and you have a long way to go.
25 MR. FRIEDMAN: I will do that, Your Honor, because

1   what I want to get at, Your Honor, is how someone like Kevin
2   Tubbs ended up being involved in these kind of actions.  And
3   the sense of it is, and, again, as the court well knows, he
4   got involved in animal actions.  The extent of his
5   involvement grew exponentially.  The fact is that when he
6   became involved with -- after college, became involved with
7   PETA, he did a variety of actions; basically, again, sort of
8   more drama, more designed to elicit publicity.  But, again,
9   this was something that was very close, deep to his heart,
10  because his goal was to raise public awareness and to help
11  those that were -- could not speak for themselves.

12          There are some wrong terms.  And, again, this
13  is -- so I don't repeat what's in the memo, I just want to
14  emphasize that it was also around this time that perhaps the
15  creature that became his closest friend, his dog, entered
16  his life, Peugeot.  And it was also around this time, Your
17  Honor, that he suffered a significant loss.  There was a
18  house fire.  And it was at that house fire that the police
19  came and they found three marijuana plants.  And that's the
20  basis of the conviction that the court -- that counsel has
21  referred to in this case.  Possession of three marijuana
22  plants, which apparently under Nebraska law considered more
23  than a pound.

24          This involvement with PETA, civil disobedience,
25  he's encouraged to do this.  Everything around him tells him

1    that this is a positive, constructive action. And I'm not
2    here to debate whether some forms of civil disobedience are
3    right or other forms of civil disobedience are wrong, Your
4    Honor. What I simply am trying to impress upon the court
5    here is that, one, they encouraged his arrests; and two, so
6    that the court clearly understands, the places where the --
7    the actions that perhaps the government has described as
8    throwing urine on a police officer or dumping cat excrement,
9    that simply is not the way it happened. What actually
10   happened was that yellow water was thrown, was spilled to
11   represent -- to represent cat urine. That kitty litter was
12   dumped. These were actions, again, designed to raise public
13   awareness, publicity.

14          And, again, it's Kevin being drawn closer and
15   closer into this knit in which the people that he's in
16   contact with are sort of reaffirming that this type of
17   action is right, this type of action is proper. And there's
18   this -- sort of this gradual escalation that's occurring,
19   from dressing up in a cow costume to being arrested at a
20   protest in front of a pharmaceutical company. That
21   escalation is encouraged by the people that he was with.
22   And he spends a summer involved in that, working for PETA in
23   D.C., and when that job ends with the girlfriend that he's
24   met there, a woman named Sis (phonetic) Anderson, he gets a
25   job, gets an offer of a job in Eugene working for

1    EarthFirst!, for the *EarthFirst! Journal*.  And he's already
2    aware of them, has already come across them, had already
3    attended a meeting where he had heard Darren Thurston speak,
4    and thought it sounded great.

5        So he came out to Eugene for the first time.  And
6    his only contacts in this town are his girlfriend, who
7    hasn't been here before, and this radical community that
8    evolved around EarthFirst! down in the Whiteaker area.  And
9    this is pre-Warner Creek.  He works there, has a very
10   short-term job, and his hope was that the job would -- where
11   he is an editor would blossom into something greater.  But
12   it's not, because essentially what the job is designed for
13   is to bring people in, to indoctrinate people into these
14   activities, into these actions with EarthFirst!.

15       And without a job, without a place to live, he's
16   forced to live out of his car.  He and his girlfriend are
17   forced to live out of his car.  He gets by with Dumpster
18   diving, and it's through that that he makes some of his
19   first contact with Jacob Ferguson who, as time goes by,
20   becomes -- for the most part, becomes his one and only
21   friend in Eugene.

22       And when he's -- when he asks if he can stay, camp
23   on the grounds of the EarthFirst!, he's told, no.  No.  But
24   there's this action starting.  There's people that are
25   moving to a camp up in Warner Creek.  And really having no

1    idea what it's about, he goes up there. And he's up there
2    for a long time, Your Honor. And yes, I will agree with the
3    government when the government points to the fact he made
4    connections there. There were a number of people that he
5    met at Warner Creek. Kevin was not a leader. Kevin was not
6    an organizer up there. In fact, I note from the video clip
7    that the government showed this morning, the inference that
8    somehow there's leadership, I think the leadership is
9    pointing out perhaps where axes and picks are, at most.

10    But Kevin was also encouraged at that point to
11    take risk, and as you saw in the video, and actually, I will
12    note in a video clip that we are going to be showing, he's
13    up on that same bipod structure. He's encouraged to take
14    the risks for the cause. For the cause. He becomes a tool,
15    Your Honor. Not a leader, not an organizer. Just simply a
16    functionary. And for someone like Jacob Ferguson, that's
17    exactly what he's looking for, is a tool. Somebody that
18    will be there at his disposal, at his beck and call.

19    After his stay up at Warner Creek, Your Honor,
20    Kevin moved back down to Eugene, got a job as an office
21    cleaner, is living for a short period of time with his
22    girlfriend, Sis, and the relationship that had been going on
23    for about a year and a half, almost two years, breaks up,
24    ends, ends quite suddenly, and for Kevin, it's quite
25    devastating when it ends, because, Your Honor, what Kevin

1   discovers is that the people that he thought were his
2   friends, people that were associated with Warner Creek,
3   people that were associated with this radical community,
4   since Sis's new boyfriend was somebody that was apparently
5   more favored within the community, they chose sides, and the
6   side they chose was hers.  And Kevin, again, found himself
7   alone and isolated in a town in which he had no connection.
8   And he worked.  He worked hard.  Managed to get by, taking
9   on a second job after a while.  Trying to medicate himself
10  with marijuana.

11          And the only person that was there, the only
12  friend that he had, was Jacob Ferguson.  And Jacob Ferguson
13  is an individual who has an interesting background.
14  Jacob Ferguson has an interesting background.  In fact, of
15  all the people that are involved in these actions, I think
16  what the court may discover, and perhaps the court already
17  recognizes, is that we basically have a pretty middle class
18  group of folks.  Jake is the -- Jake Ferguson is the
19  exception.  He's the guy that came from the wrong side of
20  the tracks.  He's the guy who firearms, explosives, and
21  things like that are nothing new to him.  Something that he
22  freely admits in his statements to the government.

23          I have got -- I just put up here a little brief
24  portion of the -- Mr. Ferguson's 302, and he's just sort of
25  relating what his background is.  And the fact of the matter

1    is, Your Honor, that his background is -- he knows about

2    explosives.  He knows about pyrotechnics.  He's the fellow

3    that introduces Kevin to the zines.

4         Now, I'm not sure if the court's familiar with the

5    zine scene, and the fact is we are talking about a period of

6    1995 going into 1996.  If you think back, Your Honor, this

7    was a period of time where, while the Internet has started

8    to blossom, it's not -- it's certainly not where it is

9    today.  And so a lot of the radical information was being

10   publicized through these zines that you could pick up just

11   about at any -- a lot of the bookstores.  They were things

12   that were freely available in many places down in the

13   Whiteaker area.  They weren't hard to find.

14        And amongst them were zines that talked about how

15   to make destructive devices, these -- these devices that

16   Kevin freely admits he later used at the Echo Dairy, the

17   Dutch Girl dairy.  This was something that had been provided

18   to him by Jacob Ferguson.

19        Your Honor, Kevin steps off into this radicalized

20   community, encouraged by the only friend he had, thinking in

21   perhaps the most -- in hindsight, it just seems so

22   outlandish that someone would -- could believe this, but

23   somehow thinking that by causing destruction at the dairy

24   that he would win back his girlfriend.  That she would see

25   him as this radical activist, and that the guy she had taken

1   up with was not the man that he was.  It's ludicrous.  It's
2   a ludicrous idea, Your Honor.  But that's what was going on
3   in his mind.  And that was an idea that was encouraged by
4   Jacob Ferguson.

5          With that, Your Honor, I'd like to turn to the
6   incidents with which Kevin is charged.  I have provided to
7   the court, and we are going to put up here a -- what we call
8   a roles worksheet.  What we have attempted to do is distill
9   from all the 302s the various roles that different people
10  played on not all the actions, but certainly a significant
11  number of the actions in which -- certainly all the ones in
12  which Kevin is charged today and all the significant pieces
13  that involve arson.

14         Now, the first amongst these, aside from Echo
15  Dairy, and, again, I don't think there's any disagreement
16  that Kevin was responsible for the Echo Dairy.  And --
17  however, it is outside the scope of these proceedings.

18         The first action was the Detroit Ranger Station,
19  and that was an action in which Jacob Ferguson and Suzanne
20  Overaker -- I'm sorry -- Sunshine Overaker and a woman known
21  as Raven were responsible for.  And what happened there,
22  Your Honor, was that Jacob Ferguson, wishing to do harm to
23  the -- wishing to do harm, wishing to do mischief, really
24  can't be sure, recruited a woman named Raven to drive his
25  car -- to drive her car, in fact, up there.

1           And we submit, it is identical to what
2   Mr. Ferguson did three days later with Kevin Tubbs.  Now, we
3   know here, this is one of the -- this is a place within the
4   discussion that the government clearly disagrees.  The
5   government says that Kevin Tubbs was responsible for
6   creating the -- the device.  And what they have done is they
7   have pointed to -- they have attempted to point to a
8   similarity between the device that was used at Echo Dairy
9   and the device that apparently was used at the Oakridge.
10  And what they have relied upon, I believe, Your Honor, is
11  Kevin's 302.  Kevin's 302.  First of all, we'd submit that
12  that's not admissible.  That's the only evidence that they
13  have of the type of device.

14          But there's more than that, Your Honor, that would
15  suggest that the government is just flat-out wrong in terms
16  of determining what Mr. Tubbs' role was in this particular
17  incident, because the fact is that where Mr. Tubbs lived at
18  that time, he had a number of roommates, and it would have
19  been virtually impossible for him to have created these
20  devices the way Mr. Ferguson suggests that he did.

21          The fact is that he was simply a tool that was
22  used by Mr. Ferguson to create a fire.  He did nothing more
23  than drive the vehicle out there, not even knowing why he
24  was going out there.  He had been out there.  There's no --
25  we are not disputing the fact that he had been out there on

1   a previous occasion with some other people where apparently

2   there had been some spray-painting and things like that.

3   But the fact of the matter, even in terms of trying to

4   define a cause for this, Mr. Tubbs did not know what

5   Jacob Ferguson had already done at Detroit Ranger Station.

6   And what he did know was that -- the success that had

7   already occurred with the result of the legislation -- or

8   the litigation regarding Warner Creek.  So there wasn't a

9   motive there, Your Honor, and it's significant in terms of

10  understanding how Kevin ends up being there.

11          For Mr. Ferguson, we are not in any position to

12  explain Mr. Ferguson's thinking in this.  Why he would --

13  why he would cast Kevin in a worse light other than to

14  suggest that he's trying to diminish his own responsibility.

15  But the other thing that is very significant, Your Honor, is

16  as we look at all these other incidents where Kevin was

17  involved, I don't think that there's a whole lot of dispute.

18  There may be some dispute with regard to Cavel West in terms

19  of Kevin's actual role, and I think it's more of technical

20  argument than a factual argument.  But with regard to every

21  other incident, I think there is agreement with regard to

22  the facts.  And we can establish that not only, obviously,

23  from what Mr. Tubbs said, but what all the other people that

24  have submitted information to the government have said in

25  these cases.

1            Finally, Your Honor, what I'd suggest, again,
2     considering Oakridge and considering Jacob Ferguson in this
3     case, I know full well that the court is well aware that
4     people -- that deals -- wonderful deals are made all the
5     time in pursuit of an investigation of a case.  The only
6     thing we would ask this court to keep in mind in looking at
7     this chart is understanding what a critical role
8     Jacob Ferguson played, not merely in Oakridge, but in all
9     these other instances as being the primary motivator, the
10    primary person who was out there in terms of choosing
11    targets, in terms of recruiting people, in terms of building
12    these devices.

13            The other thing we'd suggest, again, just
14    backtracking for a moment with regard to Oakridge, is the
15    fact that Ferguson's claim is that Tubbs wanted to build the
16    device because he was better able -- he believed he was
17    better able to do it, but, again, as we have just shown with
18    that statement from Mr. Ferguson, he's the one who had the
19    expertise, he's the one who had the knowledge.  It just
20    would -- doesn't make any kind of logical sense to think
21    that he would defer to Mr. Tubbs in building a device in the
22    situation we are at, particularly where it's what
23    unfortunately ends up being such a significant, significant
24    fire.

25            Your Honor, I'd like to turn to Cavel West.  And

1    the first thing I need to point out, you know, Kevin Tubbs
2    was involved in a lot of incidents.  We know that.  But as
3    the government was perhaps suggesting yesterday with regard
4    to Mr. Meyerhoff, there is sort of this acceleration for --
5    in terms of his culpability where it kind of goes like this,
6    escalating, escalating to the point at which he is --
7    whether he would do it or not, who knows -- thinking about
8    actually hunting down people and killing them.  The fact of
9    the matter, for Mr. Tubbs, is the exact opposite.  There's
10   decline.  Yes, it stretches over a long period of time, but
11   his role is less and less and less to the point at which he
12   is trying, desperately trying to withdraw from these
13   incidents.

14        Almost a year -- not -- not quite, but almost a
15   year passes before Cavel West occurs, and in that time, Your
16   Honor, Kevin becomes aware of the slaughterhouse.  And,
17   again, as we submit to the court, it is critical to
18   understand his thinking about animals and his love of
19   animals, and the thought that horses are being slaughtered
20   is just literally too much for him.  It's overpowering.

21        I have a very brief video which I would like to
22   show the court now.  And I -- I will preface this.  This is
23   an excruciating video to watch.  It shows horse slaughter.
24   But you have got to understand that someone like Mr. Tubbs,
25   who feels so deeply, who values life so greatly, is moved to

1    tears by the death of any creature, how the idea that horses

2    like this could be treated, is just too much.

3             I apologize in advance.

4                (The video was played; not reported.)

5             THE COURT:  If it's just more than one episode, I

6    have seen it.

7             MR. FRIEDMAN:  Okay.  It's multiple repeats of

8    horses going through this.

9             I simply -- I simply offer that, Your Honor, to --

10   so the court can understand what the true motivations were

11   for Mr. Tubbs.  Your Honor, Mr. Tubbs has freely

12   acknowledged his responsibility for identifying the

13   location.  We saw -- there was an article we heard about

14   that appeared in *The Register-Guard*.  He saw it.  He went

15   out there with his dog, saw this building, saw the horse

16   pens, wondered whether there was any way that the horses

17   could be released from these pens.  Realizing the size of

18   the facility, the location of the facility, thought that it

19   was useless.  Thought that perhaps the only thing -- and,

20   again, we fully acknowledge, he wanted to do something, he

21   wanted to do something.  But it was his belief that perhaps

22   all that could be done was that it could be tagged, graffiti

23   could be put on these buildings.  That there was no way to

24   safely free these horses because they were right within or

25   close to the town.  That there were railroad tracks, a road.

1   He did.  He talked to two other people, Your Honor.  He
2   talked to his old friend, Jacob Ferguson, and he talked to
3   Joseph Dibee.  It probably was a big mistake having those
4   conversations with them.  He knew at that point that
5   Ferguson was prone to fire starting but still didn't believe
6   that anything like that was possible.  What he didn't
7   understand or realize, I guess, at that point was
8   Mr. Dibee's ingenuity, and the fact was that Joseph Dibee
9   conceived a plan and that Joseph Dibee, if there was any
10  leader, any coordinator in this action, it was Mr. Dibee.
11  It was Mr. Dibee who came up with this idea of drilling
12  holes in the building.  It was Mr. Dibee who conceived the
13  idea of creating this -- what they call this vega gel for
14  introducing into the building.  Ferguson definitely played a
15  considerable role in terms of creating the timing devices.

16          All Kevin Tubbs did was tell two people that there
17  is horrific horse slaughter taking place at Cavel West.  And
18  all Kevin Tubbs desired to do at that point in time, Your
19  Honor, was end that horse slaughter.

20          He certainly was not thinking, considering, wasn't
21  even in his vision the notion that somehow that where the
22  horses came from or how -- how -- what impact this might
23  have on the facility.

24          And I think he's perhaps as stunned as anyone, in
25  terms of discovery, what Mr. Dibee was capable of doing.  I

1   think there is some evidence that perhaps has been offered
2   by other counsel in this case that indicate -- that actually
3   indicates that the horses were not horses that came off --
4   off of public lands.  That they were purchased privately.
5   And, again, I would submit that that was not something that
6   was on Mr. Tubbs' radar at all.

7           It was also Mr. Dibee that, in turn, contacted
8   Jonathan Paul, and it was Mr. Paul, I believe, that perhaps
9   brought in Ms. Kolar.  There's no question that Mr. Tubbs
10  started a chain of events, but his role in this was nothing
11  more than to identify the site and then to eventually act as
12  a driver and a lookout for this action.

13          Your Honor, with regard to the Burns BLM facility,
14  first of all, we would submit that information that was
15  derived from Mr. Tubbs' proffer cannot be used in this case.
16  What we submit is that, again, if there was -- if there was
17  any goal in this, and there's been reference to -- obviously
18  to the communiques that were written after Cavel West, the
19  communique that was written after Burns.  There's no mention
20  whatsoever with regard to the Cavel West communique relating
21  to government or government action.  It is strictly speaking
22  to the slaughter of wild horses.

23          With regard to Burns, and, as I say, I will have
24  legal argument in a little bit as to whether or not the
25  terrorism enhancement can apply to this situation or to

1   Oakridge.  The fact of the matter is that the goal was to

2   stop horse slaughter.  And there wasn't any intent in terms

3   of doing harm to anyone.  This was a site that was

4   originally found by Jacob Ferguson when he -- apparently he

5   had a habit of driving around trying to find places that

6   could be attacked or places where animal releases could

7   occur.

8           And at that time, Mr. Rodgers was involved in

9   this, and it was -- Mr. Rodgers was Mr. Ferguson's roommate.

10  And so it is a fairly safe presumption that it was

11  Mr. Ferguson that brought Mr. Rodgers into this action.  It

12  was Mr. Ferguson that decided that the fire could take

13  place, and it was Mr. Rodgers who determined -- who figured

14  out a way of opening up the corrals so the horses could be.

15          Again, Mr. Tubbs' role here was solely to drive.

16  And, again, you know, we sort of have this overall theme in

17  terms of Kevin is sort of being brought along on these

18  actions as someone who is a useful tool, since he is willing

19  to drive and, unfortunately, because his network of friends

20  is awfully small.  He is essentially trying to satisfy the

21  needs of others.  And if I haven't mentioned it in the past

22  few minutes, I will mention it again.  You have got to

23  understand that Kevin is someone who certainly at this point

24  in his life was still dealing with a rather deep depression.

25  And the -- the approval that he received from these other

1    people was significant.  Yes, there's no doubt that in his
2    mind, the fact that it was designed to save animals was --
3    was so, so important.  But it was also the approval that he
4    received from his friends.

5         Your Honor, for Mr. Tubbs, there is significant
6    change.  He continues -- while all these things are going
7    on, he's working two jobs, basically getting by.  Just
8    getting by.  And, you know, periodically, again, we have got
9    almost a -- over a year later with the U.S. Forest
10   Industries in Medford occurring, this -- this being an
11   incident in which, again, Mr. Ferguson recruits,
12   Mr. Ferguson conceives, Mr. Ferguson gets Kevin to drive.
13   And fortunately for Mr. Tubbs in this case, when he actually
14   drove out there, they weren't successful.  This was simply
15   an attempt on a -- on that facility.  Apparently if you --
16   after Mr. Tubbs had left, in fact, had gone to Nebraska to
17   visit family, as counsel has indicated, Mr. Ferguson went
18   back, and with the help of, I believe Ms. Tankersley,
19   actually got -- started the fire and got it to burn.

20        Childers Meat is a site that Mr. Tubbs
21   acknowledges he identified.  There was an occasion around
22   May 9th which was, unfortunately, Mother's Day, in which a
23   number of people had gotten together.  And again, you know,
24   one of the things that's important for the court to
25   understand is Kevin sort of is the central role; whereas,

1    all these other people are sort of coming and going from
2    Eugene.  Kevin's the guy that stays here.  He's always here
3    throughout this whole course of events.  In fact, I'm sure
4    the court is well aware of this:  When people were arrested
5    back in December of '05, Kevin was arrested here in
6    Springfield at his work, whereas other people came and went.
7    And that's essentially what had occurred with regard to
8    Childers.  It was a -- a tragic concurrence of these people
9    all being in town at the same time, "these people," I mean
10   Mr. Meyerhoff; Ms. Gerlach; Mr. Ferguson; Ms. Overaker;
11   another person, Louise; and Mr. Tubbs, and there being --
12   and actually, I believe there was -- there may have been
13   another person as well.  These people came together, and
14   there was a desire to do something.

15            I can't completely rationalize that, Your Honor.
16   I can't completely understand, and I don't intend to make it
17   any more sensible to the court than it is.  It was -- these
18   are stupid acts.  The butcher shop, the meat company, was
19   identified, and, again, for -- it was identified by
20   Mr. Tubbs because this was -- this was an institution that
21   profited from harm to animals, harm to cattle.  And a plan
22   was conceived and devices were built by Mr. Ferguson, and I
23   don't think Mr. Meyerhoff actually built devices in this
24   instance.  And Mr. Tubbs drove them out there and they set
25   these devices.  And we know what resulted.  Again, there

1   clearly was not -- no intention to do harm to anyone.  And,

2   you know, the court -- I can certainly appreciate that the

3   court rejects the notion that steps were taken to avoid

4   injury.  That accidents could have always occurred.  But

5   thankfully, they did not.  And they did not occur here

6   either.  But, again, it's simply critical to understand that

7   Mr. Tubbs identified the site and drove out there.

8          Your Honor, I've got to say that after Childers

9   Meat market, everything else that Mr. Tubbs was involved in

10  is just plain-out stupid.  There is no reason that he could

11  have or should have said yes when asked to participate.  He

12  was trying to pull away, was trying to withdraw and, in

13  fact, had avoided other actions.  He had avoided the

14  Y2K-type actions when he had been asked.  He had been asked

15  to participate in the BPA and had said no.  He had been

16  asked to participate in other actions and had said no.

17         But in September of 2000, in fact, on

18  September 5th of 2000, when Stan Meyerhoff came to him and

19  said, we need a lookout, we are going to do -- you know, we

20  are going to do something, Kevin had no idea why or what.

21  Basically, he felt a duty, a loyalty.  And although he

22  indicates that he initially resisted, he gave in.  You

23  simply have to appreciate the person that Kevin Tubbs is to

24  understand that under pressure of a friend, out of a duty of

25  loyalty, you'd say yes to something that you know full well

1   is stupid and purposeless. But he did. He acted as a
2   lookout that night. He did not withdraw.

3       But he clearly, and this is quite important, Your
4   Honor, he didn't even have any idea why they were doing it.
5   It was simply something that, when asked, he said yes. And
6   his role was extremely minimal, a matter of biking over to
7   13th and Alder and standing there and watching while
8   Mr. Meyerhoff and Ms. Gerlach left their bikes with devices
9   on them. He wasn't even aware of exactly what they were or
10  what the devices were.

11      Again, I don't know that other than trying to put
12  Kevin's role in perspective, Your Honor, I can truly explain
13  why Kevin was involved in some of these actions. And
14  Superior Lumber is -- is just such a situation. It wasn't
15  something that he had any involvement in terms of planning.
16  It was something that was put together by Mr. Ferguson and
17  Mr. Meyerhoff and Ms. Gerlach. Apparently, you know, we
18  know from the 302s, or at least from Mr. Ferguson's 302,
19  that it was a site that was identified by Ms. Tankersley.

20      He was recruited, and he acted as a lookout. And
21  other people that Kevin didn't even know at the time, that
22  being Mr. McGowan and apparently Ms. Savoie, were brought in
23  as well. Again, these were people that Kevin could never --
24  that Mr. Tubbs had never met before, but there they were.
25      Romania Chevrolet. Mr. Tubbs is facing, I forget

1   how many counts, 35 counts with regard to this fire.  From
2   the 302s, it indicates that someone had withdrawn -- in
3   fact, I think it's from Mr. Ferguson's 302s, he states that
4   there were not going to be any local people involved in
5   this, and that's why he did not participate in Romania
6   Chevrolet.

7           We don't know exactly who it was.  You know, we
8   can speculate that perhaps it was Mr. McGowan that was
9   supposed to have participated in this one but did not.  What
10  we do know is that, again, at the last minute, when Stan
11  Meyerhoff tells him, hey, we have got this whole thing and
12  we need a lookout, Kevin succumbs to that pressure and says
13  yes, I will do it.  These are not rational acts, Your Honor.
14  But, again, in terms of what role Kevin actually played in
15  these things, it's critical to understand that.

16          You know, I don't think that it was even until we
17  had a chance to start looking at the discovery in this case
18  that Mr. Tubbs even had a clear idea of what aims were
19  intended by this.  He played no role -- no part in the
20  communique.  Again, his participation was the night before
21  being contacted by Mr. Meyerhoff to show up and to jump in a
22  van and jump out and stand at a telephone station across
23  Franklin and just be the lookout.  But he had no sense of
24  what reasons anyone would want to do this.  Certainly had no
25  idea, even in terms of who was doing what in this incident

1   other than the fact that he was asked by Mr. Meyerhoff.

2           The fact is that Mr. Tubbs did not even know who

3   this Free and Critter were. He was not part of that

4   community.

5           He also stands charged in this case with multiple

6   counts with regard to Jefferson Poplar. And, again, this is

7   one where, you know, through the course of the plea, it was

8   necessary for Mr. Tubbs to acknowledge that he did play a

9   role in this. But what the court needs to understand is

10  Kevin's role in Jefferson Poplar was so minute, what he did

11  was he was asked about six months before, back in September,

12  October of 2000, he was asked by Mr. Meyerhoff to go with

13  him to Clatskanie, Oregon. And he went there. Drove down.

14  In fact, he -- they drove down with a bunch of people. It

15  was -- Meyerhoff drove, and Ferguson and McGowan and Savoie

16  and Mr. Tubbs. And when they got there, it was after dark.

17  Kevin did not even get out of the car that night. And then

18  they drove back up -- or back down to Eugene.

19          In January of 2001, Meyerhoff, maybe Ferguson,

20  it's not -- we're not quite clear on this, came back to

21  Kevin's house to let him know that apparently they had

22  decided that they weren't going to do Jefferson Poplar. And

23  that is the last that Mr. Tubbs ever heard of that. He did

24  not -- was not there, did not participate. It was eight

25  months later, in May of 2001, that apparently Mr. Meyerhoff

1    and all the other people went to Jefferson -- went to the
2    Jefferson Poplar facility.  Kevin did not go.

3              We talked about, briefly, that there are other
4    uncharged, including the Echo Springs Dairy, incidents with
5    Kevin.  Kevin's other involvement were animal releases, mink
6    farms, and, again, I would submit that he did this out of
7    his love, his caring for animals.  The Palmer, he was there
8    and acknowledges that he was there for the APHIS attempted
9    arson or arson, I'm not quite sure, in Olympia, Washington.
10   Again, this was an action that was planned, and to the
11   extent it was executed, it was executed by Mr. Ferguson with
12   some assistance from Mr. Rodgers.  It's one -- it's a
13   situation where everything that could have gone wrong went
14   wrong.

15             The government's also referred to the BLM corral
16   at Rock Springs, Wyoming.  Again, it was a situation where
17   nothing happened.  There's been some reference that Kevin
18   had involvement in Vail.  We submit the only thing Kevin
19   Tubbs did that is at all related to Vail is background,
20   October 10th or 11th, I guess about October 10th, he drove
21   with Jacob Ferguson, and obviously I don't recall who else
22   was in the van with him, he drove straight through from
23   Eugene, Oregon, to a rest stop some distance from Vail.
24   Again, this was at the direction of Ferguson.  Got to this
25   rest stop and fell fast asleep.

1               And the next thing he remembers is he woke up, and

2   they were in Wyoming, and they were at the Rock Springs at a

3   campground that was adjacent to the Rock Springs facility.

4               That is the extent that Kevin had any involvement

5   whatsoever in Vail.  I hope I have made it clear to the

6   court in terms of what Mr. Tubbs' motivation was with regard

7   to all these incidents.  I just -- you know, it really boils

8   down, in so many ways, to simply trying to give a ride to a

9   friend or acting out of a duty of loyalty.  The actions in

10  which Kevin participated and participated in any kind of

11  active way, Your Honor, were those actions that were

12  relating -- that relate to animal rights, animal cruelty,

13  animal freedom.  Those are the things that meant something

14  to Mr. Tubbs.

15              These other actions, these so-called ELF actions,

16  if he was there, when he was there, he acted out of blind,

17  dumb loyalty.  He acted out of a feeling that the only way

18  I'm going to have anything in my life is by helping these

19  people.  And Your Honor, in 2001, that began to change.  Or

20  actually, in late 2000, that began to change for him,

21  because it was at that point in his life that he met his

22  fiancee.  And it wasn't immediate.  It took some time for

23  him to -- for them to develop their relationship and for him

24  to feel comfort in that.

25              There is, and we -- we need to talk about this,

 1    there is the Litchfield BLM incident, which is late in
 2    2000 -- or in October of 2001.  He had -- at that point in
 3    time, although I don't believe that they were living
 4    together yet, he had started to have a relationship with
 5    Michelle Page.  And, again, you know, when asked, but
 6    essentially the only close friends that he's had for many,
 7    many years, he says, yes, and he drives.  That's what he
 8    does.  He drives.

 9          But the other thing is Kevin had begun, at that
10    point in time, although he had been trying to withdraw and
11    trying to exit from this association with these friends, he
12    told them at that time at Litchfield, that's it.  No more.
13    I'm out.  Don't call me.  Don't ask me.

14          He never participated, Your Honor, in any of these
15    Book Club meetings, never even heard about -- never even
16    heard it called the Book Club.  Had been asked, had been
17    asked to join these things, and he flat-out refused, because
18    that was not what was part of him.

19          There is a suggestion that Mr. Tubbs continued to
20    be active.  That he continued to try and participate in
21    the -- in these -- at least maintain some loyalty.  And I
22    recall at the end, the government has a -- showed a slide in
23    which Mr. Tubbs shows -- showed a connection with all these
24    other people, being Mr. Ferguson, Mr. Meyerhoff, and
25    Ms. Gerlach, and Ms. Thurston, and I believe Mr. Paul.

1    The reality is that he is not the individual who
2    could turn his back on a friend. And yes, he continued to
3    see them occasionally. Ms. Gerlach became a DJ and
4    apparently gave -- did house concerts, things like that, in
5    Eugene. And so when she was in town, he would -- he would
6    have -- they would get in touch, and he'd see her. Again,
7    there was nothing, nothing to suggest anything other than
8    a -- a saying hi, how are you. Nothing nefarious about it.

9    The other thing I want to talk about just briefly,
10   Your Honor, is the government has tried to suggest that
11   Kevin had this greater role because there were these birth
12   certificates and these IDs and things like that that he was
13   either responsible for or, at the very least, had in his
14   possession.

15   There's really only two things I need to say.
16   First of all, these birth certificates, that birth
17   certificate, that was something that was provided to him by
18   Mr. Ferguson. It was not something that he created on his
19   own. His knowledge of creating false IDs, again, this was
20   information that was provided to him, taught to him, I
21   guess, by Mr. Ferguson. It was not something that he
22   generated on his own. And the identifications that were
23   found in his property at the time of his arrest, he wasn't
24   involved in any group. He wasn't trying to secret fugitives
25   out of the country. Had he turned his back on friends? No.

1  Was he about to assist somebody in any kind of action or
2  even assist them realistically in any type of endeavor to
3  avoid -- avoid prosecution?  No.

4          Your Honor, the fact is that when Mr. Tubbs was
5  arrested on -- in December 5th, 2005, obviously he was
6  shocked because this was something that was past.  It was
7  well in his past.  And he hoped, he hoped that he would --
8  you know, he knew he had done terrible things.  But he hoped
9  that it would be something that would be forever behind him.

10         And he talked at great length with his old friend,
11  Mr. Ferguson.  And Mr. Ferguson acted at the government's
12  direction in talking with Mr. Tubbs.  And there's -- there's
13  been an attempt to suggest, from some of these
14  conversations, that Kevin was still this -- this true
15  believer.  That Kevin was still there.  And what I have got
16  to say is Kevin knows, he understands that he's caused a
17  great deal of harm.  But at the same time, if you were to
18  ask him, did the action to save an animal, was that -- was
19  that completely wrong, he can't reject that.  He's not going
20  to reject that.  He's going to reject the tactic.  And
21  that's what, in terms of conversation that occurs between
22  Mr. Ferguson and Mr. Tubbs, that's what he's talking about.
23  He's not talking about this span of activity.  What he's
24  talking about, Your Honor, is did he do anything that was
25  perhaps still right, still, in a distorted way, justified?

1    I think he can say that that -- that was.  And he's prepared
2    to pay the price for that, for saving those animals.  What
3    he doesn't want this court to do is enhance his role beyond
4    what it really needs to be.

5         What I'd like to ask the court now is I have got a
6    video, just to give you a little idea of his family and his
7    background.  And then we have got one, his fiancee, who
8    would like to speak, and then I would like to deal with some
9    of the legal issues in this case.

10        (The Video was played; not reported.)

11        MR. FRIEDMAN:  I'd ask Michelle Page to come up.

12        MS. PAGE:  My name is Michelle Page, P-A-G-E.  And
13   I have been in a relationship with Kevin since 2001.  I feel
14   that I know him better than most people know him, because I
15   know who he is now and I know who he has been for the last
16   six years, and I just wanted to take this opportunity to
17   speak to Kevin's character and to the life that he was
18   leading with me prior to his arrest in December of 2005.

19        Kevin is one of the most sensitive people I have
20   ever met.  He is uniquely gentle, and he is uncommonly
21   generous, and he cares deeply about what happens to others,
22   whether they are human or animal.  He has always been drawn
23   to helping those who have no voice or whose voices have been
24   silenced, and it's one of the things that I love the most
25   about him.  His kindness and his compassion speak volumes.

1        Kevin is known by his friends and family to be a
2   gentle, soft-spoken individual with a strict adherence to
3   nonviolence.  He has a long history of using peaceful means
4   to educate the public on many important issues, and he has
5   worked on behalf of both humans and animals.  He has devoted
6   much of his time and energy into rescuing and rehabilitating
7   stray cats and dogs.

8        As I was going through our photos recently, I came
9   across dozens of pictures of dogs that Kevin and I had
10  picked up off the streets and taken care of while we were
11  searching for their human companions or finding them new
12  homes.

13       Despite having been steadily employed for the last
14  21 years, Kevin has always taken time out of his personal
15  life to help others.  He's the kind of person who would give
16  you the shirt off his back or the last dollar in his pocket
17  if you were in need.

18       His arrest came as a complete shock to me, to our
19  family, and to all of the friends who are a part of the life
20  that we have created together.  The crimes to which he has
21  pled guilty occurred years ago, and I believe he is a much
22  different person than he was then.  These crimes seem
23  antithetical to the nature of the person that I have shared
24  my life with over the last six years.

25       He never once spoke to me about his involvement in

1 | these illegal actions, and nor did he allude to his
2 | participation in them.  I understand now that his decision
3 | to keep all of this from me is a testament to the fact that
4 | he had left all of that behind.

5 | Kevin had clearly moved on in his life.  I never
6 | could have imagined our life taking such a devastating turn.
7 | For years, Kevin and I were both working hard, saving our
8 | money, and planning for our future.  We were thinking about
9 | getting married soon and starting a family.

10 | The Kevin that I know and love is a very
11 | dedicated, hardworking, and loyal person, and I believe his
12 | loyalty to his friends drew him into activities that he
13 | otherwise would have had nothing to do with.

14 | I think Kevin had long since realized that actions
15 | such as these do so much more harm than they do good.  I
16 | believe that he is sincerely remorseful for the role that he
17 | played in these crimes and the resulting damage that was
18 | done.  He recognizes the tremendous harm that he has caused
19 | as a result of his actions.  In the thousands of pages of
20 | letters that we have exchanged since his arrest, I have
21 | never seen or felt so much sadness.

22 | He never should have allowed himself to get swept
23 | up in a movement of people who felt it necessary to use
24 | arson as a means to draw public attention to some of the
25 | serious problems that are facing our generation.  Not only

1  were his actions counterproductive, they were reckless, they

2  were dangerous, and they were stupid.

3       He is very aware of the pain and suffering he has

4  caused, not only to his family, but to the victims of the

5  crimes that he participated in.  He has suffered greatly

6  over the last year and a half as a result.

7       He's made some very serious mistakes, and he is

8  prepared to serve the sentence that is handed down to him.

9  The seriousness of the crimes must be the basis for his

10 punishment, because there is no threat of recidivism, and he

11 was deterred long before his arrest.

12      I am only asking that you please take into

13 consideration Kevin's character, his withdrawal from the

14 movement, and the quiet, peaceful life that we were living

15 together prior to his arrest.

16      His decision to cooperate with the government

17 early on in this case has further isolated him from the

18 community of people with whom he had identified during that

19 period in his life, and it has put him at great risk in the

20 prison.  He's experienced harassment already while being

21 housed at the federal detention center in Sheridan.

22      I'm very concerned about Kevin's safety in prison,

23 and I hope that you will do everything you can to see to it

24 that he's designated to a low security facility.

25      Thank you for your time.

1       MR. FRIEDMAN:  As Ms. Page has just alluded to,
2   Kevin Tubbs has been cooperating with the government in this
3   case, and that cooperation has not -- unfortunately, has not
4   gone unnoticed.  The fact is that when he was at Sheridan,
5   he -- I guess there were some other folks there that had
6   seen some articles.  Some articles had been sent into the
7   prison.  And he was -- fortunately, he wasn't seriously
8   abused, but he was targeted.  In fact, you know, he had been
9   here in Lane County now for quite a number of months.  But
10  shortly before he left the Sheridan Detention Center, I
11  think it was a Mr. Laskey, you have heard that name before,
12  the neo-Nazi, had just been sent up there, and I guess he
13  had seen -- he went up with the knowledge, the information
14  that he had gotten from the Eugene papers about Mr. Tubbs
15  and Mr. Tubbs' cooperation, and that got spread out around
16  and he became a target.  And he -- fortunately, at one
17  point, they finally moved him to the other section there for
18  his safety, but it's been a difficult go of it.

19       I know the court has seen this article, and I know
20  it was shown yesterday.  This is from the -- I believe it's
21  a fairly recent *EarthFirst! Journal* of June 2006.  And the
22  article specifically references Mr. Tubbs.  The highlighting
23  doesn't come up, but Mr. Tubbs' is mentioned, and, again,
24  this is that same piece, the same piece in terms of
25  basically threatening physical harm to anyone that has

1   cooperated with the government in this type of a case or any
2   case.  We are certainly -- you have heard a lot of testimony
3   yesterday with regard to the need for protection, and we
4   would certainly ask this court to consider Mr. Tubbs in that
5   same circumstance as Mr. Meyerhoff, needing protection
6   within the -- the prison population.  We are certainly
7   hoping that the court can take whatever steps it can to
8   ensure that Mr. Tubbs is placed in an appropriate and safe
9   environment, and we'd ask that the court consider, as you
10  indicated yesterday for Mr. Meyerhoff, writing a letter on
11  his behalf and perhaps asking the U.S. Attorney's Office to
12  write a letter as well.

13          When we had first been negotiating this case or
14  actually getting close, I know the government had indicated
15  that they might be willing to do that, and we would
16  certainly ask them to do that as well.

17          Your Honor, we did send some corrections --
18  objections to the draft PSR, and I know that they were
19  received late by the PSR writer, and that was because of a
20  family emergency that came up for me.  So I was out -- I
21  lost a week on this case.  We did forward that.  And I know
22  that the -- Mr. Purdue had indicated that he would try and
23  address those concerns in a supplemental.  And when I spoke
24  with him this afternoon, he indicated that he had not had a
25  chance to do that.  What I would ask the court to do in this

1   circumstance, then, is consider those comments as part of

2   the PSR. And I would just like to address a few very -- the

3   bulk of our concerns were related to factual issues that we

4   had disputes over. And I don't know the extent to which

5   those are going to get resolved here today. Partly -- a lot

6   of it is, again, similar to the issues that we have with the

7   government's representation of what role Mr. Tubbs played

8   and certainly representations as far as what he did versus

9   perhaps what Mr. Ferguson has indicated.

10            But of particular concern, on Page 5, Paragraph

11   29, there is a reference to a trail of terror to influence

12   the government and when violence ended, and we would ask

13   that that kind of language be stricken. I mean, it's just

14   an unnecessary rhetorical flourish to the document. As the

15   court well knows, since the PSR is used as a bible for BOP,

16   that kind of information could be quite devastating.

17            Additionally, there is a reference on Page 20,

18   Paragraph 96, to a sophisticated device with regard to

19   Oakridge. And, again, as we have submitted to the court --

20   as we have argued to the court already, that Mr. Tubbs was

21   not responsible for that -- the device that was set at

22   Oakridge. We would further submit to the court that even

23   characterizing that as sophisticated, again, given the way

24   that BOP tends to overinterpret certain language, we would

25   ask that that sort of language be stricken.

1          Additionally, depending upon what we have
2    indicated in our letter on the PSR, is that the court direct
3    the PSR to be revised as to its findings with regard to the
4    terrorism enhancement and specifically with regard to the
5    application.  And what we would submit, Your Honor, is
6    should the court find that the terrorism enhancement does
7    not apply or specifically does not apply to certain of the
8    incidents in this case, that that language also be stricken
9    from the -- from a final PSR that would be submitted to the
10   court, and that's something that comes up a number of times.

11         What I would like to do at this point, unless --
12   there's one other thing, Your Honor.  We have submitted, as
13   part of our memorandum, a fairly lengthy section on
14   sentencing disparity.

15         And I don't know whether the court wants to hear
16   more on that or not.  I do have the -- the expert available
17   who helped us prepare that.  And essentially what we -- what
18   we did was provide the court with information to compare
19   what typical sentences were for arsons and arsons where the
20   terrorism enhancement had been applied and, particularly,
21   consideration with regard to cooperation and where -- how
22   those people fared.  And, again, I would leave it to the
23   court.  I can -- I am certainly prepared to provide that
24   further evidence on that, if the court wants, or leave it as
25   presented within our memorandum.

1          THE COURT:  If there's something more that needs
2    to be told.  Otherwise, if it's just going to be read out
3    loud to me, I don't need to have that.

4          MR. FRIEDMAN:  Actually, the witness would be here
5    simply to explain if the court had any questions.  If the
6    court doesn't, I'm fine with that.

7          THE COURT:  No.  No.

8          MR. FRIEDMAN:  Thank you.

9          Then, Your Honor, what I'd like to do is -- what I
10   have provided here, Your Honor, is a -- is an offense
11   calculation.  What we have done is provide our calculation
12   under the guidelines and, alongside that, placed the
13   calculations that came out of the PSR.  And what we have
14   hoped to show by this is that, with limited exceptions,
15   there is not a whole lot of difference.  Obviously, the
16   application of the terrorism enhancement is significant with
17   regard to each of the substantive offenses.  But absent
18   that, there are -- we are very close.

19         And I guess what I'd say specifically with regard
20   to Oakridge, where there's an indication -- the government
21   has indicated that -- or the PSR writer, rather, has
22   indicated a two-point enhancement for planning, we would
23   submit that this -- again, there was -- certainly on
24   Mr. Tubbs' part, there was absolutely no planning at all.
25         Additionally, the information with regard to --

1    any information that was received from Mr. Tubbs with regard
2    to this calculation or the government's calculations in this
3    case should be stricken, as it was received through the
4    course of the proffer.

5            And, again, I will address whether or not the
6    terrorism enhancement applies on that one in a moment.

7            With regard to the 844 -- with regard to Cavel
8    West, again, the basic calculation that we have, the base
9    level is identical. We would submit that it is appropriate
10   to add two points for planning with regard to Cavel West
11   since it was Mr. Tubbs that identified that site. However,
12   we would disagree with the PSR writer with regard to any
13   leadership role. He played no leadership role in that. As
14   we have indicated, it was Mr. Dibee that was the primary
15   organizer. He was the person that came up with the plan.
16   The only thing that Mr. Tubbs did at Cavel West was act
17   as -- locate the site, yes, but then act as a lookout and
18   driver. Beyond that, he played no role.

19           And, again, we would submit here that the
20   terrorism enhancement should not apply. There is -- again,
21   we would assert that any evidence that comes from
22   Mr. Tubbs's proffer is inadmissible. And with regard to the
23   motivation, we would submit that there has not been evidence
24   that somehow, way, shape, or form that there is a
25   terroristic motivation; in other words, motivation inclined

1   to influence government or retaliate against government or

2   intimidate government.

3           So we would submit that the enhancement should not

4   apply there.  What we have done at the side there -- so,

5   again, our adjusted offense calculation level is 21 there.

6   The government's, again, absent the terrorism enhancement,

7   absent the leadership role, we are -- we concur.

8           With regard to the BLM at Burns, again, the base

9   level is identical.  We would submit that 20 -- a level 20

10  is the appropriate.  And we would agree that there is --

11  again, as the PSR writer has indicated, there is no

12  leadership role.  There is no planning.

13          The only issue here is the application of the

14  terrorism enhancement on this case.  And, again, as I will

15  submit, first of all, evidence of the motivation, any

16  information that came from Mr. Tubbs would be inadmissible.

17  The only basis would be the -- the communique.  And we would

18  assert that the communique does not provide clear and

19  convincing evidence of an intent to influence -- influence

20  government.  And, again, I will have a little bit further

21  discussion on whether the enhancement can apply to

22  844(f)(1), the substantive counts, in a moment.

23          U.S. Forest Industries, the attempt.  Again, we

24  are concurring with the PSR writer with regard to base

25  level.  It appears that 20 is correct.  Again, we would

1  agree that there is no planning role, there is no leadership
2  role.  The sole issue is the application of the terrorist
3  enhancement here, and we would submit that there has not
4  been -- there is no clear and convincing evidence that would
5  support that.  And once again, Mr. Tubbs' statements should
6  not be admissible.

7          And, again, one of the things I suppose I have
8  said many times before this afternoon, but it is critical
9  that the court specifically consider Mr. Tubbs' role in each
10  of these offenses in terms of deciding whether or not, even
11  if the court were to otherwise find application of the
12  terrorist enhancement, whether that enhancement should apply
13  specifically to Mr. Tubbs.

14          Go down.

15          Again, with regard to Childers Meat, the only
16  issue -- the only issue here, I think, is property -- is the
17  amount of property damage, and our information and what we
18  originally based it upon was the discovery that we had
19  received, and the discovery that we had received, I've got a
20  little overhead that will show that in a moment, indicated a
21  lesser value.  And that's why we had a base level of 18.
22  Again, you know, if the government -- if the PSR writer is
23  correct with regard to that, then we would concur that the
24  adjusted level is 21 -- it's either 20 or 21.

25          Go down.

1          The EPD Station, again, base level, we have a

2     concurrence.  We have -- there was some question in our mind

3     whether or not this should be a level -- base -- excuse

4     me -- a base of 20 as opposed to a base of 6.  We are

5     prepared to concede that a base level 20 is probably

6     appropriate.  Again, we would agree that there is no

7     planning, there is no leadership role for Mr. Tubbs here.

8     Again, the sole question is the application of the

9     enhancement.  I am well aware, obviously, that the court

10    perhaps has made some findings in this -- with regard to

11    this incident already.  We would submit that this is not a

12    terrorist act, and certainly when we look at Mr. Tubbs' role

13    and his knowledge in this, it's -- it's essentially absent.

14    He is simply the guy that gets asked at the last minute to

15    show up and does.

16          Superior Lumber.  Again, we have concurrence with

17    regard to a base level of 19.  Again, there's some question

18    with regard to the value of the property damaged, and there

19    still may be some question with regard to that.  What we

20    would submit, Your Honor, though, that the PSR writer's

21    suggestion of a -- two points for planning with regard to

22    Superior Lumber is inappropriate.  Again, Mr. Tubbs played a

23    very limited role in this, and we would suggest that the two

24    additional points are not appropriate.

25          Additionally, we would submit, Your Honor, again,

1   that the terrorism enhancement does not apply.  There is no

2   indication that there was any intent to -- any essentially

3   terroristic motivation in this case, and we would ask the

4   court to not impose that here.

5        So essentially we are coming up with a -- again, a

6   very similar adjusted base level.  Again, I have got three

7   options there, and I think it really boils down to the

8   question of the damages and consideration of whether or not

9   Mr. Tubbs had enough of a role to be responsible for any

10  planning in this.

11       Again, Romania is one where base level, we would

12  concur on.  Again, when we were doing this, there was still

13  more of an issue in terms of the property, the amount of

14  damage.  We would agree that 19 is the appropriate base

15  level.

16       We would submit, Your Honor, that Mr. Tubbs should

17  not be responsible for any planning role in this.  The only

18  thing he did was yield to a friend and show up and stand

19  there for a few minutes as a lookout.  He played absolutely

20  no role in the organization of this.  This was

21  Mr. Meyerhoff's and other people's action -- excuse me --

22  action and certainly was not Mr. Tubbs' action at all.

23  Further, we would emphasize that given Mr. Tubbs's very,

24  very limited role in this, that the terrorism enhancement

25  should not be applied to him specifically in this case, and

1   we would ask the court to not do so.

2          And finally, with regard to Jefferson Poplar,

3   again, we have concurrence with regard to a base level of

4   19.  We would submit, again, this is one where Mr. Tubbs was

5   not even present at the time of the action.  His -- the only

6   thing he did was some six months earlier go to the site in

7   which he didn't even leave the car.  We would submit that

8   that does not constitute planning, and therefore, the

9   two-point adjustment is inappropriate.

10         Further, with regard to the terrorism enhancement

11  there, we would submit that, you know, as Mr. Tubbs played

12  absolutely no role in this -- in this action, that it would

13  be inappropriate to apply that enhancement to him in this

14  case.

15         Again, what we have got there is just simply the

16  government's calculations.

17         Go down.

18         And then finally, sort of the -- the multiple

19  count adjustment, again, taking the greater of the counts,

20  we submit that an adjusted level of 21 is appropriate.  We

21  would submit that absent the terrorism enhancement, the

22  government's calculation, their greater -- greater adjusted

23  role is 23.  We had initially calculated a combined offense

24  level of 5.  I am less certain of that right at this moment

25  whether or not that's -- that's right.  It might be.  It

1   might be less. And I certainly would leave the court -- but

2   we do obviously acknowledge that a combined offense level

3   does apply in this case.

4           Our calculation -- again, our calculation comes up

5   to a base level of 26. The government's, absent the

6   terrorism enhancement, is 28. The -- I'm sorry. The PSR

7   writer's, absent a terrorism enhancement, is 28, or 40 with.

8   45 is what the government says. Three points off for

9   acceptance of responsibility, leaving total offense levels

10   of -- for -- under our calculation, 23, under the

11   government's and the PSR writer's calculation, either a 25

12   or a 37, and then the government is 42.

13           The government initially had indicated that they

14   would offer -- they would ask the court to grant 12 levels

15   down for substantial cooperation, and we would certainly ask

16   this court to grant -- Mr. Tubbs has substantially

17   cooperated in this case. I mean, he's done everything he

18   could. I know that from the letter that they sent to the

19   court that they were indicating perhaps that there were was

20   some minimization on his part of his role, but what I would

21   submit, Your Honor, is it's not minimization -- he's not

22   attempting to minimize his role in any way, Your Honor.

23   What he is simply trying to do is be truthful about what his

24   role was, and if that doesn't exactly concur with the way

25   the government sees it from, you know -- essentially from

1    Mr. Ferguson, that doesn't constitute minimization.

2         Otherwise, he has been completely cooperative.  He

3    did, of course, wait until he had an opportunity to talk to

4    an attorney, and, as his attorney, I thought it would be

5    prudent to have an opportunity to see some of the discovery

6    before I could recommend to a client to cooperate with the

7    government or not.  So I certainly don't think that is

8    anything that should be taken against Mr. Tubbs in this case

9    and certainly would ask the court to grant him substantial

10   cooperation in this case.

11        Finally, Your Honor, in the opinion that you

12   issued earlier in the week, you indicated that the 844(f)(1)

13   counts do not apply because the conspiracy extended beyond

14   the date of the adoption of the Patriot Act, and therefore,

15   they don't apply.

16        But you left open the question of whether or not

17   those same acts can be separately considered.  And what we

18   would submit is a couple things.  And I -- I will tell you,

19   at this point, I'm not sure whether or not -- I know there's

20   one other counsel that may -- certainly has some interest in

21   this particular legal issue.  So I'm not sure whether or not

22   they want to chime in.  But let me try and address that as

23   best I can.

24        The fact is that under Rule 1B1.11(3), the

25   sentencing guidelines, indicates that the court is to use

1    the same set of guidelines if there are multiple counts.
2    And as this court has essentially already indicated -- and,
3    again, we understand that the guidelines are not the same
4    as -- as statutes.  However, the issue is that the
5    guidelines essentially incorporated any change in the
6    statute.  And on October 31st of 2001, those are the
7    guidelines.  Again, it's the November -- November 2000
8    guidelines we are using, but we are using them at the date
9    of the last act.  The date of the last act is October 31st,
10   2001.

11           At that point in time, the Patriot Act had passed,
12   but what the Patriot Act did specifically was exclude from
13   the terrorism enhancement 844(f)(1) -- 844(f)(1) crimes.

14           We would submit that it would be inconsistent for
15   the court to apply it in one case, in one situation under
16   the substantive act and not in the other.  And obviously,
17   it's clear that it does not apply with regard to the
18   conspiracies.

19           I understand that it's not a clear-cut situation
20   here, Your Honor.  This certainly is something that is quite
21   foggy.  And it's in just these situations, Your Honor, that
22   the rule of lenity must be applied, and we would submit that
23   that is the appropriate resolution of this matter, and that
24   would argue that this court has to decide that those counts
25   cannot be subject to the enhancement.

 1           Further, you know, the guidelines talk about the
 2    application -- you know, what happens when there's an ex
 3    post facto issue.  And I guess what I'd submit, Your Honor,
 4    is we almost have the inverse of that, whereas rather than a
 5    more severe situation applying than not, we have a less.
 6    And we would submit, Your Honor, that, again, the defendant
 7    is entitled to that benefit.
 8           Unless -- again, unless the court has further
 9    questions on that, that is my argument with regard to the --
10    that application there.
11           That's all I have.
12           THE COURT:  Mr. Engdall, did you want to respond?
13           MR. ENGDALL:  Unless the court has some questions,
14    we'd reject the notion of counsel.  The court has made its
15    decision with regard to the application of the terrorism
16    guideline.
17           I would like to comment, though, that the notion
18    that the defendant just gave rides out of loyalty to friends
19    time after time after time after time after time after time,
20    and, again, without knowing or realizing that the
21    individuals with whom he was involved before, the first time
22    were involved with arsons and the second and the third is
23    simply not credible.  Mr. Tubbs knew well what -- what he
24    was involved with.  And to try to avoid the criminal
25    liability and responsibility for his actions today I think

1   is -- is overreaching on the part of Mr. Tubbs.

2            THE COURT:  Do any of the other lawyers need to

3   enter into a discussion on the issue that was just raised?

4   I don't know that it's necessary, but I just want to give

5   you that opportunity.

6            MR. FEINER:  Your Honor, I would not have anything

7   to add to that, just reserving the right to present my

8   information on Tuesday.

9            THE COURT:  Okay.  We'll take a recess.  And I

10  will let you know when we are coming back, but I have got to

11  go do some calculations, and I wanted to listen to the

12  argument, and then we'll begin and I'll be happy to hear

13  from your client if he wishes to speak.  All right?

14            Thank you.

15            We are in recess.

16            THE CLERK:  Court is in recess.

17                        *(Recess.)*

18            THE COURT:  Please be seated.

19            Mr. Tubbs, I would like to know whether or not you

20  have had a chance to read the presentence report in this

21  case.

22            THE DEFENDANT:  Um, I did about 30 days ago, a

23  month ago or so.

24            THE COURT:  And you have had plenty of time to

25  talk it over with Mr. Friedman?

1          THE DEFENDANT:  I did.  I had a lot of concerns

2    about it, and I think I read somewhere in the law library at

3    Sheridan that I was supposed to see a final copy, like, ten

4    days before the sentencing hearing, but I understand that

5    Mr. Friedman hasn't gotten a revised copy back yet.  So I

6    haven't seen a -- if any changes have been made or not.

7          MR. FRIEDMAN:  Your Honor, we had submitted our

8    comments late, and it was my understanding -- we did receive

9    a final, essentially unchanged version.  And it was my

10   understanding that we were going to be -- that there might

11   have been a supplemental that was going to be provided, but

12   that apparently didn't --

13         THE COURT:  Mr. Friedman, it was impossible when

14   it was received on a date that gave Mr. Purdue no time in

15   which to make those corrections.  And what I indicated --

16   Ms. Wood yesterday made objections and asked for revisions

17   in the presentence report.  And she will submit those in

18   writing, and we will take a look at those.  I made notations

19   while she made the objections, and I have talked to

20   Mr. Purdue.  And it was my intention to indicate that

21   Mr. Purdue still has a need to respond to those objections,

22   and we were going to respond in writing and make the changes

23   as appropriate, in our view, after hearing from Mr. Purdue

24   and in the context of your objections.  So we would intend

25   to do that.  If your client wants to set over sentencing to

1   make sure he sees a final document, you should talk to him.

2   Otherwise, I'd ask him to waive any formality or any

3   objection to that and let us proceed.  But if he wants to

4   set it over and have that final version, that's fine with

5   me.

6               THE DEFENDANT:  We can go ahead.  We can go ahead,

7   Your Honor.

8               THE COURT:  And you understand how we'll proceed?

9               THE DEFENDANT:  Not exactly.

10              MR. FRIEDMAN:  It's -- let me explain.  It would

11  be my understanding, then, that we would submit our

12  objections in writing?

13              THE COURT:  My understanding is your objections

14  have been filed in writing, right?

15              MR. FRIEDMAN:  Yes, they have.

16              THE COURT:  And Mr. Purdue has those under

17  advisement, but certainly hasn't had the opportunity to

18  provide a final written, either correction or modification

19  or substantiation to the court so that we can make a

20  determination.

21              MR. FRIEDMAN:  Okay.  Do you understand?

22              THE DEFENDANT:  That's fine, Your Honor.

23              THE COURT:  So do you waive any objection to

24  seeing the final presentence report?  It's my view, in

25  looking at the letter that was -- that came in late, that it

1  may assist with having a final document that guides the BOP,
2  but I don't know that it's going to have a tremendous impact
3  on what the sentence will be in this case.
4          Is that a fair summary of the objections as you
5  glanced through the document that Mr. Friedman filed?
6          MR. PURDUE:  Yes, correct.  I believe that a
7  number of those objections have been brought before the
8  court today in his argument.
9          THE COURT:  Anything else?
10          THE DEFENDANT:  No, Your Honor.
11          THE COURT:  Is there anything you want to tell me
12  before I impose the sentence in this case?
13          THE DEFENDANT:  Yeah.  I have prepared a little
14  statement.  And before I start my statement, I do want to
15  point out that in it I -- there's several different issues
16  and concerns that had helped convince me earlier to get
17  involved with my codefendants, and I described what made me
18  feel so sad, scared, overwhelmed, and hopeless that I felt
19  that desperate and extreme actions were necessary.
20          But I want to point out to you and to emphasize to
21  the court and to everyone listening that I mention these
22  problems not as an excuse for my actions nor in any way to
23  justify any of the crimes that I was a participant in.  I
24  don't feel they were justifiable.  But I mention them,
25  rather, just to try to give people an understanding of some

1    of the concerns that were going on in my head, where I was
2    coming from, and how I got to where I am today, and let
3    people know what motivated me to make some of the choices I
4    did and why I felt such urgency and desperation and why I
5    felt that, in the absence of action, the future looked
6    bleak.

7         Despite my role in arsons, whether I was just a
8    lookout, just a driver, or even in the incident like
9    Oakridge Ranger Station where I didn't know what was going
10   to happen, I want to say that I'm disgusted, sickened,
11   saddened, and totally ashamed that I played any part in any
12   of the incidents.

13        And after I heard Ms. Ledbetter and Mr. Sullivan
14   talk this morning, I think that's their names, from the
15   Oakridge Ranger Station, I almost decided not to say my
16   statement at all, because, um, it seems like what was
17   concerning me and what was bugging me is so insignificant
18   and irrelevant to the damage and the pain and the suffering
19   that other people went through.  But after lunch -- during
20   the lunch break, I was thinking about it, and I thought, not
21   for myself, but just in case you want to know or anybody in
22   the audience or anybody wants to know where I'm coming from
23   and what motivated me, I decided to read it anyway.  But I
24   want to in no way to belittle or -- belittle the real
25   victims of these crimes or try to justify it, because that's

1   not my intent.  So thank you.

2          Um, first of all, I'd like to apologize to all of

3   the people and their families who were affected by these

4   crimes.  I am truly, deeply sorry and regretful.  I'd also

5   like to apologize to my mom, sister, niece, to my beautiful

6   and dedicated fiancee, Michelle, and to my family and

7   friends.  And I'd like to thank them for all of their

8   unconditional love and support.

9          Words cannot express how truly sorry I am to the

10  victims of these crimes, for the loss that they, their

11  colleagues, and their families experienced.  This is

12  especially saddening to me, because in an idealistic effort

13  to help reduce destruction and sorrow in the world, I ended

14  up creating a different but equally troubling kind of

15  destruction and sorrow.  This is unfortunate because, in the

16  crimes that I was a participant in, I was only motivated by

17  a passion to save animals' lives and a desire to help the

18  environment so that we could pass on a healthy and more

19  vibrant earth to our children and to future generations.

20          Though my actions were wrong and misguided, I

21  always acted out of love, never hate or retaliation or anger

22  at anyone.  And other than a deep loyalty to my friends, a

23  little bit of peer pressure, I was spurred on and motivated

24  by the continual and enormous scale of ecological

25  destruction taking place, as well as the extreme cruelty and

1  disregard for -- for all animals and life forms that is so
2  prevalent today.

3  We are facing a planetary emergency, but like the
4  fish who can't see the water because they are immersed in
5  it, we too are mostly blind to the ecological destruction
6  and the suffering of millions of animals around us.

7  As we too are immersed in that, and sometimes we
8  just choose not to see it, our beautiful and life-giving
9  earth is sick.  Nearly all of the rivers that provide us
10  with fresh drinking water are polluted and nearly -- and
11  recently 100% of the fish that were caught and tested from
12  rivers throughout all of North America were all found
13  contaminated with PCBs, fire retardants, and other toxic
14  chemicals.  The oceans are heavily polluted, phytoplankton
15  are dying and disappearing, and fish stocks are collapsing.
16  Excuse me.

17  Oxygen-giving forests in the U.S. and around the
18  world are being cut down, both legally and illegally, for
19  short-term economic gain.  Ice shelves and glaciers are
20  melting at an unprecedented rate, and fish, bird, and mammal
21  species teeter on the brink of extinction, with many being
22  pushed over that brink one individual animal at a time.

23  We sit back and watch helplessly or read about sea
24  turtles, marbled murrelets, owls, whales, polar bears, and
25  dozens of other animals getting pushed closer and closer to

1  extinction, and it is now predicted that before the first
2  half of this century is over, nearly 30% of all of the
3  species on this planet will be near extinction.  We are left
4  sitting as impotent observers, watching daily as these
5  problem neither slow down, stop, nor reverse course, but
6  they continue on, giving us a bleak and a depressing view of
7  the future.

8       I love America, and we are all very blessed to
9  live in this country, but our wealth helps insulate us from
10 the extreme and dire consequences of these issues.  But more
11 and more, we too are starting to suffer from the effects.
12 The earth's temperature continues to rise, the world's
13 fisheries are depleted, water pollution is endemic, and
14 topsoil is eroding at an alarming rate.  And locally right
15 here in Oregon, both our health and our economy are
16 suffering from collapsing salmon runs and fish stocks to
17 water shortages and ocean dead zones to food that pregnant
18 women and children are warned not to eat.

19      And now government consultants and NASA
20 administrators are warning us that climate change bringing
21 severe draught, devastating floods, and widespread hunger
22 and disease to our children and grandchildren is a national
23 security risk, one far greater, they say, than even
24 terrorism.

25      None of these facts excuses my behavior or makes

1   any of the actions that I helped out with all right,
2   helpful, or acceptable.  Nor does the scale or the
3   seriousness of these problems justify such drastic, hurtful,
4   and destructive measures.  But it does illustrate just a few
5   of the many reasons of what my intent was and what had
6   motivated me to help participate in these actions and join
7   others in a desperate but counterproductive and futile
8   effort to raise awareness.

9         As these problems got worse, action was a reprieve
10  from hopelessness, despair, and cynicism.  It's as if the
11  ecological destruction and the cataclysmic events that
12  follow it are a huge train bearing down on us and we are
13  asleep on the tracks.  I was just trying to do my part to
14  help wake us up.  It's in everybody's interest if we wake up
15  and address these issues.

16        Yesterday, Your Honor, you said that the reason we
17  don't yell fire in a building is because it causes people to
18  panic.  And though I didn't intend to cause anyone to panic,
19  I think my intent was to wake people up, alert them, raise
20  consciousness, and spark discussion on these issues.

21        When I helped out with these actions, my only
22  intent was with altruistic intentions.  I had nothing to
23  gain personally from helping out.  Not money, not glory, not
24  fame.

25        My intent was never to scare or to harm anybody,

1  nor was my intent to seek retribution against anybody.  But
2  it was just a desperate and naive effort to try to save some
3  animals' lives and try to wake us up and raise the
4  consciousness to problems that affect us all and, more
5  importantly, will be affecting our children and
6  grandchildren.

7          My behavior, though inexcusable and completely
8  reprehensible, was a desperate plea to try to alert people
9  and warn people about what type of legacy and what type of
10  world we want to pass on to future generations.

11          I mention all of this not to make a political
12  statement, nor to make excuses for my behavior, which I
13  concede was ignorant, thoughtless, stupid, and shortsighted.
14  But I mention it, rather, with a hope that some of these
15  issues are addressed and that corrective action is taken.
16  Otherwise, I fear a new generation will make the same
17  mistakes that we did and take their concerns to the
18  perceived source of the problems in an effort to address
19  these issues rather than to a courtroom or to a legislature.

20          The magnitude and scale of these global problems,
21  along with my innate sensitivity, love, and concern for
22  animals who have no voice of their own, my concern for our
23  earth and for future generations blinded me to the real harm
24  and the negative repercussions that my participation in
25  these events would bring to those people who were victimized

1   by these actions.

2          Though I never started any of these fires myself,
3   I completely and totally regret taking any part in any of
4   these incidents, no matter how small the role.  And I'm
5   deeply sorry to all of those people whose lives were
6   permanently and negatively affected by them.  Over the last
7   several years, efforts by Sir Richard Branson, Al Gore,
8   Woody Harrelson, and Barack Obama, as well as thousands of
9   other less famous but equally concerned citizens has shown
10  us that there is hope for the future and that there is a
11  better way to address these problems without being
12  destructive and without violating other people's rights.

13         I just wish I would have found a better and more
14  civil way to address these issues, such as through
15  legislation, like the current bill to ban horse slaughter,
16  and through the judicial system, which are not only more
17  civil, but tend to have bigger, more positive, and
18  longer-lasting results.

19         Again, I want to deeply apologize to all those
20  people who were affected by my participation in these
21  actions, and I want them to know that I'm truly very sorry
22  and very remorseful from the bottom of my heart for the
23  personal loss and suffering that they have endured.

24         If I could go back in time and stop it all from
25  happening again, believe me, I would, in a second, I

1 | absolutely would.

2 | I'd also like to apologize to my family, to my
3 | loving and beautiful fiancee, Michelle, and to my loved
4 | ones, and also to the court for having to deal with this
5 | issue.  Please accept my regrets and my sincerest apologies.
6 | The writer of the book of Proverbs wrote in Chapter 24
7 | Verses 13 and 14, that honey is sweet to your taste.  And so
8 | shall the knowledge of wisdom for your past mistakes be to
9 | your soul.  If you have found it, there is a prospect or
10 | future hope, and your hope will not be cut off.

11 | And to Judge Aiken, Your Honor, I beg and plead
12 | that you don't cut off our hope.  I beg for your compassion,
13 | your understanding, some mercy, and forgiveness.  I wish so
14 | badly I could go back and right all the wrongs that were
15 | done, but I can't.  There's been enough pain, sorrow, and
16 | loss already.  Too much.  And for that I am truly forever
17 | sorry.  I ask you, for my mother's sake, for the sake of my
18 | committed, faithful, and loving fiancee, Michelle, and for
19 | the sake of our future and our family together, to please
20 | don't cut off hope.  Please tender your justice today with
21 | some forgiving mercy.

22 | I hope that I have demonstrated, through my last
23 | five years of living peacefully in the community, becoming
24 | engaged, buying a home, and shunning all direct action, that
25 | I have proven my ability to live peacefully and productively

1   within the community and that I have rehabilitated myself

2   from the days when I acted desperately, stupidly, selfishly,

3   and recklessly, and that I have proven that I can be a

4   positive and contributing member of society. But most

5   importantly of all, I'd like to apologize to all the victims

6   of these crimes and let them know that I'm truly deeply

7   sorry and ask them to forgive me.

8           Thank you.

9           THE COURT:  What you may or may not be aware of is

10  that in Portland, small SUVs are being burned while we are

11  in this process.  Whether they are related or not, it really

12  just doesn't matter.  What you started is a chain of events

13  that gives people the understanding that there is this

14  widespread issue, there is a concern, and the only way to

15  get people's attention is to take radical action.  So

16  throughout the State of Oregon, back east, the calls that

17  come in are identifying Oregon with a place where, when you

18  don't like how things get done, you start fires.

19          And what about the air?  If you cared about the

20  environment, why burn all that was going up in the air and

21  polluting the environment?  Incredible thoughtlessness.

22          None of you were martyrs.  None of you should be

23  celebrated for what you did.  All of you should be given the

24  consequences of action and told there are other ways.  You

25  cannot take action on your own and damage people's property

1   and the governmental process, period.

2           Your mother raised you to be better than that.

3   And until you were arrested, I suspect she knew none of

4   this.  I'm not going to ask you whether you talked to her

5   about it or not.  But I strongly suspect that if you had

6   stopped for five minutes and said, gosh, my mother, who took

7   in animals and strays and taught me to be caring, what would

8   she think about what I'm doing, I suspect if you even asked

9   yourself that question, you wouldn't be here today.  And you

10  are older than most of the people who will come before me.

11  You knew better.

12          So after hearing everything today, I am simply

13  struck by the differences in this sentencing from that of

14  Mr. Meyerhoff.  Mr. Meyerhoff, although denying the

15  leadership role, fully and wholeheartedly accepted

16  responsibility for his criminal behavior and condemned his

17  prior action and those of his conspirators and expressed

18  true remorse.

19          And I think you have attempted to do that today

20  and I think you have made your best efforts.  And I heard

21  what you had to say.  And I hope you are sincere.  And like

22  Mr. Meyerhoff, you too should be thankful that the

23  government has been willing to offer and extend a negotiated

24  resolution that does allow you to reenter the community and

25  make amends.

1          They made a decision, they evaluated this case
2     very carefully, and they concluded that there were
3     consequences to extract, and, at the same time, when you
4     came -- when you would have the opportunity to come back in
5     the community, they saw something in you, or you convinced
6     them that you will be a law abiding and contributing member
7     of this society.

8          That is the best message you can provide to future
9     generations:  It simply wasn't worth it.  There are other
10    ways to help people see a different path.

11         But I do have to note that given the considerable
12    length and depth of your involvement in these crimes and the
13    uncharged relevant conduct, that, contrary to the repeated
14    attempts to minimize your participation, the facts just
15    simply speak otherwise.

16         I just have to call to your attention, I sat here
17    throughout the hearing thinking, hmm, Mr. Tubbs, you have
18    pled guilty to these offenses.  It was almost as though you
19    were denying much involvement.  And that struck me this
20    morning as I listened to your lawyer talk on and on.

21         I would have been more impressed had you simply
22    said, this is how it is.  I will take responsibility.  And
23    this -- one way or the other, I understand what I did, you
24    need to understand why I did it.  It was foolish.  I will
25    take my punishment like an adult and move on.  I was struck

1 by there's still an attempt to minimize or to sort of hang
2 on the fringe.

3 Regardless, I don't believe for one minute that
4 you were an unwilling and passive participant in most of
5 these crimes. It just, frankly, seems like you didn't want
6 to get your hands dirty. Yes, you were often, if not
7 always, the lookout man. But you also had the van that was
8 fraudulently registered in another's name during the
9 conspiracy that facilitated the crimes, rendering it most
10 convenient for you to be the driver and the lookout.

11 And I find your actions in obtaining the
12 fraudulent documents to be clear evidence of more than just
13 tagging along. In fact, I find that you were a facilitator
14 and an organizer. You clearly identified the Childers Meat
15 Company and Cavel West. You recruited others, Rebecca
16 Rubin, and possibly funded Mr. Meyerhoff so that he could
17 train others, and provided fraudulent identification to
18 others. And you agreed to become involved on your own
19 accord, knowing your actions were wrong, knowing they were
20 illegal, and knowing there would be a price to pay if you
21 were caught.

22 As with your conspirators, you planned and
23 committed acts of arson to intimidate and frighten people
24 into changing their conduct. You succeeded in one respect.
25 You frightened people and made them feel less secure in

1   their workplace and perhaps even their homes.

2           And, as you heard today, you even made lifelong

3   forest service employees, people who are dedicated to public

4   service, afraid to walk in the public forests.  You

5   destroyed their work, their possessions, and their sense of

6   trust.  And I find their appearance and words spoken today

7   to be particularly courageous.  And to further highlight the

8   cowardice of your actions, it makes me wonder whether others

9   who were victimized have not spoken out for fear they might

10  be targeted again.

11          As I said yesterday, fear and intimidation can

12  play no part in changing the hearts and minds of people in a

13  democracy.  Let me say it again.  Fear and intimidation can

14  play no part in changing the hearts and minds of people in a

15  democracy.

16          I reject the notion that many of your actions were

17  motivated by a desire to improve the plight of animals and

18  the environment.  Evidence of the arson of the Oakridge

19  Ranger Station committed after the efforts of legitimate

20  environmental activists and attorneys who secured a legal

21  halt to the logging at Warner Creek says that.  You saw

22  firsthand that lawful and positive action in support of

23  environmental protection could make a difference, and yet

24  you chose the act of arson and intimidation to further your

25  own interests, whatever those were.

1          In fact, your actions and those of your
2    conspirators branded proponents of environmental protection
3    as dangerous and irrational, thus making it more difficult
4    for those who attempt to achieve their goals through
5    legitimate means.

6          As with your conspirators, your actions were
7    systematic, and you used fear and intimidation in an attempt
8    to coerce others, including governmental employees trying to
9    do their jobs and serve the public, into changing their
10   behavior to achieve your goal.

11         Whether under the terrorism enhancement or an
12   upward departure within my discretion, you must be held
13   accountable for attempting to intimidate and retaliate
14   against government agencies and private individuals and
15   corporations.

16         Regardless of whether the target is private or a
17   public entity, intimidation of one is equally reprehensible
18   as the other.  Everyone has a right to feel safe in their
19   workplace, in their homes, and certainly within our public
20   forests.

21         And contrary to your attorney's arguments, I do
22   not need and need not rely on the government's
23   characterizations of your actions to support my findings.
24   Your actions speak for themselves.  Any claim that your
25   action at the Oakridge Ranger Station and the wild horse

1   corrals were not in retaliation against government conduct
2   simply belies credibility, as evidenced by the location and
3   timing of your actions and the words of the communiques, not
4   by any, quote, slant, unquote, that the government proposes.

5          How can you possibly claim that you were not
6   attempting to influence or retaliate against the conduct of
7   government or others?  The communiques express pride in
8   destroying the, quote, horse murdering plant, unquote, and
9   describe your efforts to halt the BLM's illegal and immoral
10  business of rounding up wild horses from public lands and
11  funneling them to slaughter.  These actions are not attempts
12  to raise public awareness.

13         Notably, I heard no mention that you began an
14  awareness campaign to call attention to the inhumane
15  treatment and slaughter of horses at Cavel West.  You just
16  thought torching the place would be more effective.

17         Concern for treatment of animals is commendable,
18  and many people take many positive actions to protect
19  animals.  They volunteer at shelters.  They rescue abused
20  horses.  They foster animals.  They work for changes in the
21  legislature.  They try to raise awareness.  They donate
22  their money and their time.  They do not commit arson.

23         Your attempt to shift the blame to Joseph Dibee
24  for the Cavel West is as misguided as your attempt to shift
25  the blame for the Oakridge Ranger Station to Jacob Ferguson.

1    This court is -- this court is to believe that your
2    involvement in significant arson activities that caused
3    millions of dollars of damage, cost people their jobs and
4    livelihood was just a coincidence?  I don't think so.  That
5    you found yourself driving to these scenes without the
6    knowledge of what was to occur?  I don't think so.  Even
7    though you obtained a fraudulent registration for your van,
8    presumably to avoid detection?  That you were unaware of the
9    motivation of others in the arson of Superior Lumber, Rock
10   Springs, U.S. Forest Industries, after you, yourself, were
11   involved in numerous arson activities?  You portray yourself
12   almost as a victim of your friends that you couldn't say no
13   to.  Yet you were involved in more arsons than almost any
14   other conspirator.  To coin a phrase, give me a break.

15          As Ms. Page concisely stated, your actions were
16   dangerous, reckless, and stupid.  You will need to earn and
17   deserve Ms. Page's love and respect, because I can only
18   imagine how stunned she was to learn of your past actions.
19   And it is laudable that she is standing by you.  But you
20   still have to earn that trust and respect back.

21          I understand you felt and hoped that these
22   criminal events were behind you and that you could move on.
23   Unfortunately, the victims of your illegal actions were not
24   so lucky.  They still feel the effects of your selfishness,
25   misguided and criminal acts.

1     It is troubling that even now at your sentencing,
2   you choose, really, again, not to truly step up and just
3   simply own up to your responsibility. I see you still as
4   minimizing. And you blame it on the entreaties of others
5   and your loneliness. However, over one year before the
6   arson of other targets, you and you alone targeted a dairy,
7   constructed the incendiary device similar to those used in
8   later arsons, and on Christmas Day, no less. Who can you
9   blame for that action? The evidence shows that you were
10  willing and able to take action on your own. The fact that
11  Jacob Ferguson, or anyone else, encouraged you to do so does
12  not lessen your responsibility or your culpability, and it
13  is disheartening that you still fail to realize that.

14     So I'm going to walk through the guideline
15  calculations.

16     I find the following guideline calculations apply
17  to the offenses as grouped pursuant to 3D1.1.

18     Case No. 60-60070 [sic], Count 1, conspiracy.

19     Pursuant to guideline 3D1.2, conspiracy is grouped
20  with the underlying substantive offense. Accordingly, the
21  conspiracy count is grouped with the substantive offenses
22  below.

23     Count 2, arson of the Oakridge fire station.

24     The base offense level for this offense is 6 with
25  an upward adjustment of 15 levels for the amount of loss,

1   and two levels for more than minimal planning.

2           Further, 844(f)(2) is enumerated as a federal

3   crime of violence, regardless of the 2001 amendments to

4   2332b(g)(5)(B), and I find that the evidence clearly

5   establishes that this offense created a substantial risk of

6   harm, based on the size and location of the fire and the

7   individual who occasionally slept there.  I further find

8   that the offense was calculated to retaliate against

9   government conduct, specifically, actions of the forest

10  service in their management of forest lands.  The temporal

11  proximity to defendant's participation in the Warner Creek

12  protest is significant.  Therefore, a 12-level enhancement

13  will apply, making the offense level of 35.

14          Count 3, arson of Cavel West.

15          The base offense level for this offense is 6, with

16  an upward adjustment of 13 levels for amount of loss under

17  2B1.3(b)(1), and two levels for more than minimal planning

18  under 2B1.3(b)(3).

19          I further find that the defendant played the role

20  of organizer in identifying Cavel West as a target of arson,

21  warranting a two-level upward departure -- upward

22  adjustment.

23          The government contends that this offense

24  qualifies for the terrorism enhancement because it was

25  motivated to retaliate against the BLM's sale of wild horses

1  to slaughterhouses.  If arson of the BLM horse corrals had

2  occurred first, I would have no problem finding that clear

3  and convincing evidence supported such a motivation.

4  However, those arsons occurred after Cavel West, and the

5  communique issued after this offense referred to the arson

6  itself and putting the, quote, horse murdering plant out of

7  business.  Therefore, I find the government has not

8  established that the offense was calculated to influence or

9  affect the conduct of government by intimidation or coercion

10  or to retaliate against government conduct, resulting in an

11  offense level of 23.

12           Count 4, BLM Burns Wild Horse Facility.

13           The base offense level for this offense is 20.

14           Further, I find that the offense was calculated to

15  influence, affect, or retaliate against government conduct,

16  as evidenced by the communique issued afterwards describing

17  the arson and horse release as efforts to stop the BLM's

18  illegal and immoral practice of rounding up wild horses that

19  eventually end up in the slaughterhouse.

20           The communique also states that the practice of

21  grazing cattle on public lands must stop and encourages

22  others to take action.

23           The only question is whether this court can

24  consider this offense in violation of § 844(f)(1), a federal

25  crime of terrorism, in light of the Patriot Act's 2001

1    amendment requiring that arson of government property must

2    include a substantial risk of harm or death before it may be

3    considered as a federal crime of terrorism.

4            It is difficult to find that there was a

5    substantial risk of harm because of the remoteness of the

6    corral and the fact that the fire was smoldering when

7    discovered.  Thus, the sole issue is whether the 2001

8    amendments apply to this offense, even though the offense

9    conduct was completed prior to the amendments.

10           In my opinion, I rejected defense counsel's

11   argument that the amendments rendered the guidelines a,

12   quote, revised edition.

13           I continue to reserve ruling on this issue, as

14   defendant Thurston intends to submit further argument.

15   Ultimately, whether this offense qualifies for the

16   enhancement does not affect my sentencing determination in

17   this case.  Therefore, the offense level is 20.

18           Count 5, attempted arson of the U.S. Forest

19   Industries.

20           The base offense level is 20.

21           The government maintains that this offense

22   qualifies for the terrorism enhancement because the U.S.

23   Forest Industries harvested timber from federal lands.

24   However, the communique issued after this offense referenced

25   the arson as, quote, retribution for all the wild forest

1    animals -- wild forests and animals, unquote, and that it
2    was, quote, payback and a warning, unquote, to greedy
3    companies.

4            I find that clear and convincing evidence does not
5    establish that the offense was calculated to influence or
6    affect the conduct of government by intimidation or
7    coercion, or to retaliate against government conduct,
8    resulting in an offense level, then, of 20.

9            Count 6, arson of Childers Meat Company.

10           The government agrees that this offense cannot be
11   considered as a federal crime of terrorism.  Therefore, I
12   find that the base offense level is 6, with an upward
13   adjustment of 13 levels for the amount of loss, and two
14   levels for more than minimal planning, resulting in an
15   offense level of 21.

16           Count 7, arson of the Eugene Police Department
17   Public Safety Station.

18           Pursuant to 2K1.4(a)(2), the base offense level is
19   20.

20           Further, 18 U.S.C. § 844(i) is enumerated under
21   2332b(g)(5)(B), and based on the totality of the evidence,
22   the only possible conclusion I can reach is that the
23   defendant intended to retaliate against the conduct of
24   government.  Regardless of defendant's role, he is
25   responsible for the conduct of others committed during the

Case 6:06-cr-60070-AA   Document 46-1   Filed 08/27/07   Page 148 of 160

1    commission of this offense.  Even if this offense does not

2    qualify as a terrorism enhancement because of the location

3    and nature of the intended target, a police substation, I

4    would exercise my discretion to depart upward under 5K2.0.

5    Therefore, the offense level is 32.

6              Count 8, arson of Superior Lumber.

7              The base offense level for this offense is 6, with

8    an upward adjustment of 13 levels for amount of loss under

9    2B1.3(b)(1), and two levels for more than minimal planning

10   under 2B1.3(b)(3).

11             The government contends that this offense

12   qualifies for the terrorism enhancement because Superior

13   Lumber harvested timber from federal lands.

14             However, the communique issued after this offense

15   referenced Superior Lumber as, quote, a typical earth raper

16   contributing to the ecological destruction of the northwest,

17   unquote, and that the defendants hoped to, quote, see an

18   escalation in tactics against capitalism and industry,

19   unquote.  It did not, however, mention any conduct of the

20   government.  Therefore, I find that the government has not

21   established that the offense was calculated to influence or

22   affect the conduct of government by intimidation, coercion,

23   or to retaliate against government conduct, resulting in a

24   base level offense of 21.

25             Counts 9 through 43, arson of Romania Chevrolet.

1          The base offense level for this offense is 6, with
2    a 13-level upward adjustment for amount of loss, and a
3    two-level upward departure for more than minimal planning.
4    Further, 844(i) is enumerated as a federal crime of
5    violence, and I find that the evidence clearly establishes
6    that this offense was calculated to retaliate against
7    government conduct, specifically, the arrest and prosecution
8    of Jeffrey Luers for arson at the very same location.  Even
9    though defendant served as a driver, he is responsible for
10   the conduct of his coconspirators during the commission of
11   this offense.  Therefore, a 12-level enhancement will apply,
12   and the total offense level is 33.
13          Counts 44 through 56, arson of Jefferson Poplar
14   Farm.
15          The base level for this offense is 6, with a
16   13-level upward adjustment for an amount of loss, and two
17   levels as an upward adjustment for more than minimal
18   planning.
19          As I found with Mr. Meyerhoff, the statement in
20   the communique reveals that the offense was intended to send
21   a message to the government that legislation is ineffectual.
22   As with the Romania Chevrolet offense, even though defendant
23   did not participate in the actual offense, his relevant
24   conduct includes the reasonably foreseeable actions of
25   others taken during the commission of this offense.  Thus, I

1    find that the purpose of the offense was to influence or

2    affect the conduct of government.

3           Because 18 U.S.C. § 844(i) is identified as a

4    federal crime of terrorism, a 12-level upward departure

5    applies.  Regardless, even if this offense did not qualify

6    for the enhancement, I would exercise my discretion under

7    United States Sentencing Guidelines 5K2.0 to depart upward.

8    Therefore, the base level offense is 33.

9           Finally, I decline to impose the terrorism

10   enhancement under the conspiracy count, given that I have

11   imposed the enhancement or imposed upward departures based

12   on group offenses.

13          Multiple count adjustment.

14          Pursuant to 3D1.4, the combined offense level for

15   multiple counts is determined by taking the offense level

16   applicable to the group with the highest offense level and

17   increasing that offense level by a specific amount.  In this

18   case, the group with the highest offense level is 35.  The

19   offense levels of the remaining groups total four units, and

20   the court must increase the offense level by four, resulting

21   in a combined offense level of 39.

22          Upward departures.

23          Under the sentencing guidelines section 5K2.0, I

24   have the discretion to depart where the guidelines do not

25   adequately take into account aggravating circumstances of

 1   the offense conduct.  Here 3A1.4 does not adequately take

 2   into account the defendant's intent to frighten, intimidate,

 3   and coerce government and private individuals through his

 4   actions.

 5          After the Childers Meat arson, the communique

 6   warned that the conspirators will continue to target these

 7   operations and their insurance companies until they are out

 8   of business.  These are powerful statements intended to

 9   coerce, frighten, and intimidate the owners of such

10   businesses and the people who work there.

11          Likewise, the communiques after the Cavel West,

12   Superior Lumber, U.S. Forest Industries, the Burns Wild

13   Horse Corral arsons all described enjoyment or satisfaction

14   in destroying property and encouraging or hoping that others

15   would take similar actions.

16          Therefore, I exercise my discretion under 5K2.0 to

17   depart upward by one level, resulting in a base offense

18   level of 40.  By upwardly departing only one level, I do not

19   intend to minimize the nature of defendant's conduct.

20   Rather, based on the grouping calculations, a one-level

21   increase results in the same offense level had the terrorism

22   enhancement applied.

23          Based on the agreements of the parties, the

24   defendant will receive a three-level downward adjustment for

25   acceptance of responsibility, resulting in an adjusted

1   offense level of 37.

2           Criminal history category.

3           The defendant has 0 criminal history points,

4   resulting in a criminal history category of I.  However,

5   under 3A1.4, the defendant's criminal history category is

6   established at a VI.

7           Therefore, based on an offense level of 37 and a

8   criminal history category of VI, the guidelines range is 360

9   months to life.

10          Do you have a motion, Mr. Engdall?

11          MR. ENGDALL:  Yes, Your Honor.

12          The government would move for substantial

13  assistance, a downward departure of 7 levels.  I believe

14  that gets us to a level 30, with a range of 168 to 210

15  months, and we would recommend he be sentenced at the low

16  end of that range, 168 months.

17          THE COURT:  In addition, I have the discretion to

18  depart downward pursuant to 5K2.0 for mitigating

19  circumstances not taken into account under the guidelines.

20  Therefore, I find that defendant's cooperation warrants a

21  one-level downward departure for -- taking the 8 to a 9 for

22  a total and final offense level of 29, with an applicable

23  guidelines range of 151 to 188 months.

24          In addition to all the material that I read,

25  everything that has been said today, I have not only gone

 1   through and carefully, in an attempt to adequately address
 2   guidelines calculations that the court must make, I have
 3   also looked very carefully at all the consideration the
 4   court is to give 18 U.S.C. § 3553 regarding the nature and
 5   circumstances of these offenses; your own criminal history
 6   and your characteristics; the goals of sentencing, be it
 7   punishment, deterrence, rehabilitation, or public safety;
 8   and other factors that I believe are important in fashioning
 9   a sentence that is reasonable but not greater than necessary
10   for these offenses.

11          And I have to tell you, it is profoundly, palpably
12   sad to know that this is yet about the second of eight -- or
13   a total of ten, eight more days to sit in this courtroom and
14   watch wasted minds, people damaged, the community debate
15   skewered sideways, the costs of putting you in a facility,
16   whether it's minimum, maximum, or something in between.  It
17   is incredibly depressing, when you could be out there
18   practicing random acts of kindness that would have had a
19   tremendous impact in the debate.

20          Can you imagine if you had started a fund and
21   purchased those horses and used them in a therapeutic way
22   with kids with handicapped disabilities?  Could you imagine
23   if you had gone out to Greenhill, they are in desperate need
24   of help, and offered to participate with your band of merry
25   friends to provide shelter for all the animals that are not

1    cared for?  Can you only imagine if you had gone out and

2    educated people and purchased property and given it as a

3    trust for generations to come?  But instead, all these acts

4    are destructive.  It makes no sense.

5             And what strikes me is so many of you are smart

6    people, and you had kind people in your life.  Why couldn't

7    kindness be your guide?  Why couldn't education be your

8    tool?  It's a question I will think about the rest of my

9    time on this bench.  Random acts of kindness.  I only wish

10   the communiques that were coming out now talked about,

11   that's the way we go.  Stop destroying the earth to get a

12   message across.  Care for the earth.  Care for one another.

13            So, taking all that into account, with regard to

14   Count 1, you are committed to the Bureau of Prisons for

15   confinement for a period of 60 months.

16            With regard to Count 2 through 56, you are

17   committed to the Bureau of Prisons for confinement for a

18   period of 151 months to be served concurrent with the

19   sentence imposed in Count 1 and with each other.

20            Now, Mr. Engdall, would you -- I looked, and I

21   probably should have been able to quickly reference the

22   restitution amount in your -- the slides, but I wasn't able

23   to do that.  The figure that I have is $10,652,533.

24            MR. ENGDALL:  That is correct, Your Honor.

25            THE COURT:  Is that the number?

1       MR. ENGDALL: We had an opportunity to visit with

2   the parole and probation department, and that is an accurate

3   figure. We'll accept that. Thank you.

4       THE COURT: All right.

5       You shall pay full restitution to the victims

6   identified in the presentence report in the amount of

7   $10,652 -- $652,533, jointly and severally with the

8   codefendant, Stanley Meyerhoff, Chelsea Gerlach, Joseph

9   Dibee, Daniel Gerard McGowan, Josephine Overaker, Suzanne

10  Savoie, Nathan Block, Joyanna Zacher, and I will waive

11  interest.

12      I know that over time, this is -- this figure

13  probably will never be paid. But for the rest of your life,

14  if you truly want to rehabilitate yourself, you will pay

15  every month, and you will pay whether you are obligated to

16  or not to pay back the damage that you caused.

17      In addition, you will be required to serve a

18  three-year term of supervised release subject to the

19  standard conditions and supervision requirements adopted by

20  this court and upon the following special conditions:

21      You shall cooperate in the collection of DNA as

22  directed by the probation officer if required by law.

23      I will recite, again, the restitution. You are to

24  pay full restitution to the victims identified in the

25  presentence report in the amount of $10,652,533, jointly and

1   severally with Stanislas Meyerhoff, Case No. 60-60078 [sic];

2   Chelsea Gerlach, 60-60079 [sic] and 60-60122 [sic]; Joseph

3   Dibee, 60-60011 [sic]; Daniel Gerard McGowan, 60-60124

4   [sic]; Josephine Overaker, 60-60011 [sic]; Suzanne Savoie,

5   60-60080 [sic]; Nathan Block, 60-60123 [sic]; and Joyanna

6   Zacher, 60-60126.

7          If there's an unpaid balance at the time that you

8   are released from custody, it shall be paid at the maximum

9   installment possible, but not less than $200 per month or

10  10% of gross income per month, whichever is greater.

11         You are prohibited from incurring new credit card

12  charges or opening additional lines of credit without the

13  approval of your probation officer.

14         You shall authorize release to the U.S. probation

15  office any and all financial information by means of a

16  release of financial information form or by any other

17  appropriate means as directed by your probation officer.

18         Your employment shall be subject to approval by

19  the probation officer.

20         You shall disclose all assets, liabilities to your

21  probation officer, and you shall not transfer, sell, give

22  away, or otherwise convey any asset with a fair market value

23  in excess of $500 without approval of the probation officer.

24         You shall have no contact with individuals known

25  to be or have been involved in the environmental or animal

| | |
|---|---|
| 1 | rights activism movement without approval of the court. |
| 2 | MR. FRIEDMAN: The only problem with that -- |
| 3 | THE COURT: And I have read, because I hadn't just |
| 4 | yet read Ms. Gerlach's statement and the arguments made by |
| 5 | Mr. Weinerman on her behalf, that I don't have any problem |
| 6 | if there's a submission of a list and they are well known |
| 7 | organizations that the court can have ready access to |
| 8 | information and can -- I will not infringe on their First |
| 9 | Amendment rights to participate to the extent they can be |
| 10 | involved in the -- say, for example, the Sierra Club or |
| 11 | generalized Audubon Society or those sorts of organizations. |
| 12 | I will have some discretion. |
| 13 | And believe it or not, I intend to be here when |
| 14 | all of you come out so that I can ensure that when you start |
| 15 | over out in the community, we are paying attention and that |
| 16 | you are contributing, not taking from this community. |
| 17 | Is that clear enough? |
| 18 | MR. FRIEDMAN: Definitely. That addresses it, |
| 19 | Your Honor. |
| 20 | THE COURT: I'm not imposing a fine. I'm making |
| 21 | the finding you don't have the financial resources, nor an |
| 22 | appreciable earning ability to pay the fine. |
| 23 | You are required by statute to pay the fee |
| 24 | assessment in the amount of $5,600. |
| 25 | You entered into a plea agreement which waives all |

1   or part of your appeal rights.  If you wish to file a notice

2   of appeal, you may do so.  If you cannot afford to do so,

3   contact the clerk's office.  It will be done for you and

4   done for free, but it must be done within ten days and will

5   be governed by your plea agreement.

6          I don't recall seeing a recommendation for

7   placement.  I will, on behalf of any defendant requesting

8   the -- a letter, I will do letters regarding placement.  And

9   very frankly, I'm going to write strong language that each

10  and every one of them should be put to work in programs

11  providing education to those who are less fortunate.

12          MR. FRIEDMAN:  With regard to placement, Your

13  Honor, we would like to do a little bit of research and be

14  able to advise the court within a week.

15          THE COURT:  I don't have a problem with that.  And

16  I'm sorry.  Mr. Purdue and Mr. Blasher would make themselves

17  available if the probation office can be of any help, and

18  I'm not certain any of us can, but you are more than welcome

19  to call them.

20          Anything else?  Did I miss anything, Mr. Engdall?

21          MR. ENGDALL:  No, Your Honor.  Thank you.

22          MR. FRIEDMAN:  No, thank you.

23          THE COURT:  Mr. Tubbs, good luck.

24          THE DEFENDANT:  Thank you.

25          THE CLERK:  Court is in recess.

1           *(The proceedings were concluded this*

2           *24th day of May, 2007.)*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

160

1        I hereby certify that the foregoing is a true and

2    correct transcript of the oral proceedings had in the

3    above-entitled matter, to the best of my skill and ability,

4    dated this 27th day of August, 2007.

5

6

7    _____

Kristi L. Anderson, Certified Realtime Reporter

8

9

10

11   

12

13

14

15

16

17

18

19

20

21

22

23

24

25